Nos. 25-1603 & 25-1659
25-1655 & 25-1657

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

RONALD L. SCHROEDER, et al.

and

NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, et al.,

*Plaintiffs-Appellants-Cross-Appellees,*

v.

MARIO TRETO, JR.,

*Defendant-Appellee-Cross-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of Illinois
Case Nos. 1:17-cv-04663 & 3:16-cv-50310

---

## CONSOLIDATED PRINCIPAL BRIEF OF APPELLANTS

---

Thomas G. Olp
Patrick T. Gillen
THOMAS MORE SOCIETY
309 W. Washington, Suite 1250
Chicago, IL 60606
(312) 782-1680
tolp@thomasmoresociety.org
pgillen@thomasmoresociety.org

*Counsel for Appellant-Cross-Appellee*
*Ronald L. Schroeder,*
*et al.*

Erin M. Hawley
John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
ehawley@ADFlegal.org
jbursch@ADFlegal.org

James A. Campbell
Erik C. Baptist
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
ebaptist@ADFlegal.org

Kevin H. Theriot
Julia C. Payne
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
ktheriot@ADFlegal.org
jpayne@ADFlegal.org

*Counsel for Appellants-Cross-Appellees*
*National Institute of Family & Life*
*Advocates, et al.*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-1655; 25-1657</u>

Short Caption: <u>National Institute of Family and Life Advocates et al v. Mario Treto, Jr.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>National Institute of Family and Life Advocates; Tri-County Crisis Pregnancy Center; The Life Center, Inc; Mosaic</u>

<u>Pregnancy & Health Centers</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Alliance Defending Freedom</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>s/ Erin M. Hawley</u>    Date: <u>05/05/25</u>

Attorney's Printed Name: <u>Erin M. Hawley</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address: <u>440 First Street, NW, Suite 600</u>

    <u>Washington, DC 20001</u>

Phone Number: <u>(202) 393-8690</u>    Fax Number: _____

E-Mail Address: <u>ehawley@adflegal.org</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1655; 25-1657

Short Caption: National Institute of Family and Life Advocates et al v. Mario Treto, Jr.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

National Institute of Family and Life Advocates; Tri-County Crisis Pregnancy Center; The Life Center, Inc; Mosaic

Pregnancy & Health Centers

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Alliance Defending Freedom

(3)   If the party, amicus or intervenor is a corporation:

  i)   Identify all its parent corporations, if any; and

  N/A

  ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

  N/A

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ John J. Bursch     Date: 05/02/25

Attorney's Printed Name: John J. Bursch

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: 440 1st St NW Suite 600, Washington D.C. 20001

Phone Number: (616) 450-4235     Fax Number:

E-Mail Address: jbursch@adflegal.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-1655; 25-1657</u>

Short Caption: <u>National Institute of Family and Life Advocates et al v. Mario Treto, Jr.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>National Institute of Family and Life Advocates; Tri-County Crisis Pregnancy Center; The Life Center, Inc; Mosaic</u>

<u>Pregnancy & Health Centers</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Alliance Defending Freedom</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>s/ James A. Campbell</u>    Date: <u>05/05/25</u>

Attorney's Printed Name: <u>James A. Campbell</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address: <u>44180 Riverside Parkway, Lansdowne, VA 20176</u>

Phone Number: <u>(571) 707-4655</u>    Fax Number: _____

E-Mail Address: <u>jcampbell@adflegal.org</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-1655; 25-1657</u>

Short Caption: <u>National Institute of Family and Life Advocates et al v. Mario Treto, Jr.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>National Institute of Family and Life Advocates; Tri-County Crisis Pregnancy Center; The Life Center, Inc; Mosaic</u>

<u>Pregnancy & Health Centers</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Alliance Defending Freedom</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>s/Erik Baptist</u>      Date: <u>05/05/25</u>

Attorney's Printed Name: <u>Erik Baptist</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐   **No** ☑

Address: <u>44180 Riverside Parkway, Lansdowne, VA 20176</u>

Phone Number: <u>(571) 707-4751</u>      Fax Number: _____

E-Mail Address: <u>ebaptist@adflegal.org</u>

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1655; 25-1657

Short Caption: National Institute of Family and Life Advocates et al v. Mario Treto, Jr.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

National Institute of Family and Life Advocates; Tri-County Crisis Pregnancy Center; The Life Center, Inc; Mosaic

Pregnancy & Health Centers

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Alliance Defending Freedom

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Kevin H. Theriot    Date: 05/02/25

Attorney's Printed Name:  Kevin H. Theriot

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address:  15100 N. 90th St., Scottsdale, AZ 85260

Phone Number: 480-444-0020    Fax Number:

E-Mail Address: ktheriot@adflegal.org

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>25-1655; 25-1657</u>

Short Caption: <u>National Institute of Family and Life Advocates et al v. Mario Treto, Jr.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

      ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>National Institute of Family and Life Advocates; Tri-County Crisis Pregnancy Center; The Life Center, Inc; Mosaic</u>

<u>Pregnancy & Health Centers</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Alliance Defending Freedom</u>

(3)    If the party, amicus or intervenor is a corporation:

     i)      Identify all its parent corporations, if any; and

         <u>N/A</u>

     ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

     <u>N/A</u>

Attorney's Signature: <u>s/ Julia C. Payne</u>      Date: <u>05/02/25</u>

Attorney's Printed Name: <u>Julia C. Payne</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address: <u>15100 N. 90th St., Scottsdale, AZ 85260</u>

Phone Number: <u>480-444-0020</u>      Fax Number: _____

E-Mail Address: <u>jpayne@adflegal.org</u>

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-1603</u>

Short Caption: <u>Ronald L. Schroeder, et al., v. Mario Treto, Jr.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

       ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>1. Ronald Schroeder, individual.; 2. Women's Help Services (name change from 1st Way Pregnancy Support</u>

<u>Services), non-profit corporation; (3) Pregnancy Aid South Suburbs, non-profit corporation.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Thomas More Society, 309 W. Washington, Suite 1250, Chicago, IL 60606</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>Women's Help Services, none; Pregnancy Aid South Suburbs, none.</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>Women's Help Services, none; Pregnancy Aid South Suburbs, none.</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Thomas Olp</u>    Date: <u>April 30, 2025</u>

Attorney's Printed Name: <u>Thomas Olp</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑  No ☐

Address: <u>309 W. Washington, Suite 1250</u>

        <u>Chicago, IL 60606</u>

Phone Number: <u>312-782-1680</u>    Fax Number: <u>    </u>

E-Mail Address: <u>tolp@thomasmoresociety.org</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1603

Short Caption: Ronald L. Schroeder, et al., v. Mario Treto, Jr.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

1.Ronald Schroeder, individual; 2. Women's help Services (name changed from 1st Way Pregnancy Support Services), non-profit corporation; 3) Pregnancy Aid South Suburbs, non-profit corporation.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Thomas More Society, 309 W. Washington, Suite 1250, Chicago, IL 60606

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

Women's Help Services, none; Pregnancy Aid South Suburbs, none.

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

Women's Help Services, none; Pregnancy Aid South Suburbs, none.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Patrick Gillen    Date: May 28, 2025

Attorney's Printed Name: Patrick Gillen

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes [ ] No [✔]

Address: 309 W. Washington, Suite 1250

Chicago, IL 60606

Phone Number: 312-782-1680    Fax Number:

E-Mail Address: pgillen@thomasmoresociety.org

rev. 12/19 AK

# TABLE OF CONTENTS

Table of Authorities ..................................................................................... iii

Introduction ................................................................................................. 1

Statement of Jurisdiction ............................................................................ 2

Statement of Issues .................................................................................... 3

Statement of the Case ................................................................................ 4

Summary of the Argument ........................................................................ 10

Standard of Review .................................................................................... 12

Argument .................................................................................................... 12

I.      The Referral Requirement violates the Free Speech Clause. ......................... 13

        A.      The Referral Requirement regulates speech based on its content
                and viewpoint. ....................................................................... 14

        B.      The District Court erred by finding that the Referral
                Requirement regulates only conduct. ....................................... 16

        C.      The District Court erred by concluding that the Referral
                Requirement regulates only speech incidental to conduct. ................. 23

        D.      The State is wrong that the "truthful, non-misleading" standard
                applies because the Referral Requirement is not an informed
                consent provision. ................................................................. 25

        E.      The Referral Requirement fails strict scrutiny. .................................. 27

        F.      The Referral Requirement fails intermediate scrutiny. ........................ 28

II.     The Referral Requirement violates the Free Exercise Clause. ...................... 29

        A.      The Referral Requirement coerces only religious providers to
                refer, not their secular counterparts. ....................................... 30

        B.      The Referral Requirement fails strict scrutiny. .................................. 32

Conclusion .................................................................................................. 32

Certificate of Compliance .......................................................................... 34

Certificate of Service..................................................................................... 35

Circuit Rule 30(d) Statement ........................................................................ 36

Required Short Appendix ............................................................................... 37

# TABLE OF AUTHORITIES

## Cases

*1-800-411-Pain Referral Service, LLC v. Otto,*
    744 F.3d 1045 (8th Cir. 2014) ........................................................ 20

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ............................................................... 13, 25

*Agency for International Development v. Alliance for Open Society International, Inc.,*
    570 U.S. 205 (2013) .................................................................... 13

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001) .................................................................... 17

*Board of County Commissioners v. Umbehr,*
    518 U.S. 668 (1996) .................................................................... 13

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) .................................................................... 27

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) .................................................................... 31

*DeBoer v. Village of Oak Park,*
    267 F.3d 558 (7th Cir. 2001) ........................................................ 14

*Doe v. Rokita,*
    54 F.4th 518 (7th Cir. 2022) .................................................... 22, 23

*Dual-Temp of Illinois, Inc. v. Hench Control, Inc.,*
    821 F.3d 866 (7th Cir. 2016) ........................................................ 12

*E.M.W. Women's Surgical Center, P.S.C. v. Beshear,*
    920 F.3d 421 (6th Cir. 2019) ........................................................ 26

*Edenfield v. Fane,*
    507 U.S. 761 (1993) ............................................................... 27, 29

*Espinoza v. Montana Department of Revenue,*
    591 U.S. 464 (2020) ............................................................... 31, 32

*Expressions Hair Design v. Schneiderman,*
    581 U.S. 37 (2017) ...................................................................... 24

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ..................................................................... 30

*Giboney v. Empire Storage & Ice Company,*
    336 U.S. 490 (1949) ..................................................................... 18

*Hodgkins v. Peterson,*
    355 F.3d 1048 (7th Cir. 2004) ..................................................... 24

*Janus v. American Federation of State, County & Municipal Employees,*
    *Council 31,*
    585 U.S. 878 (2018) ....................................................................... 1

*K.C. v. Individual Members of the Medical Licensing Board of Indiana,*
    121 F.4th 604 (7th Cir. 2024) ............................................... passim

*Kennedy v. Bremerton School District,*
    597 U.S. 507 (2022) .............................................................. 29, 30

*Kory v. Bonta,*
    2024 U.S. Dist. Lexis 73845 ........................................................ 20

*Libertarian Party of Indiana v. Packard,*
    741 F.2d 981 (7th Cir. 1984) ....................................................... 13

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
    584 U.S. 617 (2018) ..................................................................... 30

*Mayor & City Council of Baltimore v. Azar,*
    2019 WL 4415539 (D. Md. Sept. 12, 2019) ................................. 20

*Miami Herald Publishing Company v. Tornillo,*
    418 U.S. 241 (1974) ..................................................................... 25

*NAACP v. Button,*
    371 U.S. 415 (1963) ............................................................... 20, 21

*National Institute of Family & Life Advocates. v. Becerra,*
    585 U.S. 755 (2018) ............................................................... passim

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ......................................... 16, 17, 22

*Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, Kentucky, Inc.*
    *v. Commissioner, Indiana State Department of Health,*
    732 F. Supp. 3d 971 (S.D. Ind. 2024) ......................................... 20

*Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health,*
 699 F.3d 962 (7th Cir. 2012) ........................................................... 12

*Planned Parenthood of Southeast Pennsylvania v. Casey,*
 505 U.S. 833 (1992) ................................................................................ 22

*Reed v. Town of Gilbert,*
 576 U.S. 155 (2015) ............................................................ 14, 16, 27

*Riley v. National Federation of the Blind of North Carolina, Inc.,*
 487 U.S. 781 (1988) .................................................................... 15, 21

*Rosenberger v. Rector & Visitors of University of Virginia,*
 515 U.S. 819 (1995) ............................................................................... 14

*Rust v. Sullivan,*
 500 U.S. 173 (1991) ............................................................................... 20

*Tandon v. Newsom,*
 593 U.S. 61 (2021) .................................................................................. 30

*Texas v. Johnson,*
 491 U.S. 397 (1989) ............................................................................... 16

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
 582 U.S. 449 (2017) ........................................................................ 13, 30

*Turner Broadcasting System, Inc. v. F.C.C.,*
 512 U.S. 622 (1994) ......................................................... 1, 21, 28

*United States v. Alvarez,*
 567 U.S. 709 (2012) ............................................................................... 21

*United States v. O'Brien,*
 391 U.S. 367 (1968) ................................................................. 23, 24, 29

*United States v. Price,*
 775 F.3d 828 (7th Cir. 2014) ......................................................... 17

*United States v. Stevens,*
 559 U.S. 460 (2010) ............................................................................... 21

*United States v. White,*
 610 F.3d 956 (7th Cir. 2010) ......................................................... 18

*Valley Family Planning v. State of North Dakota,*
    489 F. Supp. 238 (D.N.D. 1980) ................................................ 20

*Valley Family Planning v. State of North Dakota,*
    661 F.2d 99 (8th Cir. 1981) .................................................... 20

*Wollschlaeger v. Governor, Florida,*
    848 F.3d 1293 (11th Cir. 2017) ................................................ 24

**Statutes**

28 U.S.C. § 1291 .......................................................................... 3

28 U.S.C. § 1331 .......................................................................... 2

28 U.S.C. § 1343 .......................................................................... 2

28 U.S.C. § 1361 .......................................................................... 2

28 U.S.C. § 1367 .......................................................................... 2

42 C.F.R. § 489.24 ....................................................................... 6

42 U.S.C. § 1983 .......................................................................... 2

745 Ill. Comp. Stat. 70/4 .............................................................. 5

745 Ill. Comp. Stat. 70/6 ........................................................... 2, 5

745 Ill. Comp. Stat. 70/6.1 ................................................... passim

745 Ill. Comp. Stat. 70/9 .............................................................. 5

Ind. Code § 16-34-2-1.1 ............................................................. 22

**Other Authorities**

American Medical Association, *1.2.3 – Consultation, Referral, and Second
    Opinions*, AMA Code of Medical Ethics ................................ 19

*Informed Consent*, Black's Law Dictionary (12th ed. 2024) ...................... 26

*Refer*, Taber's Cyclopedic Medical Dictionary (F.A. Davis Co. 2025) ............ 19

*Transfer*, Taber's Cyclopedic Medical Dictionary (F.A. Davis Co. 2025) .......... 6

**INTRODUCTION**

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). Laws that compel individuals to speak when they'd prefer to remain silent "pose the inherent risk that the Government" may seek to "manipulate the public debate through coercion." *Id.* Thus, the First Amendment prohibits conditioning a public benefit on compelled speech. *See Janus v. Am. Fed'n of State, Cnty. & Mun. Employees, Council 31*, 585 U.S. 878, 893, 902 (2018). This is especially so when government-coerced speech compels individuals to be complicit in a medical procedure that violates their most deeply held beliefs.

This appeal concerns whether the government may compel pro-life pregnancy centers to refer clients for abortion or provide clients with a list of providers that they reasonably believe offer abortion as a condition of receiving statutory conscience protection. The district court said yes, concluding that this requirement regulated professional conduct, not speech. But that decision flies in the face of *National Institute of Family & Life Advocates. v. Becerra*, which held that a state may *not* compel pro-life pregnancy centers to "inform women how they can obtain … abortions." 585 U.S. 755, 766 (2018) ("*NIFLA*").

The State here conditions the conscience rights of pro-life health care providers on their willingness to refer for and extol the purported benefits of abortion, the very procedure that violates their faith. That conditioning of conscience rights on compelled speech is unconstitutional under both the Free

Exercise and Free Speech Clauses of the First Amendment. And for good reason: "the people lose when the government is the one deciding which ideas should prevail." *Id.* at 772. This Court should reverse the district court's decision allowing Illinois to enforce its law coercing abortion referral in violation of the centers' free speech and free exercise rights.

## STATEMENT OF JURISDICTION

The National Institute of Family and Life Advocates (NIFLA)—a Virginia corporation with its principal place of business in Virginia—along with three Illinois corporations with principal places of business in Illinois—Tri-County Crisis Pregnancy Center, The Life Center, Inc., and Mosaic Pregnancy & Health Centers— (collectively, "the NIFLA Plaintiffs") filed suit under 42 U.S.C. § 1983 for injunctive relief against the Defendant Illinois Attorney General. Dr. Ronald L. Shroeder—an Illinois physician—and two Illinois corporations with principal places of business in Illinois—1st Way Pregnancy Support Services and Pregnancy Aid South Suburbs— (collectively, "the Schroeder Plaintiffs") filed a separate action under 42 U.S.C. § 1983 for injunctive relief against the Attorney General. Both sets of Plaintiffs sought invalidation of 745 Ill. Comp. Stat. 70/6.1(1) and (3) under the Free Speech and Free Exercise Clauses of the First Amendment. The district court had subject matter jurisdiction over both cases under 28 U.S.C. §§ 1331, 1343, 1361, and 1367.

On April 4, 2025, the district court entered final judgment in both cases, holding that 745 Ill. Comp. Stat. 70/6.1(1) was unconstitutional under the Free Speech Clause, but that 745 Ill. Comp. Stat. 70/6.1(3) did not violate the Free Speech or the Free Exercise Clause. Appellants' Required Short Appendix ("RSA")

RSA-59, 118. No party filed a motion for a new trial or alteration of the judgment. On April 9, 2025, the Schroeder Plaintiffs filed a notice of appeal to the Seventh Circuit. Appellants' Separate Appendix ("SA") SA-745. The NIFLA Plaintiffs also filed a notice of appeal to the Seventh Circuit on April 17, 2025. SA-740. Attorney General Treto filed a notice of appeal in the Schroeder case on April 17, 2025, SA-747, and a notice of appeal in the NIFLA case on April 18, 2025, SA-743. This Court consolidated all four appeals. This is not an appeal from a decision by a magistrate judge. This Court has jurisdiction over this appeal of a final judgment by a district court under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Illinois's Health Care Right of Conscience Act conditions statutory conscience protections for pro-life health care providers on their willingness to refer for an elective abortion or provide a written list of providers they believe will perform such an abortion, the very procedure that violates their faith. The question presented is: Does it violate the Free Speech or Free Exercise Clauses of the First Amendment for the government to coerce pro-life health care facilities and providers, which have conscience-based objections to elective abortion, to provide a referral for, or give patients a written list of providers that offer, such abortions?

# STATEMENT OF THE CASE

## I.    The Pregnancy Centers

NIFLA is a religious organization comprised of member pregnancy centers from across the nation. SA-2–3. NIFLA has 40 pregnancy center members in Illinois, including Tri-County Crisis Pregnancy Center (Informed Choices), TLC Pregnancy Services (TLC), and Mosaic Pregnancy and Health Centers (Mosaic). SA-4. All three pregnancy centers are religious non-profits that offer pregnancy tests, ultrasounds, and counseling about pregnancy options. SA-4, 74–75, 80, 128, 134, 154–55, 175–76.

Dr. Ronald Schroeder is the volunteer Medical Director for Options-Now/Thrive Metro-East, an Illinois pregnancy center (Options Now). SA-2–3. 1st Way Pregnancy Support Services (Focus) and Pregnancy Aid South Suburbs (PASS) are also Illinois nonprofit pregnancy centers. SA-3. All three pregnancy centers are religiously inspired faith-based organizations. SA-3. They assist women in unplanned pregnancies by providing information, compassionate counsel, and material support. SA-4. These centers provide limited medical services, including pregnancy testing, ultrasounds, and, in some cases, STD testing and treatment. SA-6.

Both the NIFLA Plaintiffs and the Schroeder Plaintiffs (collectively, the Pregnancy Centers) seek to "empower the choice for life" by "provid[ing] information, health care services, and material support free of charge." SA-4–5. The Pregnancy Centers believe that abortion ends a human life, SA-5, and that abortion has no benefits for women, SA-3; RSA-10. None of the Pregnancy Centers provide,

refer for, or otherwise facilitate access to abortion due to their religious beliefs that abortion ends a human life. SA-5. Referring patients to an abortion provider would make them complicit in a procedure that violates their deeply held religious beliefs. *Id.*

## II.     Illinois's Health Care Right of Conscience Act

Illinois's Health Care Rights of Conscience Act (HRCA) provides certain conscience protections for health care providers. It authorizes an affirmative defense against civil and criminal liability for providers who "refuse to perform, assist, counsel, suggest, recommend, refer or participate" in a "health care service" that violates his or her "conscience." 745 Ill. Comp. Stat. 70/4. The HRCA also provides an affirmative defense for any person who "owns, operates, supervises, or manages a health care facility" that refuses "to permit or provide a particular form of health care service" that violates the facility's conscience. 745 Ill. Comp. Stat. 70/9.

Under these provisions, pro-life health care providers have an affirmative defense against civil or criminal liability if they refuse to perform, assist, suggest, or refer for an abortion because it violates their conscience. These statutory defenses do not apply in emergency situations. 745 Ill. Comp. Stat. 70/6 (describing the statutory conscience protection and stating that "[n]othing in this Act shall be construed so as to relieve a physician or other health care personnel from obligations under the law of providing emergency medical care"); 745 Ill. Comp. Stat. 70/9 (addressing liability and providing that "[n]othing in this Act shall be

construed so as to relieve a physician, health care personnel, or a health care facility from obligations under the law of providing emergency medical care").

Bizarrely, Section 6.1 amended the HCRA to *condition* its conscience protections for pro-life health care providers on those providers' willingness to violate their conscience. Specifically, to obtain protection, providers must now refer for and extoll the benefits of abortion. First, the **Benefits-Discussion Requirement** in Section 6.1(1) requires that the Pregnancy Centers "shall inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options," including abortion. 745 Ill. Comp. Stat. 70/6.1(1). This provision thus compels conscientious objectors to disclose the "benefits" of abortion. RSA-36 (noting that "the compelled disclosures required by Section 6.1(1)" include "the risks and benefits of abortion and childbirth"). Second, the **Referral Requirement** in Section 6.1(3) requires that "[i]f requested by the patient or the legal representative of the patient," the Pregnancy Centers "shall: (i) refer the patient to, or (ii) transfer the patient to, or (iii) provide in writing information to the patient about other health care providers who they reasonably believe may offer" abortion. 745 Ill. Comp. Stat. 70/6.1(3).[1] This provision thus conditions conscience protections on the Pregnancy Centers referring a patient for abortion or providing

---

[1] "Transfer" is defined by federal law as "the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated … with) the hospital." 42 C.F.R. § 489.24(b). Medical dictionaries agree. *See Transfer*, Taber's Cyclopedic Medical Dictionary (F.A. Davis Co. 2025) (defining transfer to mean "[t]o move from one place to another"). Because the Pregnancy Centers are not hospitals or a facility that otherwise admits patients, they do not transfer patients.

written information about providers whom they believe will perform one. In short, the "conscience-based actions [of the Pregnancy Centers] are unprotected" unless they sing the benefits of and then refer patients for abortion. RSA-7. The district court acknowledged that only referrals for elective abortions are at issue because the Pregnancy Centers do not consider treatment for ectopic pregnancies or life-threatening emergencies to be an abortion. RSA-18.

The Pregnancy Centers sued, challenging both the Benefits-Discussion Requirement and the Referral Requirement under the Free Speech and Free Exercise Clauses of the First Amendment.

## III. The District Court's Decision

In April 2025, the district court issued a decision granting final judgment to the Pregnancy Centers on the Benefits-Discussion Requirement and to the State on the Referral Requirement.

In its ruling, the district court made a series of initial findings. It found that the State had produced no evidence to support its claim that the Referral Requirement and Benefits-Discussion Requirement were necessary to protect the health of women when health care providers refuse to be complicit in abortion. RSA-2–4 (discussing State's failure of proof). The court also found that the State presented no evidence that any woman had been harmed, even though the Referral Requirement and Benefits-Discussion Requirement had been enjoined for almost ten years. RSA-3.

The court first considered the Benefits-Discussion Requirement, finding the requirement that the Pregnancy Centers extol the benefits of abortion to be unconstitutional under the Free Speech Clause. The court held that the provision plainly "regulates speech, implicating the First Amendment." RSA-17. The court then found the requirement that the Pregnancy Centers tell patients about the benefits of abortion to be content- and viewpoint-based because it "makes the providers 'instruments' in delivering a particular message." RSA-17–18. And the court found that the Benefits-Discussion Requirement is not an informed consent requirement because it is not connected to a specific medical procedure that the Pregnancy Centers provide. RSA-34–40. It explained that "a statute qualifies as an informed consent provision—and therefore incidental to conduct—when it requires a health care professional, before she performs a medical procedure, to discuss the nature or consequences of the impending medical procedure." RSA-31.

The court then applied strict scrutiny, holding that the Benefits-Discussion Requirement "fails strict scrutiny because it's fatally overbroad." RSA-41–42. The court rejected the State's argument that the requirement was constitutional because the "standard of care" already required doctors to discuss the benefits and risks of abortion. RSA-12. To the contrary, the court determined that "all the evidence shows … that the standard of care *doesn't* require a binding, uniform benefits discussion," but rather "depends on the specific factual circumstances presented to the health care professional." RSA-12–13 (emphasis added).

Conversely, the lower court upheld the Referral Requirement because, according to the court, that requirement "doesn't implicate speech." RSA-43. The court suggested that the Referral Requirement does not "require[] health care professionals to *say* something to obtain immunity from civil or criminal liability," but merely "explains what covered people and entities must *do* to earn immunity after the triggering event occurs: refer, transfer, or provide written information." RSA-43.

To support this proposition, the lower court relied on this Court's decision in *K.C. v. Individual Members of the Medical Licensing Board of Indiana*, 121 F.4th 604 (7th Cir. 2024). RSA-45–46. But that case held that referrals *were* speech. *K.C.*, 121 F.4th at 628. They were just unprotected in *K.C.* because the referrals were integral to criminal conduct. Based on its conclusion that neither referring patients to elective abortion providers nor providing written information about such providers implicates speech, the district court did not apply heightened scrutiny.

Finally, the court upheld the Referral Requirement under the Free Exercise Clause. RSA-51. The court acknowledged that "the Plaintiffs have a sincere religious practice in refraining from facilitating abortions." RSA-50. The court nevertheless upheld the Referral Requirement's conditioning of conscience protections on referring for or providing information about elective abortions because it found the referral requirement to be "a neutral law of general applicability." RSA-51. The court reasoned that "all health care providers are amenable to suit for failure to refer, transfer, or provide written information about

potential abortion providers." RSA-53. That assumption, the court explained, was conditioned on the standard of care imposing such duties. *See id*. Yet the court had just held that there was *no* uniform standard of care that required physicians to perform the duties set forth in Section 6.1(3). RSA-52 n.24. The court nevertheless applied rational-basis review and upheld the Referral Requirement. RSA-57.

The Pregnancy Centers appealed the district court's decision upholding the Referral Requirement, and the State cross-appealed the district court's decision invalidating the Benefits-Discussion Requirement. This brief addresses the lower court's decision rejecting the Pregnancy Center's First Amendment challenges to the Referral Requirement.

## SUMMARY OF THE ARGUMENT

Plaintiff Pregnancy Centers exist to provide Illinois women with the support and resources they need to care for themselves and their baby during pregnancy and beyond. Each of the Pregnancy Centers believes that every child is created in the image of God and deserving of life. Yet, by withholding a valuable benefit—the availability of conscience protections for procedures like elective abortion—Illinois coerces the Pregnancy Centers to facilitate those very procedures. It compels the Pregnancy Centers to refer women to abortion providers and to extol the benefits of abortion, contrary to their deeply held religious beliefs. This coercion violates the Free Speech and Free Exercise Clauses of the First Amendment.

The district court erred by concluding that the Referral Requirement does not implicate speech at all. The Referral Requirement requires pro-life health care

professionals to refer women to abortion providers or to provide written information about abortion providers they believe will perform an elective abortion to receive statutory conscience protections. That is speech. Indeed, this case is controlled by *NIFLA*, which held that a state may not force pro-life Pregnancy Centers to "inform women how they can obtain … abortions" because such a requirement "plainly alters the content of [their] speech." *NIFLA*, 585 U.S. at 766 (cleaned up). And it coerces the Pregnancy Centers to inform women how they can obtain abortions at the same time they "try to dissuade women from choosing that option." *Id.*

Worse, because the Referral Requirement induces the Pregnancy Centers to communicate specific content to their patients—a referral to an abortion provider or a list of providers that they reasonably believe offer abortion—it is a content-based regulation of speech. And because the Referral Requirement also distinguishes among speakers based on their beliefs about abortion, it compels speech based on viewpoint. The Referral Requirement is thus "presumptively unconstitutional" under the Free Speech Clause and may be upheld only if the State proves that it is "narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766 (cleaned up).

The Referral Requirement fails both strict and intermediate scrutiny. As the district court found, the State introduced zero evidence of a compelling or important state interest. And the Referral Requirement is not tailored because the State failed to explore any less restrictive means of furthering any interest, such as a state-sponsored advertising campaign.

The Referral Requirement also violates the Free Exercise Clause. It imposes a substantial burden by conditioning the availability of conscience protections for pro-life health care providers on their willingness to violate their consciences. It applies *only* to health care providers with conscience-based objections to legal treatment options and compels them to facilitate access to care they do not provide because their conscience will not permit them to do so. It does not apply to other, similarly situated secular providers that do not have a conscience-based objection to legal treatment options. Because the Referral Requirement is not neutral or generally applicable, it must—but cannot—satisfy strict scrutiny.

For these reasons, the Pregnancy Centers respectfully request that this Court reverse the district court's decision and find the Referral Requirement unconstitutional under the Free Speech and Free Exercise Clauses.

## STANDARD OF REVIEW

Following a bench trial, this Court "review[s] the district court's legal conclusions de novo and its factual findings for clear error." *Dual-Temp of Ill., Inc. v. Hench Control, Inc.*, 821 F.3d 866, 869 (7th Cir. 2016).

## ARGUMENT

The government cannot condition a public benefit on citizens surrendering their constitutional rights. *See Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 986 (7th Cir. 2012) ("[T]he doctrine prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise

of a constitutional right."); *Libertarian Party of Ind. v. Packard*, 741 F.2d 981, 988 (7th Cir. 1984) ("[W]hat a government cannot compel, it should not be able to coerce."); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) (cleaned up) (considering burden on free exercise of religion and noting "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."). The unconstitutional conditions doctrine holds "that the [g]overnment may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*, 570 U.S. 205, 214 (2013) (cleaned up); *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (same).

Yet the Referral Requirement unconstitutionally conditions conscience protections on pro-life Pregnancy Centers' agreement to "(i) refer the patient to, or (ii) transfer the patient to, or (iii) provide in writing information to the patient about other health care providers who they reasonably believe may offer" abortion. 745 Ill. Comp. Stat. 70/6.1(3). This violates the Pregnancy Centers' free speech and free exercise rights.

## I.    The Referral Requirement violates the Free Speech Clause.

Under the Free Speech Clause of the First Amendment, "the government may not compel a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). But the Referral Requirement compels the Pregnancy Centers to speak the government's preferred abortion message and alter the content of their own pro-life speech, which is dedicated to trying to dissuade

women from choosing the option (abortion) the government's Referral Requirement is designed to facilitate. That violates the First Amendment. Indeed, this case is controlled by *NIFLA*, which held that a state may not force pro-life Pregnancy Centers to "inform women how they can obtain … abortions" because such a requirement "plainly alters the content of [their] speech." 585 U.S. at 766 (cleaned up).

## A.   The Referral Requirement regulates speech based on its content and viewpoint.

The Referral Requirement is a content- and viewpoint-based speech restriction. A law is content-based if it "target[s] speech based on its communicative content." *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015). Viewpoint-based regulations are "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). A statute is viewpoint-based if it "[r]equir[es] an individual to present a viewpoint not his own." *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 572 (7th Cir. 2001). Given that government has "no power to restrict expression because of its message, its ideas, its subject matter, or its content," such laws are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766 (cleaned up).

The Referral Requirement is content-based because it compels the Pregnancy Centers—who cannot transfer patients to another facility because they never admit them—to communicate specific information to their patients upon request. It requires either a referral to, or list of, "other health care providers who they

reasonably believe may offer" abortion. 745 Ill. Comp. Stat. 70/6.1(3). By

[m]andating speech that a speaker would not otherwise make" the State

unquestionably "alters the content of [their] speech." *Riley v. Nat'l Fed'n of the*

*Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). This makes the mandate "a content-

based regulation of speech." *Id.*

And the Referral Requirement is viewpoint-based because it requires the

Pregnancy Centers "to promote the State's own preferred message." *See NIFLA*, 585

U.S. at 779 (Kennedy, J., concurring). The Centers must promote the availability

and legitimacy of elective abortion even though their own view is that elective

abortion harms both women and their unborn child. SA-16–17, 708–712 (stating

that pro-life health care providers consider the mother and child to be patients).

The Referral Requirement is also viewpoint-based because it only targets

certain speakers, namely those who "refuse[] to permit, perform, or participate in"

abortion "because of a conscience-based objection." 745 Ill. Comp. Stat. 70/6.1(3).

The State argued below that no targeting exists because a uniform standard of care

requires health care providers to refer and provide the information required by

section 6.1(3). Yet the district court held that there is no general standard of care

that imposes a Referral Requirement on non-objecting health care professionals.

RSA-11–13, 52; SA-20–21, 27–28, 35. The federal courts "are deeply skeptical of

laws that distinguish among different speakers" because "[s]peaker-based laws run

the risk that [a] State has left unburdened those speakers whose messages are in

accord with its own views." *NIFLA*, 585 U.S. at 777–78 (cleaned up). Thus, content-

and viewpoint-based regulations of speech are unconstitutional unless they can survive strict scrutiny. *Reed*, 576 U.S. at 164.

**B.    The District Court erred by finding that the Referral Requirement regulates only conduct.**

The Supreme Court has identified two limited circumstances in which professional speech regulations may be subject to something less than strict scrutiny: (1) regulations of commercial speech, and (2) regulations of speech incidental to conduct. *NIFLA*, 585 U.S. at 768–69. Neither exception applies here.

The district court erred by holding that the State may compel the Pregnancy Centers to provide referrals to abortion providers because referrals are "pure conduct." RSA-46. That conclusion defies common linguistics and controlling Supreme Court precedent. To be sure, "[i]n cases at the margin, it may sometimes be difficult to figure out what constitutes speech protected by the First Amendment. But this is not a hard case in that respect." *Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020) (cleaned up).

It is axiomatic that the First Amendment protects "the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Indeed, it protects much more besides. *See id.* (protecting "conduct [that] possesses sufficient communicative elements"). As this Court has recognized, an oral referral is quintessential speech protected by the Free Speech Clause. *See K.C.*, 121 F.4th at 628 (referring to a referral as "speech"). So too for a written referral or a written list of providers that the pro-life Pregnancy Centers believe are likely to provide abortions.

As the Supreme Court said in another case purportedly addressing conduct, if "the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (cleaned up). The same is true here. "If speaking to [patients] is not speech, the world is truly upside down." *Otto*, 981 F.3d at 866.

*NIFLA* controls this case. In *NIFLA*, the Supreme Court struck down a California law that required pregnancy centers to post a notice informing women where they could access free or low-cost abortions. 585 U.S. at 763. The Supreme Court found that referral-like requirement to "regulate[] speech as speech." *Id.* at 770. So too here. As in *NIFLA*, the Referral Requirement alters the Pregnancy Centers' speech by compelling them to inform women how they can obtain abortions—either through a referral or through a written list of providers that the Pregnancy Centers believe provide abortions—at the same time they "try to dissuade women from choosing that option." *Id.* at 766. It "regulates speech as speech." *Id.* at 770.

The district court misread *K.C.* to "compel [its] conclusion that medical referrals … are pure conduct." RSA-46. Quite the opposite. *K.C.* held that such referrals were "*speech*"—they were just unprotected speech in that case because the "speech [was] integral to unlawful conduct." 121 F.4th at 628 (cleaned up).

*K.C.* involved an aiding and abetting statute. Thus, the only speech at issue was "speech used as an integral part of *unlawful* conduct." *Id.* (cleaned up; emphasis added). "Such speech 'is historically recognized as unprotected.'" *Id.* (quoting *United States v. Price*, 775 F.3d 828, 838 (7th Cir. 2014)). Accordingly, this

Court found that referrals that aided and abetted an unlawful activity fell within the "category of unprotected speech." *Id.*

*K.C.* falls into the same camp as *United States v. White,* 610 F.3d 956, 960 (7th Cir. 2010) (per curiam), which upheld a solicitation indictment because "[s]peech integral to criminal conduct … remain[s] categorically outside [First Amendment] protection." The same is true of the restriction on illegal picketing in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949). The Supreme Court held that "it has never been deemed an abridgment of freedom of speech ... to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* at 502.

But the speech-integral-to-unlawful-conduct cases are fundamentally different from the Referral Requirement. The Referral Requirement *compels* speech on a controversial topic, requiring the Pregnancy Centers to refer for or provide lists of providers they believe would provide elective abortions, procedures to which they strenuously object. Because the Referral Requirement compels speech—rather than restricting speech about unlawful conduct—neither *K.C.* nor *Giboney* control.

In fact, *K.C.* recognized the distinction between promoting lawful conduct (protected speech) and promoting unlawful conduct (unprotected speech). This Court noted that, where a law restricts referrals for *lawful* conduct, such speech does not fall within a category of unprotected speech, and ordinary First Amendment principles apply. 121 F.4th at 629 (cleaned up) (recognizing that the

relevant question is whether the speech restriction "was directed at certain content and aimed at particular speakers").

The district court also cited two medical definitions to suggest that referring to an abortion provider is an act. RSA-45. But other medical definitions make clear that referring is predicated on communication. See *Refer*, Taber's Cyclopedic Medical Dictionary (F.A. Davis Co. 2025) (defining "refer" to mean "recommend[ing] someone to another health care provider"). And the American Medical Association explains that a referral typically involves a detailed conversation with a patient, including "[e]xplain[ing] the rationale for the consultation, opinion, or findings and recommendations clearly to the patient." American Medical Association, *1.2.3 – Consultation, Referral, and Second Opinions*, AMA Code of Medical Ethics, https://perma.cc/PCZ3-7EPD. Indeed, multiple experts in this case confirmed that referrals are expression. Dr. Lee testified that referral is not just a recommendation but an "implicit endorsement that the physician can … competently … provide that service." SA-22. He makes referrals only to physicians he believes are competent. SA-22. Dr. Fernandes likewise emphasized that the referrals are "medical advice" that includes "vouching" for the physician and contemplated care. SA-438.  In other words, they're speech.

The district court then referenced a few lower court cases discussing *prescriptions*. RSA-45. Those cases are inapposite. A prescription is speech incidental to a doctor's conduct of providing medicine to her patient, while referring to an elective abortion provider coerces speech *unrelated* to any medical treatment provided by the Pregnancy Centers. *Cf.* RSA-45 (citing *Kory v. Bonta*, 2024 U.S.

Dist. Lexis 73845 (recognizing that writing a prescription is incidental to the provision of medical care)). Plus, numerous courts—in addition to this one, *e.g., K.C.*, 121 F.4th at 628 (holding that referrals are speech integral to unlawful conduct)—have concluded that a medical referral is speech. *E.g.*, *Valley Fam. Plan. v. State of N.D.*, 489 F. Supp. 238, 242 (D.N.D. 1980), *aff'd*, 661 F.2d 99 (8th Cir. 1981) ("The referral of persons to a physician who performs abortions is a form of speech protected by the First Amendment.") (citing *NAACP v. Button*, 371 U.S. 415, 434 (1963)); *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 732 F. Supp. 3d 971, 976 (S.D. Ind. 2024) (quoting the *Valley Family* language and subjecting statute regarding out-of-state abortion referral to First Amendment scrutiny); *Mayor & City Council of Balt. v. Azar*, No. CV RDB-19-1103, 2019 WL 4415539, at *8 (D. Md. Sept. 12, 2019) (holding that complaint stated First Amendment claim by challenging agency action "dictating the medical advice and referrals that its providers may deliver"); *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1053 (8th Cir. 2014) (analyzing a statute that regulated certain types of ads about medical referrals under commercial speech principles).

The Supreme Court assumed as much in *Rust v. Sullivan*, 500 U.S. 173, 192–94 (1991). There, the Court concluded that a law "prohibiting counseling, referral, and the provision of information regarding abortion" was consistent with the First Amendment because the government was not required to fund the exercise of even fundamental rights. *Id.* That analysis presupposed that referrals were protected speech.

The district court also suggested that it could carve out a new category of unprotected speech because the Referral Requirement regulates "*professional* conduct." RSA-46 (emphasis added). Here, too, *NIFLA* controls. There, the Supreme Court rejected a so-called "professional speech" exception to the First Amendment, holding that "[s]peech is not unprotected merely because it is uttered by professionals." 585 U.S. at 767. To be sure, *NIFLA* acknowledged that "States may regulate professional *conduct*," but it cautioned against allowing government to regulate *speech* merely because it occurred in a professional setting. *Id.* at 768 (emphasis added). "As with other kinds of speech, regulating the content of professionals' speech 'pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information.'" *Id.* at 771 (quoting *Turner*, 512 U.S. at 641). And the State may not reduce First Amendment rights by labeling speech professional conduct. *Riley*, 487 U.S. at 796 ("[S]tate labels cannot be dispositive of [the] degree of First Amendment protection."); *Button*, 371 U.S. at 429 (finding that "a State cannot foreclose the exercise of [First Amendment] rights by mere labels.").

Although *NIFLA* did "not foreclose the possibility" that some type of unidentified professional speech might be a "unique category that is exempt from ordinary First Amendment principles," the Court refused to endorse such a category. 585 U.S. at 773. And for good reason. Courts do not have "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." *United States v. Alvarez*, 567 U.S. 709, 722 (2012) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)). In particular, speech uttered by

professionals is not "a new speech category deserving less protection." *Otto*, 981 F.3d at 867. In fact, *NIFLA* concluded that the California disclosure statute at issue in that case regulated "speech as speech." *NIFLA*, 585 U.S. at 770. That conclusion is dispositive here, where the State similarly seeks to compel pro-life health care providers who do not provide abortion to tell their patients how to obtain one.

The district court wrongly sought refuge for its new category of unprotected speech in *Doe v. Rokita*, 54 F.4th 518 (7th Cir. 2022). RSA-31–33. *Rokita* upheld an Indiana statute requiring physicians to tell women undergoing abortion about their statutory options for the disposition of fetal remains. 54 F.4th at 520. This Court concluded that, when read together, *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992), and *NIFLA* yield a straightforward principle: "a state may not enforce [compelled speech] requirements disconnected from medical care," but "a state may require medical professionals to provide information … directly linked to procedures that have been or may be performed." *Rokita*, 54 F.4th at 521.

The district court said that the law in *Rokita* was not part of the informed consent process because "[t]he provider could explain those options after the procedure, and the information didn't aim to inform her consent to a procedure." RSA-31–32. That's wrong. The Indiana statute required physicians to provide this information on a state-developed form at least 18 hours before the abortion as part of the informed consent process. Ind. Code § 16-34-2-1.1(a)(2) ("[C]onsent to an abortion is voluntary and informed only if the following conditions are met"). And this Court clearly viewed the law at issue in *Rokita* as an informed consent provision, citing *Casey*'s discussion of informed consent laws, and upholding the

provision because it required "medical professionals to provide information that facilitates patients' choices directly linked to procedures that have been or may be performed." *Rokita*, 54 F.4th at 521; *see also id.* 520 ("Physicians must tell patients about drugs' side effects and provide information that enables informed consent to risky procedures such as surgery. Nothing in *Dobbs*, or any other post-*Casey* decision, implies that similar notice requirements violate the Constitution.").

Because *Rokita* considered an informed consent law, it provides no basis for the district court's creation of a new category of wholly unprotected professional speech. Instead, *Rokita* shows that the Referral Requirement violates the First Amendment because it compels speech that is "disconnected from" and not "directly linked to" any medical procedures the Pregnancy Centers perform. *Id.* at 521.

### C. The District Court erred by concluding that the Referral Requirement regulates only speech incidental to conduct.

The district court next suggested that even if the Referral Requirement compels speech qua speech, it was permissible because the speech was "incidental to professional conduct." RSA-48. That too is wrong. The Referral Requirement is a direct regulation of speech because, just like *NIFLA*, the State seeks to facilitate abortion by coercing the Pregnancy Centers to explain how to obtain one.

Speech is incidentally burdened when the law's primary target is conduct, not speech. *United States v. O'Brien's* prohibition on burning draft cards is the prototypical example. 391 U.S. 367, 369 (1968). That regulation targeted conduct, and any effect on speech was indirect. *Id.* at 376–77. That's also true of the hypothetical pricing limitations alluded to in *Expressions Hair Design v.*

*Schneiderman*, 581 U.S. 37, 47 (2017), and referenced by the district court. RSA-47. A law requiring delis to charge $10 for sandwiches targets pricing-setting conduct, even though it indirectly affects menus and ads that list prices. So too for the minimum wage laws hypothesized by the district court; such laws only indirectly affect the amount employers write on checks as part of regulating the conduct of how much must be paid. Further, the *Expressions Hair Design* Court juxtapositioned its hypothetical price regulation with the law at issue in that case which required sellers to tell customers whether a surcharge applied. 581 U.S. at 48. The Supreme Court held that "in regulating the communication of prices rather than the prices themselves, [the law] regulates speech." *Id.*

Here, the Referral Requirement *directly* targets speech. The provision compels the Pregnancy Centers to convey a message explaining where to obtain an elective abortion. Like the statute held unconstitutional in *Expressions Hair Design*, the Referral Requirement does not regulate the *conduct* of health care providers but rather their speech about elective abortions—a procedure performed by other providers. There is nothing here but conversation. To say that compelling such speech is merely incidental "is like saying that limitations on walking and running are merely incidental to ambulation." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc).

Further, for a burden on speech to be considered merely incidental, the law at issue must be content-neutral. *O'Brien*, 391 U.S. at 377 (finding that the governmental interest must be "unrelated to the suppression of free expression"); *see also Hodgkins v. Peterson*, 355 F.3d 1048, 1059 (7th Cir. 2004). But here, the

requirement that the Pregnancy Centers refer patients to abortion providers is both content- and viewpoint-based. *See supra* Part I.A.

The district court speculated that the speech compelled by the Referral Requirement was merely incidental to conduct because the Pregnancy Centers are otherwise able to express their own opinions. RSA-48. That is no cure for compelled speech. In *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974), the Court struck down a statute compelling a newspaper to allow access by political candidates to respond to the paper's criticism even though the paper could include a reply to the candidate's response. *Id.* at 258. Similarly, in *NIFLA*, the Supreme Court struck down California's disclosure law even though nothing prohibited the plaintiffs from adding a disclaimer. The ability of a speaker to counter compelled speech fails to negate the fact that speech was coerced in the first place.

Finally, the district court intimated that the Referral Requirement was incidental to conduct because it applied only *after* a woman requests information. RSA-48 ("The State doesn't intend to control the flow of discussion between doctors and patients—nor could it, for that matter."). But compelled speech is unconstitutional no matter when the state requires it. *303 Creative,* 600 U.S. at 586 ("Generally, . . . the government may not compel a person to speak its own preferred messages.").

**D.    The State is wrong that the "truthful, non-misleading" standard applies because the Referral Requirement is not an informed consent provision.**

The State argued below that the "truthful, non-misleading, and relevant" standard should govern the speech compelled by the Referral Requirement. But

that skips a step. That standard applies only after a court finds the statute at issue to be an informed consent provision. *See E.M.W. Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 424 (6th Cir. 2019) ("[E]ven though an abortion-informed-consent law compels a doctor's disclosure of certain information, it should be upheld so long as the disclosure is truthful, non-misleading, and relevant to an abortion."). And the district court correctly held that the Referral Requirement "isn't an informed consent requirement," because it "isn't directly linked" to a medical procedure. RSA-48 n.21. So that "truthful, non-misleading" standard does not apply.

Here, as in *NIFLA*, the Referral Requirement flunks all the requirements of informed consent. Most fundamentally, it "does not facilitate informed consent to a medical procedure." *NIFLA*, 585 U.S. at 770. "[I]t is not tied to a procedure at all." *Id.* That ends the inquiry.

Additional factors confirm that the Referral Requirement is not an informed consent provision. The Referral Requirement, for example, does not precede a medical procedure, as required by the definition of informed consent. *See Informed Consent*, Black's Law Dictionary (12th ed. 2024) ("A person's agreement to allow something to happen, made with full knowledge of the risks involved and the alternatives."). In fact, the only possible medical procedure to which informed consent could attach are ultrasounds. But the Referral Requirement does not become operative until *after* the ultrasound procedure; a woman must know she is pregnant before she requests an abortion referral. Additionally, abortion is not an alternative to an ultrasound. Instead, it is an alternative to delivering the child—a

service the Pregnancy Centers do not provide. For all these reasons, the informed consent standard does not apply.

### E. The Referral Requirement fails strict scrutiny.

Under strict scrutiny, the State must prove "that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (cleaned up). The State here has failed to prove either a compelling government interest or least restrictive means.

The district court acknowledged that the State "fail[ed] to affirmatively produce evidence at trial" of *any* important interest justifying the Referral Requirement. RSA-42. The State, for instance, did not produce any evidence that pregnant women do not receive accurate, timely information about their abortion options. On the contrary, the evidence at trial showed that Illinois women know how and where to obtain an abortion. SA-19–20, 56, 80–81, 112–13, 133, 160. At no time did the State "specifically identify an actual problem in need of solving." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up).

The district court hypothesized that "the State has a legitimate interest in facilitating abortions provided by health care professionals to reduce the number of 'self-managed abortions …,' which are inherently dangerous." RSA-57. But a legitimate interest is not a compelling one. And under heightened scrutiny, courts are not permitted to conjure up state interests; that burden rests solely on the state. *Edenfield v. Fane*, 507 U.S. 761, 768 (1993). Regardless, although the Act has been enjoined for nearly a decade, the State presented "no evidence … showing that a single woman's health was compromised." RSA-3.

Nor is the Referral Requirement the least restrictive means of achieving any asserted state interest. The State could have addressed any alleged interest through a state-sponsored public-information campaign. *NIFLA*, 585 U.S. at 775. Its failure to do so is fatal here. *Id.* And the Referral Requirement is "wildly underinclusive," *id.* at 774—there is no corresponding attempt to coerce abortion referrals by secular providers who choose not to perform them.

The State argued below that the Referral Requirement does not impose a burden on the Pregnancy Centers because they were already required to refer for abortion under the applicable standard of care. Not so. The lower court concluded that there is no general standard of care requiring health care professionals to refer for procedures that they do not themselves perform. RSA-11–12.

For all these reasons, the Referral Requirement fails strict scrutiny.

**F.    The Referral Requirement fails intermediate scrutiny.**

Even if the speech compelled by the Referral Requirement is speech incidental to conduct (it is not), intermediate scrutiny applies, and the Referral Requirement does not satisfy it. Where speech is compelled pursuant to a law that focuses on conduct but nevertheless burdens speech, it must at least satisfy intermediate scrutiny. *Turner*, 512 U.S. at 662. The district court here erred in finding such speech wholly unprotected.

Under intermediate scrutiny, a statute does not violate the First Amendment (1) "if it is within the constitutional power of the Government;" (2) "if it furthers an important or substantial governmental interest;" (3) "if the governmental interest is unrelated to the suppression of free expression;" and (4) "if the incidental restriction

on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377. The Referral Requirement fails the latter three prongs.

As explained, the State introduced no evidence of an important government interest. And courts are not allowed to suppose potential interests for the State. *See Edenfield*, 507 U.S. at 768. Nor does the Referral Requirement solve any documented problem—the record shows that women already know where to obtain a legal abortion in Illinois. SA-19–20, 56, 80–81, 112–13, 133, 160. And even though the Referral Requirement has been enjoined for the better part of a decade, the State identified no woman who had been harmed. RSA-3.

The Referral Requirement also compels far more speech than necessary to further any alleged government interest. Illinois could inform women about licensed abortion providers "itself with a public-information campaign." *NIFLA*, 585 U.S. at 775. Doing so would avoid "burdening a speaker with unwanted speech." *Id.* (quotation and citation omitted). Because the Referral Requirement is not tailored to serve any important state interest, it violates the Free Speech Clause.

## II. The Referral Requirement violates the Free Exercise Clause.

A law violates the Free Exercise Clause if it burdens a plaintiff's sincere religious beliefs, is not neutral and generally applicable, and fails strict scrutiny. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). The district court found that "the Plaintiffs have a sincere religious practice in refraining from facilitating abortions." RSA-50. Because the Referral Requirement is not neutral and generally

applicable and fails strict scrutiny, this Court should enjoin it under the Free Exercise Clause.

## A. The Referral Requirement coerces only religious providers to refer, not their secular counterparts.

The Free Exercise Clause "protect[s] … the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Kennedy*, 597 U.S. at 524 (cleaned up). It protects religious believers from indirect coercion or penalties on the free exercise of religion. *Trinity Lutheran*, 582 U.S. at 463. Thus, "[t]he Free Exercise Clause bars even subtle departures from neutrality on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018) (cleaned up).

"[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021). And a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest." *Tandon*, 593 U.S. at 62.

At the outset, the Referral Requirement subjects conscientious objectors—and *only* conscientious objectors—to its requirements. It states that health care providers availing themselves of a "conscience-based refusal[]" must comply with its mandate. 745 Ill. Comp. Stat. 70/6.1. But laws that "single out" religious conduct for discriminatory treatment are subject to strict scrutiny. *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 483 (2020). The Referral Requirement thus fails "the minimum requirement of neutrality" because it "refers to a religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

Under *Fulton*, the Referral Requirement is not generally applicable. It compels religious health care providers to speak contrary to their most deeply held beliefs while exempting secular health care providers from the requirement to refer for elective abortion. And the secular providers are comparable to conscientious objectors like the Pregnancy Centers since the State's interest in facilitating abortion is the same for both.

The district court opined that the Referral Requirement is neutral and generally applicable because "all health care providers are amenable to suit for failure to refer, transfer, or provide written information about potential abortion providers." RSA-53. That's wrong. No provision of Illinois law coerces secular providers to refer for an elective abortion or furnish a list of providers that they believe will perform the procedure. The State doesn't condition a governmental benefit on secular providers complying with section 6.1(3) and a general "standard of care" does not require it. RSA-11–12; SA-20–21, 27–28, 35. Yet for pro-life health care providers, the State says they must agree to violate their conscience by

facilitating elective abortion or risk exposure to tort claims or disciplinary action. Because the Referral Requirement is not generally applicable, it is subject to strict scrutiny. *Espinoza*, 591 U.S. at 475.

### B. The Referral Requirement fails strict scrutiny.

The Referral Requirement does not survive strict scrutiny under Free Exercise for the same reasons it fails under free speech. *See supra* Part I.E.

## CONCLUSION

For these reasons, this Court should reverse the district court's decision upholding the Referral Requirement. Due to the important issues presented by this case, the Pregnancy Centers respectfully request oral argument under Federal Rule of Appellate Procedure 34(a).

Dated: May 28, 2025

Respectfully submitted,

s/ *Patrick T. Gillen*

Thomas G. Olp
Patrick T. Gillen
THOMAS MORE SOCIETY
309 W. Washington, Suite 1250
Chicago, IL 60606
(312) 782-1680
tolp@thomasmoresociety.org
pgillen@thomasmoresociety.org

*Counsel for Appellant-Cross-Appellee*
*Ronald L. Schroeder,*
*et al.*

s/*Erin M. Hawley*

Erin M. Hawley
John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
ehawley@ADFlegal.org
jbursch@ADFlegal.org

James A. Campbell
Erik C. Baptist
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
ebaptist@ADFlegal.org

Kevin H. Theriot
Julia C. Payne
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
ktheriot@ADFlegal.org
jpayne@ADFlegal.org

*Counsel for Appellants-Cross-Appellees
National Institute of Family & Life
Advocates, et al.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Circuit Rule 28.1 and 32(c) because this brief contains 8,117 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: May 28, 2025

*s/Erin M. Hawley*
Erin M. Hawley
*Counsel for Appellants-Cross-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

<u>*s/Erin M. Hawley*</u>
Erin M. Hawley
*Counsel for Appellants-Cross-Appellees*

## CIRCUIT RULE 30(D) STATEMENT

Pursuant to Circuit Rule 30(d), I certify that all material required by Circuit Rule 30(a) and (b) are included in the attached required short appendix and separate appendix filed concurrently with this brief.

*s/Erin M. Hawley*
Erin M. Hawley
*Counsel for Appellants-Cross-Appellees*

# REQUIRED SHORT APPENDIX

Memorandum of Decision (Case No. 3:16-cv-50310) .......................................... RSA-1

Rule 58 Judgement Order (Case No. 3:16-cv-50310) ....................................... RSA-59

Memorandum of Decision (Case No. 1:17-cv-04663) ....................................... RSA-60

Rule 58 Judgement Order (Case No. 1:17-cv-04663) ..................................... RSA-118

# REQUIRED SHORT APPENDIX

# REQUIRED SHORT APPENDIX

Memorandum of Decision (Case No. 3:16-cv-50310) ......................................... RSA-1

Rule 58 Judgement Order (Case No. 3:16-cv-50310) ...................................... RSA-59

Memorandum of Decision (Case No. 1:17-cv-04663) ....................................... RSA-60

Rule 58 Judgement Order (Case No. 1:17-cv-04663) ..................................... RSA-118

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| National Institute of Family and Life Advocates, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 16 CV 50310 |
| | ) |
| Mario Treto Jr., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| Ronald Schroeder, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 17 CV 4663 |
| | ) |
| Mario Treto Jr., | ) |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OF DECISION</u>

This Memorandum of Decision contains the Court's findings of fact and conclusions of law under Rule 52(a). The Court will separately enter Rule 58 judgment orders in each case.[1] The Court concludes that Public Act 99-690 Section 6.1(1), in exchange for a liability shield, compels speech, requiring a discussion about the risks and benefits of childbirth and abortion. That compelled discussion violates the First Amendment. Section 6.1(1) isn't a doctrinally qualifying informed consent

---

[1] The Court thanks counsel for all the Parties for their work in these cases. Without doubt, the subject matter of this litigation can result in intemperate language and behavior. But throughout the Court's involvement with this case, counsel have been courteous and professional among themselves and with the Court. What's more, the Court appreciates the quality of the presentations and filings by all counsel. Thank you. X

1

statute, and the compelled speech isn't "incidental" to conduct. However, unlike Section 6.1(1), Section 6.1(3) doesn't compel speech. Instead, Section 6.1(3) merely regulates professional conduct, instructing clinicians, upon request, to either refer or transfer a patient to another physician, or at least provide her with a list of potential providers. These types of conduct regulations don't implicate the First Amendment's Speech clause. And because Section 6.1(3) returns conscientious objectors to their earlier, generally applicable liability exposure, it doesn't violate the Free Exercise Clause either. So, the Court finds Section 6.1(3) constitutional. Constitutionally, to obtain the liability shield, the State can't require medical professionals to discuss with patients what the State believes are the benefits of abortions; however, if patients request abortions, at a minimum, the State can require medical professionals to provide information of other medical professionals whom they reasonably believe might perform abortions.

**INTRODUCTION**

Before launching into the legal analysis, the Court is compelled underscore the narrow legal and factual issues in this case.

First, as described in more detail later, the legislative evidence presented to the Illinois General Assembly in support of Public Act 99-690[2] was underwhelming. Nevertheless, in its wisdom, the State of Illinois sought to address a perceived

---

[2] A note on citations: As discussed shortly, Public Act 99-690 amended the Health Care Right of Conscience Act ("HCRCA"). Public Act 99-690 encompasses Section 6.1(1) and 6.1(3). When the Court refers to the amendment generally, it uses "Public Act 99-690." It otherwise identifies the particular section (e.g. 6.1(1) or 6.1(3)) at issue. Citations to the Illinois Code (ILCS) refer to the HCRCA.

2

RSA-002

problem, which it has every right to do in support of the public's health, safety, and welfare. It is not this Court's role to judge the wisdom of a public act. Instead, the Court's limited function is to determine whether Public Act 99-690 is constitutional, in whole or in part.

Second, a preliminary injunction enjoining enforcement of Public Act 99-690 has been in place for nearly a decade. Despite the General Assembly's determinations and the State's assertions that—absent Public Act 99-690—the health of women was in grave peril, no evidence has been presented to this Court that supports that concern. Dkt. 48 at 26–27. Despite extensive summary judgment briefing and a three-day bench trial, no evidence was presented showing that a single woman's health was compromised because Public Act 99-690 was enjoined.

Third, the lack of this evidence should not be surprising. Public Act 99-690 amended the HCRCA to limit its use as an affirmative defense in civil and criminal proceedings. This factual scenario is highly unusual and rarely (if ever) occurs. Indeed, the Parties cited no instances in which this aspect of the HCRCA has been litigated, and the Court was unable to find a single reported case involving this aspect of the HCRCA.

Fourth, the lack of evidence of women's health being imperiled but for Public Act 99-690 is unsurprising because the HCRCA provides no protections for health care professionals who fail to treat emergencies. 745 ILCS 70/6 ("Nothing in this Act shall be construed so as to relieve a physician or other health care personnel from obligations under the law of providing emergency medical care."); 745 ILCS 70/9

3

("Nothing in this Act shall be construed so as to relieve a physician, health care personnel, or a health care facility from obligations under the law of providing emergency medical care."). Health care professionals who fail to treat pregnant women in a medical emergency find no quarter in the HCRCA, regardless of the amendments contained in Public Act 99-690.

None of the foregoing should be interpreted as minimizing the constitutional issues at stake in this litigation, the role of the State to address perceived concerns about public health, safety, and welfare, or a woman's access to medical care. Instead, the Court notes that its decision is cabined to the statutory scheme at issue and the HCRCA and its subsequent amendments.

## I. BACKGROUND

### A. *Parties*

This case involves two sets of plaintiffs: the National Institute of Family and Life Advocates ("NIFLA") Plaintiffs and the Schroeder Plaintiffs. NIFLA is a religious organization comprised of member pregnancy centers from across the country. NIFLA dkt. 275-2. ¶ 1.[3] The NIFLA Plaintiffs also include three individual Illinois pregnancy centers. *Id.* The Schroeder Plaintiffs include Dr. Ronald Schroeder, the volunteer medical director at Options-Now/Thrive Metro-East, as well as two other pregnancy centers. Schroeder dkt. 236-1 ¶ 1.[4]

---

[3] The Court cites 16-cv-50310 as "NIFLA" and 17-cv-04663 as "Schroeder."
[4] For this decision's purposes, the two sets of Plaintiffs and the Pregnancy Centers' work are essentially identical. So, unless otherwise noted, the Court simply refers to them as "Plaintiffs," and assumes they're all engaged in the same activities.

RSA-004

Defendant is the Director of the Illinois Department of Financial and Professional Regulation. The action is brought against that individual in the individual's official capacity. The current Director—and therefore, Defendant—is Mario Treto Jr. Rather than call out the latest person to hold this office, the Court will simply refer to the Defendant as "the State." The Court is mindful that some adherents of the Eleventh Amendment might be shocked at this approach. But they'll get over it. It's just a label for purposes of this decision.

B.    *The Health Care Right of Conscience Act (HCRCA)*

As the Court previously mentioned, Public Act 99-690 purports to amend the HCRCA. Since its enactment in 1977, the HCRCA has addressed many issues, including prohibiting discrimination and providing a right of action if discrimination occurs. Relevant to this action, the HCRCA provides an affirmative defense against civil and criminal liability. 745 ILCS 70/4, 70/9. Section 4 of the HCRCA contains one of the affirmative defenses:

> No physician or health care personnel shall be civilly or criminally liable to any person, estate, public or private entity or public official by reason of his or her refusal to perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care service which is contrary to the conscience of such physician or health care personnel. 745 ILCS 70/4.

Section 9 of the HCRCA contains the other provision providing a defense:

> No person, association, or corporation, which owns, operates, supervises, or manages a health care facility shall be civilly or criminally liable to any person, estate, or public or private entity by reason of refusal of the health care facility to permit or provide any particular form of health care service which violates the facility's conscience as documented in its ethical guidelines, mission statement,

5

RSA-005

> constitution, bylaws, articles of incorporation, regulations,
> or other governing documents. 745 ILCS 70/9.

In 2016, the General Assembly held hearings regarding the HCRCA because of concerns raised by Illinois residents regarding their health care treatment.

### C.    *Legislative History of Amendments to the HCRCA*

Relating to the issues raised in this case, the legislative support for Public Act 99-690 was sparce. Only two examples have been identified. First, there appear to be two letters from an anesthesiologist who refused to provide his services when abortions were performed. Second, there was heartbreaking testimony from a witness about her treatment during a pregnancy that was not viable. But nothing in the challenged provisions (what would become Section 6.1(1) and Section 6.1(3)) would have remedied any of problems highlighted by these two examples, because Public Act 99-690 neither requires conscientious objectors to personally perform abortion services nor excuses them from facilitating emergency treatment.

Following these hearings, by way of Public Act 99-690, Illinois amended the HCRCA in several ways. First, Illinois added a provision identifying the public policy for the HCRCA and presumably the amendments to the HCRCA. According to the amendments, "[i]t is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care." Second, the amendments added the definition of "undue delay," which "means unreasonable delay that causes impairment of the patient's health." Third, the amendments added to the list of duties of medical "practices and care" not relieved by the immunity provided by the HCRCA, specifically identifying the duty to inform

6

RSA-006

patients of "legal treatment options" and "benefits of treatment options." Fourth, the amendments to the HCRCA made two significant additions—one entitled "access to care and information protocols" and the other entitled "permissible acts related to access to care and information protocols." Access to care and information protocols are the important parts.

The amendments adding the protocols provision to Section 6.1 are the crux of this litigation. Section 6.1 requires all health care facilities to adopt protocols that allegedly would ensure that conscience-based objections did not impair patients' health. Critically, the affirmative defenses contained in Section 4 and Section 9 of the HCRCA "only apply if conscience-based refusals occur in accordance with these protocols." The consequence being that for physicians, health care personnel, and persons, associations, or corporations that own, operate, supervise, or manage a health care facility to receive the benefits of the affirmative defense, they are forced to comply with the requirements of Public Act 99-690. Their conscience-based actions are unprotected unless they comply with Illinois' mandates in Public Act 99-690, which require physicians to "inform," "give[] information" to, "refer," or "transfer" patients when they are unable to act or provide information to a patient because of a "conscience-based objection."

To obtain the immunity protections, the protocols minimally need to address the requirements of Section 6.1(1) and Section 6.1(3). The Plaintiffs challenge both provisions. Under Section 6.1(1), health care facilities, physicians, and health care personnel are mandated to inform a patient of, among other things, "legal treatment

RSA-007

options, and the risks and benefits of the treatment options in a timely manner."
Under Section 6.1(3), if requested by a patient or a patient's representative, health
care facilities, physicians, and health care personnel must take one of three actions:
(a) refer the patient, (b) transfer the patient, or (c) provide written information about
other health care providers who they reasonably believe may offer the service that
the facility, physician, or personnel can't provide because of a conscience-based
objection. Note a critical difference between Section 6.1(1) and Section 6.1(3): the
former mandates speech regardless of anything else; whereas, the latter requires
actions when prompted by a patient.

The amendment regarding "permissible acts" allows a health care facility to
require physicians and health care personnel working at the facility to comply with
the protocols. In full, this amendment states, "[n]othing in this Act shall be construed
to prevent a health care facility from requiring that physicians or health care
personnel working in the facility comply with access to care and information protocols
that comply with the provisions of this Act." 745 ILCS 70/6.2.

Fifth, as to liability, the HCRCA's amendments added that a health care
facility is not relieved from providing emergency medical care under the HCRCA.
Stated differently, the HCRCA—which is an immunity statute—explicitly doesn't
provide any immunity when physicians, health care personnel, or health care
facilities fail to meet their legal obligations to provide emergency medical care. 745
ILCS 70/9.

D.      *Procedural History of the Litigation*

This litigation started in 2016, when the NIFLA Plaintiffs filed an action in this Court. The Schroeder Plaintiffs then filed an action in the Eastern Division of the Northern District of Illinois, which was consolidated with the NIFLA action in this Court. On July 19, 2017, then-Judge Fredrick Kapala entered a preliminary injunction, enjoining the State from enforcing Public Act 99-690.

On December 15, 2017, based on an unopposed motion, the Court stayed both actions pending the Supreme Court's ruling in *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018). Following the Supreme Court's decision, the Plaintiffs asserted that the decision supported their position and the preliminary injunction. The State asserted that *Becerra* "provided some guidance" but was not "dispositive."

After then-Judge Kapala took inactive status, the actions were assigned to then-Chief Judge Rebecca Pallmeyer. The Plaintiffs moved for summary judgment, seeking permanent injunctive relief. They contended that Public Act 99-690 violated their rights to free speech and to free exercise of religion under the First Amendment. On September 3, 2020, Judge Pallmeyer denied the summary judgment motions, concluding that "genuine disputes of material facts remain[ed]." Dkt. 176. In doing so, Judge Pallmeyer found "that expert discovery about the standard of care [was] necessary before the court [could]" resolve the litigation. Dkt. 176 at 36.

Following Judge Pallmeyer's ruling on summary judgment, three events occurred. First, the undersigned was confirmed by the United States Senate and received a commission, resulting in these actions being transferred. Second, the

RSA-009

Parties engaged in expert discovery per Judge Pallmeyer's order. Third, following expert discovery, the Court held a three-day bench trial.

## II. FACTUAL FINDINGS

### A. *Pregnancy Centers' Work*

Pregnancy Centers ("Pregnancy Centers") are pro-life clinics that will not perform or refer for an abortion. NIFLA dkt. 282-1 ¶ 23. The Pregnancy Centers generally offer free ultrasounds, pregnancy testing, STI testing and treatment. *See* NIFLA dkt. 275-2 ¶¶ 2–15. At least one Pregnancy Center offers "abortion pill reversals." *Id.* ¶ 5. The Pregnancy Centers also provide material assistance to pregnant women and engage in "pregnancy options" and "post-abortion" counseling. *Id.* That counseling includes discussion about the risks of abortion, but it doesn't include a benefits discussion, because the Pregnancy Centers don't believe any benefits exist. *Id.*; NIFLA dkt. 282-1 ¶¶ 31–32. They further believe that counseling about abortion benefits would encourage the procedure. *Id.* ¶ 33. The Pregnancy Centers "rely on the visuals of the ultrasound itself and the health care provider's diagnoses to try to convince pregnant patients to carry to term and not have an abortion." *Id.* ¶ 20. The Parties dispute the extent to which the Pregnancy Centers engage in "medical conduct."

### B. *Standard of Care and Informed Consent*

On summary judgment, Judge Pallmeyer applied intermediate scrutiny and identified an unresolved factual question: whether Public Act 99-690 "burden[ed] more speech than necessary" and whether secular doctors, upon request, generally

transferred, referred, or provided alternative resources. NIFLA dkt. 176 at 23. The State said Public Act 99-690 wasn't overly burdensome because the "standard of care" already required all doctors to discuss a treatment option's benefits and risks. *Id.* at 24. So, the State argued, Public Act 99-690 merely imposed that same standard on the Plaintiffs. *Id.* The Plaintiffs disagreed, claiming that the "standard of care" didn't universally require these types of discussions. *Id.* So, the Plaintiffs contended Public Act 99-690 was underinclusive, applying only to conscientious objectors. *Id.* Judge Pallmeyer ordered a trial to determine what the "standard of care" required.

As discussed later, the Court analyzes the legal issues differently, in a way that turns less on the "standard of care" question. Regardless, a three-day bench trial demonstrated only that, in the abstract, there's no single administrable definition of the standard of care. During that trial, the Parties also discussed "informed consent." Those two issues—standard of care and informed consent—intertwine with one another. However, for later analytical purposes, the Court discusses them separately. All Parties relied on credible and persuasive opinion witnesses. And all Parties agree that any medical organizations pronouncements are only nonmandatory guidelines. NIFLA dkt. 275-2 ¶ 34.

### Standard of Care

The trial testimony was, by and large, consistent with the Parties' briefing: The State argued that Public Act 99-690 simply repeats the professional standards that already bind all health care professionals, while the Plaintiffs argued that the pre-existing standard of care doesn't require a so-called benefits discussion. NIFLA

RSA-011

dkt. 275 at 22; dkt. 271 at 4–8. According to all Parties' retained experts, medical standards of care turn on individualized assessments of a patient's needs, including a woman's medical history, mental health, spirituality, stated goals and expectations, reaction to her pregnancy, the providers' own abilities and expertise, and other factual inquiries. *See e.g.*, Trial Tr. 600:5–13; 629:13–630:21; Trial Tr. 61:6–62:25; *compare* Trial Tr. 431:21–432:9 (Dr. Fernandes encouraging physicians to balance a patient's wishes against other factors) *with id.* at 587:1–25 (Dr. Burcher suggesting patient autonomy is the preeminent principle in modern bioethics). This testimony is unsurprising. Under Illinois law, standard of care depends on the specific factual circumstances presented to the health care professional. *Edelin v. Westlake Comm. Hosp.*, 510 N.E.2d 957, 962 (Ill. App. Ct. 1987). Indeed, Illinois juries are instructed to this effect. Illinois Pattern Jury Instructions, Civil, No. 105.00 (2020). This highly fact-specific inquiry is incompatible with requiring a doctor to discuss so-called benefits with *every* patient—largely because the State never presented evidence that every pregnant woman needs the "thorough[]" discussion that the State tries to impose. NIFLA dkt. 275-1 ¶¶ 90–110.

The State argued that professional organizations create ethical standards of care that encourage health care professionals to provide neutral options counseling and requested abortion referrals. NIFLA dkt. 275 at 5–6. But those standards aren't binding. Trial Tr. 316:8–10; NIFLA dkt. 275-1 ¶¶ 75–78, 106–09.[5] In an amicus brief before the Court, the American College of Obstetrics and Gynecology ("ACOG") cites

---

[5] Like the Pirate's Code, trial testimony established that these standards are more what you'd call "guidelines" than actual rules. https://www.youtube.com/watch?v=WJVBvvS57j0.

its own Code of Professional Ethics, stating that obstetrician-gynecologists must discuss the "risks, benefits, possible complications, and anticipated results" of terminating a pregnancy, and the American Medical Association ("AMA") statement that health care providers "should" present accurate information about "the burdens, risks, and expected benefits of all options." NIFLA dkt. 279 at 3. As the experts testified at trial, ACOG and AMA standards for discussing abortion make no sense when a patient is thrilled to learn of her pregnancy and no reasonable concerns exist for the patient to continue with the pregnancy. Trial Tr. 168:8–13, 629:18–630:2. And, not surprisingly, given the contentious nature of elective abortion, other professional groups have conflicting opinions. *See* Trial Tr. 473:15–475:23. So, all the evidence shows is that the standard of care doesn't require a binding, uniform benefits discussion.

### Informed Consent

The Court's best efforts to define "informed consent" were similarly futile. The Parties disagree on the medical definition of "informed consent." According to the Plaintiffs, a doctor's ethical obligations to a specific patient "arise out of the nature of the doctor–patient relationship . . . specifically what has that patient come to the physician for and what is the physician offering to the patient." NIFLA dkt. 271-1 ¶ 28. Accordingly, "[i]nformed consent is the responsibility of the physician who will provide the treatment for which consent is sought, not the referring physician or any other physician." *Id.* ¶ 29. So, according to the Plaintiffs, "a physician need not discuss the risks and benefits of treatments like abortion that they do not personally provide." *Id.* ¶ 30.

RSA-013

The State takes a different view. According to the State, "[i]nformed consent is not limited to seeking authorization for an imminent medical procedure." NIFLA dkt. 275-1 ¶ 107. Instead, informed consent can "apply to counseling both about a specific medical intervention by a health care provider or more broadly about different relevant medical options available to a patient, because both involve choosing a treatment option or a plan of care." *Id.* ¶ 108. So, "[h]ealth care personnel are obligated to advise patients of risks and benefits of relevant procedures and treatment options, even if those treatments are not available at that particular medical facility." *Id.* ¶ 109. According to the State, proper medical care then requires "medical options counseling," in which providers "present[] patients with medically appropriate treatment options for their condition and the risks and benefits of those options." *Id.* ¶ 96. Again, this view makes no sense if the patient is thrilled to learn of the pregnancy and no reasonable medical concerns exist for the patient to continue the pregnancy.

As with the standard of care issue, the witnesses drew their definitions from competing ethical and moral principles. For example, the State says the "*central approach* to biomedical ethics is the 'principalist theory,'" which emphasizes "autonomy, beneficence, nonmaleficence, and justice." *Id.* ¶ 66. But the Plaintiffs stress that some medical professionals—and organizations—adhere to other ethical regimes that balance values differently. *Schroeder* dkt. 236-1 ¶¶ 61–78. So, the Court can't define, in the abstract, a binding, universal definition of "informed consent."

14

## III.    CONCLUSIONS OF LAW

The Court now addresses the legal questions.  It first considers whether either Section 6.1(1) or Section 6.1(3) violates the First Amendment's Free Speech Clause.[6] If warranted, the Court also considers whether either Section violates the Free Exercise Clause.  In making these assessments, this Court recognizes that "[w]here fairly possibl[e], [it] should construe a statute to avoid a danger of unconstitutionality." *Zbaraz v. Madigan*, 572 F.3d 370, 383 (7th Cir. 2009) (citations omitted); *see Rescue Army v. Mun. Ct.*, 331 U.S. 549, 568–74 (1947).  Further, in addressing the constitutionality of a state statute, a federal court may not formulate a rule of constitutional law broader than is required by the precise facts to which is to be applied.  *United States v. Raines*, 362 U.S. 17, 21 (1960).  And, if a federal court is required to grant injunctive relief, the relief should be no more burdensome than necessary.  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Injunctive relief must be tailored to the scope of the violation and the specific harm established.  *DraftKings Inc. v. Hermalyn*, 118 F. 4th 416, 423 (1st Cir. 2024); *e360 Insight v. Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007).

**Unconstitutional Conditions**

The Plaintiffs argue that Public Act 99-690 imposes unconstitutional conditions on the receipt of a public benefit.  Importantly, a state cannot condition the receipt of a public benefit—such as a liability shield—on a citizen surrendering their constitutional rights.  *See Elrod v. Burns*, 427 U.S. 347, 361 (1976) (plurality

---

[6] The Court only addresses Sections 6.1(1) and (3), because the others aren't contested.  *See* NIFLA dkt. 275 at 9. Section 6.1(2) is not mentioned.  *Id.*

15

opinion); *Libertarian Party of Ind. v. Packard*, 741 F.2d 981, 988 (7th Cir. 1984) ("What a government cannot compel, it should not be able to coerce."). So, the unconstitutional conditions doctrine is a theory of First Amendment liability, not a claim in itself. As discussed more in the Free Exercise section, Public Act 99-690 offers a benefit, namely a liability shield. In making that offer, however, the State can't demand a constitutional violation. So, the threshold question is whether each Section violates the constitution.

**First Amendment Free Speech Claim**

The First Amendment, applicable to the states through the Fourteenth, prohibits laws "abridging the freedom of speech." U.S. Const. amend. I; *Becerra*, 585 U.S. at 766. In any challenge to government action that allegedly violates the First Amendment, the first step is to determine whether a particular state-action provision regulates speech (implicating the First Amendment) or conduct (not entitled to First Amendment protections).[7] Next, if the state action regulates speech based on its content, the court applies strict scrutiny, unless a doctrinal exception pulls the state action to a lesser tier of scrutiny. The First Amendment protects both the "right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The Court analyzes Sections 6.1(1) and 6.1(3) in turn.

---

[7] Just as Everlast explained in *What It's Like*, *see* https://genius.com/Everlast-what-its-like-lyrics, where a court starts its analysis—by concluding that the state action regulates speech or regulates conduct—is essentially dispositive. *See Dana's R.R. v. AG*, 807 F.3d 1235, 1242 (11th Cir. 2015) (describing speech conduct determination as being determinative).

16

RSA-016

A.        *Section 6.1(1)*

The Supreme Court's precedents have "long drawn a line" between speech and conduct.  *Becerra*, 585 U.S. at 769 (collecting cases).   Although, in some circumstances, that line might be "difficult" to draw, *id.*, Section 6.1(1) falls on the speech side.  The provision demands that health care providers "*inform*" patients about the risks and benefits associated with their treatment options.  § 1 (emphasis added).  And the State imagines a "thorough discuss[ion]" between the health care provider and the patient.   NIFLA dkt. 275-1 ¶¶ 90–110 (terming the discussion "counseling").[8]  So, Section 6.1(1) regulates speech, implicating the First Amendment.

Next, the Court considers whether Section 6.1(1) is content-based or content-neutral.   Content-based state actions "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).   A statute alters the content of a speaker's speech by compelling individuals to speak a particular message or share particular pieces of information.  *Becerra*, 585 U.S. at 755 (2018).

Section 6.1(1) is a content-based regulation because it governs a health care provider's discussion on pregnancy and abortion.   The state action is especially suspect because it's also view-point discriminatory.  *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 704 (N.D. Ill. 2023) (citing *Rosenberger*, 515 U.S. 819 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more

---

[8] The Court discusses below whether counseling can be considered "conduct."

17

blatant."). The Plaintiffs contend that abortion confers no medical benefits. NIFLA dkt. 271-1 ¶ 18; Schroeder dkt. 236-1 ¶ 41. It is important to note that the Plaintiffs' definition of abortion basically only encompasses elective abortions (which seems to mean all abortions where there's a viable fetus). Schroeder dkt. 236-1 ¶ 38. For example, the Plaintiffs don't argue that terminating an ectopic pregnancy is an "abortion" as they define the term. *See* Trial Tr. 52:20–53:4. This view is consistent— albeit perhaps for different reasons—with the fact that even the medical profession doesn't consider terminating an ectopic pregnancy to be an "abortion." *See Procedural Abortion*, UptoDate.com (Feb. 2025) ("[W]hen a trained health care provider does a procedure to remove the pregnancy *from [a] uterus*.") (emphasis added). This limited definition of abortion is at least somewhat consistent with the Act, which doesn't provide immunity when health care professionals fail to act in an emergency. 745 ILCS 70/9.

The State disagrees with the Plaintiffs, believing that an abortion (however it is defined) is beneficial in certain circumstances. Whether the State or the Plaintiffs are correct, however, doesn't factor into this constitutional analysis. In demanding that health care professionals discuss the benefits (and thereby concede to the State's view), the State makes the providers "instruments" in delivering a particular message. *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572 (7th Cir. 2001) (quoting *Wooley v. Maynard*, 430 U.S. 705, 715 (1977)).

Ordinarily, the First Amendment bars a state from commanding this type of speech, unless it survives strict scrutiny. This level of scrutiny requires the state to

RSA-018

identify a compelling interest and narrowly tailored means to achieve it. The State says it's entitled to deferential treatment in this case because Section 6.1(1) targets professional conduct and only incidentally implicates speech. The Plaintiffs disagree, arguing that Section 6.1(1) unconstitutionally compels speech. To determine whether Section 6.1(1) receives deferential treatment, the Court considers two First Amendment doctrines: (a) the *Zauderer* commercial speech and (b) the "speech incidental to conduct" exceptions.

a)      *Zauderer* Commercial Speech

In limited, narrow circumstances, the government has leeway to regulate speech relating to professional activities. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626 (1985); *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 573 (1995). The *Zauderer* exception applies only to "purely factual and uncontroversial information" in commercial advertising. *Becerra*, 585 U.S. at 768–69; *Hurley*, 515 U.S. at 573.

*Zauderer*'s narrow scope doesn't apply to this case for three reasons. First, none of the speech in this case is "commercial" speech. Generally, "[c]ommercial speech is speech that proposes a commercial transaction." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014) (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 475 (1989); *see also Commerce*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining commerce as the "exchange"—not the free provision—of "goods and services"); *In re Primus*, 436 U.S. 412, 437–38 n. 32 (1978) (finding an attorney

19

engaged in noncommercial speech by advertising free services intended to advance "beliefs and ideas," as opposed to financial gain).

In this case, there's no economic transaction: None of the Pregnancy Centers charge for their services, so there's no financial exchange. *See NIFLA v. Raoul*, 685 F. Supp. 3d 688, 705 (N.D. Ill. 2023) (This Court made the same conclusion involving largely the same facts, because "there [was] no economic motivation for the speech."). Moreover, "abortion [is] anything but an 'uncontroversial' topic." *Becerra*, 585 U.S. at 769. Ordinary life experiences support that conclusion: Try talking about abortion in public amongst strangers and see what reaction it spawns. Third, as discussed more below, the information Public Act 99-690 requires "in no way relates to the services" that the Plaintiffs provide. *See Becerra*, 585 U.S. at 769. In *Becerra*, the Supreme Court held that the compelled disclosures (information about abortion) weren't "commercial speech," in part because the pregnancy centers didn't provide abortions. That's the same in this case. The Plaintiffs don't provide abortions, so the State can't rely on the *Zauderer* exception to compel speech about the procedure. So, the commercial speech exception won't shield the disclosures from heightened review.

b)      Speech Incidental to Conduct

The First Amendment also permits a state to regulate conduct, even when doing so incidentally burdens speech. Whether the regulation remains "incidental" depends on how to read (and reconcile) *Becerra* and *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) (*overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)). The Parties excise favorable sentences from one case while

nearly ignoring the other. *See e.g.*, NIFLA Plaintiffs' Table of Authorities, dkt. 275 at 3 (citing *Becerra* "*passim*" and *Casey* once); the State's Table of Authorities, dkt. 271 at 3, (citing *Casey* "*passim*" and *Becerra* twice). The Court also must examine whether and to what extent the Seventh Circuit's decision in *Doe v. Rokita* affects the interpretation of those two cases. 54 F. 4th 518. The Court is duty bound to harmonize all three cases. *United States v. Hansen*, 929 F.3d 1238, 1254 (10th Cir. 2019) ("[W]e must endeavor to interpret our cases in a manner that permits them to coexist harmoniously with overarching and controlling Supreme Court precedent and with each other."); *Kimberly-Clark Corp. v. Fort Howard Paper Co.*, 772 F.2d 860 63 (Fed. Cir. 1985) ("Thus, statements in opinions of this court must be read harmoniously with prior precedent, not in isolation.").

In *Casey*, abortion-provider plaintiffs challenged Pennsylvania's law requiring them to provide patients with certain information before performing an abortion. 505 U.S. at 880. Specifically, the law required the physician to discuss the "nature of the procedure, the health risks of the abortion and of childbirth, and the probable gestational age of the unborn child." *Id.* at 881. Further, the law required the physician to note the availability of state-published materials on child-support assistance, adoption agencies, and other abortion alternatives. *Id.*

The *Casey* plurality didn't evaluate the Pennsylvania law under heightened review. *Id.* Instead, the plurality termed the mandated disclosures an "informed consent requirement." *Id.* It suggested that a state doesn't violate the First Amendment when it requires a doctor to provide "truthful, nonmisleading

21

information about the nature of [a] procedure." *Id.* at 882. Though such requirements implicated the doctor's right not to speak, they did so "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Id.*

The State is correct that *Casey*'s language gives it some constitutional leeway to enact Section 6.1(1). But the *Casey* decision doesn't stand in isolation. Both the Supreme Court and the Seventh Circuit had more to say.

In *Becerra*, the Supreme Court considered a California statute that required certain pro-life pregnancy centers to display a state-drafted notice regarding abortion availability. *Becerra*, 585 U.S. at 763. The notice had to be "posted in the waiting room, printed and distributed to all clients, or provided digitally at check-in." *Id.*

Rejecting a so-called "professional speech" First Amendment exception, the Supreme Court held that "speech is not unprotected merely because it is uttered by professionals.'" *Id.* at 766. Citing *Casey*, the Court acknowledged that "States may regulate professional conduct, even though that conduct incidentally involves speech." *Id.* at 769. In doing so, *Becerra* immediately categorized the action at issue in *Casey* as more akin to conduct, rather than speech. Moving forward, the Supreme Court then held *Casey*'s lower standard didn't apply to the California statute. Instead, according to the *Becerra* Court, the law "regulate[d] speech as speech." *Id.* at 770. The *Becerra* Court reasoned that the Pennsylvania statute in *Casey* was an "informed consent" law; whereas, the California statute was "neither an informed consent requirement nor any other regulation of professional conduct." *Id.*

22

RSA-022

Although it didn't overrule *Casey*, *Becerra*'s dicta revealed the Court's dim view of compelled speech, even when it occurs in a medical context. "Doctors help patients make deeply personal decisions, and their candor is crucial," the Court said. *Id.* at 771 (citations omitted). And "[t]hroughout history, 'governments have 'manipulated the content of doctor-patient discourse' to increase state power and suppress minorities." *Id.* (citations omitted). "Doctors and nurses might disagree about the ethics of assisted suicide or the benefits of medical marijuana . . . [but] the people lose when government is the one deciding which ideas should prevail." *Id.* at 772.

***

The Court detours here to discuss "informed consent," for purposes of *Becerra*'s "speech incidental to conduct." *Becerra*, *Casey*, *Rokita*, and other abortion-related cases refer to informed consent. And, as the Parties recognize, this loaded term of art does a decisive amount of work: If a disclosure fits within an "informed consent" statute, *Becerra* deemed it "incidental to professional conduct," and thereby immune from heightened review. Indeed, post-*Becerra*, if a disclosure *isn't* an informed consent statute, few avenues permit deferential review. *But see Rokita infra.* Yet, there's apparently "no[] legal authority reciting the contours of 'informed consent.'" *E.M.W. Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F. 3d 421, 448 (6th Cir. 2019) (Donald, J., dissenting).

The Parties in this case offer conflicting definitions of informed consent. A three-day trial devolved into disagreements about the competing ethical principles underpinning medical practice and which values should be prioritized over others.

23

*See* Trial Tr. 426–35; 603–10. To the extent the American Medical Association or similar groups adopt a definition, the record demonstrates those are nonbinding guidelines. NIFLA dkt. 275-2 ¶ 34. So, under these circumstances, the Court has two options: examine legal precedent and derive a definition from that caselaw or choose between competing experts and trade associations on an issue fraught with scientific, moral, and philosophical controversy. Some judges take the latter approach, looking to the normative medical definition promulgated by groups like AMA and ACOG. *See E.M.W.*, 920 F. 3d at 454–55. (6th Cir. 2019) (Donald, J., dissenting); *Camnitz*, 774 F.3d at 251–53. A court would then conclude that whatever falls within the medical groups' informed consent definition automatically meets *Becerra*'s "speech incidental to conduct."

But there are significant problems with that approach, an approach this Court refuses to take. First, that process ultimately nullifies *Becerra*: "Speech isn't unprotected," the *Becerra* Court held, "merely because it's uttered by professionals." Yet if the State or professional groups could tuck the compelled speech under an "informed consent" labeled shield, then they could routinely evade scrutiny. *See Becerra*, at 755 ("[S]tate labels cannot be dispositive of [the] degree of First Amendment Protection." (cleaned up)). Further, that approach forces the Court to decide what's constitutional based on the normative, conventional perspectives. That conflicts with the First Amendment's entire purpose, aiming to protect *"unpopular* ideas [and] information." *See Becerra*, 585 U.S. at 773 (emphasis added).

24

RSA-024

More importantly, doctors and lawyers are talking past each other. *Becerra* didn't say "informed consent" status alone is a get-out-of-First-Amendment-free card. Instead, *Becerra* held that such provisions are acceptable *because they're incidental to professional conduct*. Indeed, the Supreme Court pointed to the specific informed consent provision at issue in *Casey*. 585 U.S. at 769–70. So, the Court must determine whether the medical definition of informed consent remains incidental to conduct. If the scope of the medical community's definition captures protected speech—i.e. amounts to more than an incidental burden—then it violates the First Amendment. A court can't abdicate its responsibility to determine constitutional protections to trade associations.

Ultimately, when medical experts disagree as to what constitutes "informed consent," the Court can't pick a side. It's not only unqualified do so, but, more importantly, *Becerra* doesn't care about the abstract definition. Instead, the Court examines abortion-related cases to discern some of the contours of informed consent. When "informed consent" meets *those* qualifications, it necessarily satisfies *Becerra*'s "incidental to professional conduct." The Court finds that "informed consent" is incidental to conduct when it meets the following four minimum requirements.

First, informed consent necessarily requires a "medical procedure." The *Becerra* statute wasn't an informed consent provision, because it wasn't "tied to a procedure at all," instead applying to "all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered or performed." *Becerra*, 585 U.S. at 756; *see also Rokita*, 54 F. 4th at 520 (noting that

25

states may require "informed consent to risky procedures"). That's also consistent with the term "incidental to conduct." If there's not an identifiable procedure—i.e. no conduct—then the informed consent can't latch on to anything.

Second, as the term suggests, an informed consent provision must "afford the patient the ability to make an informed, intelligent decision regarding medical treatment he is to receive," including "the general nature of the contemplated procedure, the risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." *Roberts v. Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985). *Canterbury v. Spence*, 464 F.2d 772, 781 (D.C. Cir. 1972) (physicians generally must "warn the patient of any risks to his well-being which the contemplated therapy may involve").

So, by definition, a disclosure only qualifies as an informed consent provision if it occurs *before* a patient undergoes a medical procedure. *See Patel*, 620 F. Supp. at 325 ("The doctrine of informed consent requires that *prior to* administering medical treatment . . . .) (emphasis added); *Becerra*, 585 U.S. at 769 (noting that *Casey* required "informed consent *before* they could perform an abortion." (emphasis added); *Karlin v. Foust*, 188 F.3d 446, 454 (7th Cir. 1999) (discussing informed consent before a procedure); *Stuart v. Camnitz*, 774 F.3d 238, 252 (4th Cir. 2014) ("The informed consent process typically involves a conversation between the patient . . . and the physician . . . before the procedure begins."). Both legal and medical dictionaries agree on this fundamental principle of informed consent. *Informed Consent*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A person's agreement to allow something to

happen, made with full knowledge of the risks involved and the alternatives."); *Informed Consent*, STEDMAN'S MED. DICTIONARY ("Voluntary agreement given by a person . . . for participation in a . . . treatment regime . . . after being informed of the purpose, methods, procedures, benefits, and risks.").

Third, to be incidental to conduct, the informed consent provision must substantively relate to the impending medical procedure. In other words, a state can't throw whatever it wants into a compelled disclosure and label it informed consent. Before surgery, the State can't require a doctor to tell her patient that ketchup should never be put on a hotdog. Courts have interpreted that requirement broadly, allowing discussions of such things as adoption and parental support, *Casey*, 505 U.S. at 881, and descriptive ultrasounds, *E.M.W.*, 920 F. 3d 421, 424. (6th Cir. 2019); *but see Camnitz*, 774 F.3d at 252 (holding such ultrasounds don't fit within informed consent). But in all those scenarios, the disclosures aimed to articulate the factual "risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." *Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985). The relational requirement essentially tracks the "truthful, non-misleading and relevant" standard articulated in *E.M.W.*, 920 F.3d at 424.[9]

---

[9] The State argues that "truthful, non-misleading, and relevant" standard should govern compelled disclosures, like Section 6.1(1). But the State skips a step. The *E.M.W.* court had already concluded that the statute at issue was an informed consent provision. *See* 420 F.3d at 424 ("Even though an *abortion-informed-consent* law compels a doctor's disclosure of certain information, it should be upheld so long as the disclosures is truthful, non-misleading, and relevant to an abortion.") (emphasis added); *id.* at 429 ("[S]uch incidental regulation includes mandated informed-consent requirements, provided that the disclosures are truthful, non-misleading, and relevant."). Moreover, the Court shares some

Fourth, doctrinally, an informed consent provision is incidental to conduct only when it regulates the health care provider performing the identified medical procedure. *See Casey*, 505 U.S. at 881–82 (explaining how the statute applied to the doctor performing the abortion); *A Woman's Choice-East Side Women's Clinic v. Newman*, 305 F.3d 684, 684–85 (discussing what the Court called an "informed consent" statute that regulated the "*physician who is to perform* the abortion") (emphasis added); *E.M.W.*, 920 F.3d at 424 (discussing what the court termed an informed consent provision that "direct[ed] a doctor, prior to performing an abortion"); *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012) (same); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008) (same). All of those cases are doctrinally consistent with the goal of informed consent that a physician can't operate on a person without the patient's permission. *See Becerra*, at 770 (citing *Chloendorff v. Soc'y of N.Y. Hosp.*, 105 N.E. 92, 93 (1914) (Cardozo, J.) ("[A] surgeon who performs an operation without his patient's consent commits an assault."). That rationale only carries weight when the operating physician obtains the patient's consent for *that* impending procedure.

The State calls this an "invent[ed]" rule that imposes "a novel limitation" on the State's power. NIFLA dkt. 275 at 15. It's true that neither *Casey* nor those other cases said in exact words that a disclosure is only an informed consent provision when

---

of the *E.M.W.* dissent's concern that *Casey* may have used that language in an undue burden analysis, not a First Amendment one. *Id.* at 449.

it's regulating the procedure-providing doctor. But those were the factual circumstances. And cases must be read and their holdings interpreted in the factual context presented to the court making the decision. *See Pampered Chef v. Alexian*, 804 F. Supp. 2d 765, 782 (N.D. Ill. 2011); *MB Fin. Bank, N.A. v. Walker*, 741 F. Supp. 2d 912, 919 (N.D. Ill. 2010). Indeed, the Supreme Court found *Becerra*'s counterfactual (i.e. a state compelling speech from someone not necessarily performing the medical procedure) unconstitutional. What's more, the State has things backwards. The State cites no case that construes "informed consent" in this type of expansive manner, one that applies "informed consent" to health care providers who never offer the underlying-yet-to-occur procedure. Instead, the *State* breaks doctrinal ground by pioneering a novel definition without authority. In doing so, the State—not the Plaintiffs—are the inventors.

The State notes that *Casey* required the operating physicians to inform women about "subjects far beyond the health care they offered," including paternal child support and adoption. NIFLA dkt. 275 at 12. So, the State asserts, the physician need not provide the triggering medical procedure. *Id.* But the State confuses the necessary and sufficient conditions. If a doctor performs a medical procedure, then a state may require an informed consent disclosure. The doctor must perform a medical procedure for the state to constitutionally compel that disclosure. However, the doctor doesn't need to also perform the procedures (if any) contained within those disclosures. For example, a state may compel a surgeon to inform a patient that

29

surgery will consequentially require physical therapy, even though the surgeon doesn't offer physical therapy.

The State proposes a broader definition of informed consent. It contends that "[i]nformed consent is not limited to seeking authorization for an imminent medical procedure." NIFLA dkt. 275-1 ¶¶ 107–08. Instead, "[h]ealth care personnel are obligated to advise patients of risks and benefits of relevant procedures and treatment options, even if those treatments are not available at that particular medical facility." NIFLA dkt. 275-1 ¶¶107–08. The State derives that definition from the AMA's Code of Ethics and other professional bodies. *See* NIFLA dkt. 275-1 ¶¶ 75–78, 106–09. The State admits those ethical guidelines are "not binding professional or legal standards, but they provide a normative set of guidelines within the medical profession that health care professional consult to inform their practice." *Id.*[10] The State cites no case in which courts stretch informed consent to apply to doctors who don't perform the impending procedure. The Plaintiffs and their experts disagree with the State, offering a definition similar to the Court's definition. *See* NIFLA dkt. 271 at 3 ("To qualify as an informed consent requirement, a law must be tied to a medical procedure that the regulated parties perform.").

---

[10] To be clear, the Court doesn't doubt that "informed consent" also prizes "patient autonomy" and "self-determination." *Camnitz*, 774 F.3d at 251; *see also Canterbury v. Spence*, 464 F.2d 772, 787 (D.C. Cir. 1972) (emphasizing "patients right to self-decision" and determination). But the doctrine still requires certain other predicates to be satisfied for the term to qualify as "speech incidental to conduct." *Camnitz* found that an ultrasound-description requirement fell outside informed consent—essentially because it demanded *too much* information—but the necessary elements discussed above still existed.

30

RSA-030

The State's definition falls outside *Becerra*'s scope. *Becerra* carved out room for informed consent provisions as incidental to conduct. But that's because they were nearly contemporaneous with and in furtherance of the underlying procedure. "Incidental to conduct" is incompatible with a definition of informed consent that would require doctors to discuss hypothetical medical procedures they won't perform.

So, to summarize: Doctrinally, a statute qualifies as an informed consent provision—and therefore incidental to conduct—when it requires a health care professional, before she performs a medical procedure, to discuss the nature or consequences of the impending medical procedure.

***

In medical cases, informed consent occupies most of the "speech incidental to professional conduct" universe. *See Becerra*, 885 U.S. at 768 (citing only two examples: the informed consent statute in *Casey* and legal advertising regulations). But *Becerra* leaves some room for non-informed consent qualifying statutes that are nonetheless incidental to professional conduct. *See id.* at 770 (noting that the California statute was "not an informed consent requirement *or any other regulation of professional conduct*."). *Rokita* provides such an example.

In *Rokita*, Indiana regulated the disposal of fetal remains. Specifically, the state required abortion providers (but not women who kept the remains) to dispose of the remains by either burial or cremation. 54 F. 4th 518, 519 (2022). The disposal requirements didn't apply to women who kept the remains themselves. *Id.* The

31

RSA-031

provider could explain those options after the procedure, and the information didn't aim to inform her consent to a procedure; nor did *Rokita* call the statute an informed consent provision. Two doctors sued, arguing that the First Amendment barred Indiana from requiring them to ask the women to select an option: burial or cremation. *Id.* at 520.

In a brief decision, the Seventh Circuit held Indiana's law constitutional. On the one hand (and as the State highlights), the *Rokita* Court stressed that "states may require medical providers to give truthful notices," including disclosures that enable "informed consent to risky procedures." *Id.* Characterizing *Becerra*, *Rokita* explained that although a "state may not enforce requirements disconnected from medical care,"[11] the state could still demand that "medical professionals alert patients to laws that affect medical choices." *Id.* at 521. That precise language gives states some latitude to demand certain speech, so long as that speech related to "medical choices" or falls within "medical care." But, as the Seventh Circuit has reminded district courts, that sentence must be read in context, including in the context of the facts of the case. *Livingston v. Trustguard Ins.*, 558 Fed. Appx. 681, 683 (7th Cir. 2014) *citing United States v. Costello*, 663 F.3d 1040, 1044 (7th Cir. 2012).[12] The Seventh Circuit's reminder is critical because, as the Plaintiffs emphasize, later language in *Rokita* limits its scope. Characterizing *Becerra*'s characterization of *Casey*, *Rokita* held that "a state may require medical professionals to provide

---

[11] This is the "ketchup on the hot dog" example the Court used previously.
[12] For example, although *Rokita* used the phrase "risky procedures," no risky procedures were implicated under the challenged statute or facts of the case.

RSA-032

information that facilitates patients' choices directly linked to procedures that have been or may be performed." *Rokita*, 54 F.4th at 521.

Reading *Casey*, *Becerra*, and *Rokita* together, the Court derives the following rule: States may regulate the practice of medicine, but to the extent the regulation implicates speech, to be constitutional, that speech must be "incidental to professional conduct." *Becerra*, 885 U.S. at 768. In the medical context, qualifying informed consent provisions will occupy most of the "speech incidental to professional conduct" universe. But *Rokita* makes clear that there's still room for some other speech-implicating conduct regulations, so long as the speech remains incidental to the underlying conduct.

*Application to Section 6.1(1)*

With that background, the Court now assesses Section 6.1(1). It first considers whether the mandated disclosures are "informed consent" provisions, as earlier defined. It then weighs whether the provisions are otherwise "incidental to conduct."

As discussed above, to secure a liability shield, Section 6.1(1) compels certain speech; namely a discussion about a patient's "condition, prognosis, legal treatment options, and risks and benefits of the treatment options." NIFLA dkt. 275-1 ¶ 100 (imagining a "thorough[] discuss[ion]" between the provider and the patient; *id*. ¶¶ 90–110 (terming the discussion "counseling"). As discussed, the mandated disclosures don't qualify as commercial speech. So, the Court subjects it to heightened scrutiny, unless the speech is only incidental to conduct.

33

RSA-033

*Informed Consent Analysis*

If the disclosures fall under the definition of informed consent, then the *Becerra*, *Casey*, and *Rokita* decisions teach that the disclosures are necessarily incidental to conduct and therefore don't trigger strict scrutiny. Recall that a state action doctrinally qualifies as an informed consent provision when it requires a health care professional, before she performs a medical procedure, to discuss the nature or consequences of the impending medical procedure. Under Section 6.1(1):

> "The health care facility, physician, or health care personnel shall inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner, consistent with current standards of medical practice or care."

The Pregnancy Centers engage in some medical-like conduct. They discuss medical histories, maternal health, abortion, and childbirth. In some cases, they administer STI and/or pregnancy tests as well as abortion pill reversals. And the Pregnancy Centers also perform transvaginal and abdominal ultrasounds. None of the Pregnancy Centers themselves perform abortions.

Although the cases on informed consent don't define a "medical procedure," under these facts, the Court is able to identify only two procedures from the list of medical conduct that could possibly anchor an informed consent provision: (i) sonogram/pregnancy test, and (ii) "medical options counseling." The Court considers whether either are qualifying "medical procedures," and, if so, whether the disclosures meet the other qualifications for informed consent.

RSA-034

i)     *Ultrasound*

The Pregnancy Centers perform abdominal and transvaginal ultrasounds and conduct pregnancy tests.[13]  In doing so, a woman is "assigned a medical professional," and brought to an ultrasound exam room.  Tr. 361:12–22.   The Court finds these exams to be "medical procedures."  And because it's a qualifying medical procedure, the State has leeway to require informed consent for these procedures.

As applied to the Pregnancy Centers, the disclosure's timing doesn't fit the informed consent definition.  Section 6.1(1) kicks-in *after* the ultrasound procedure.  *See* Section 6.1(1) (the provider must inform the patient of her "condition, prognosis, legal treatment options, and risks and benefits of the treatment options.").[14]  These types of discussions could only occur following a pregnancy determination.  But after the ultrasound the woman is either "free to go," Trial Tr. 97:13–16, or otherwise discusses her pregnancy options with a nurse or patient advocate.  Trial Tr. 155:17–21.  At that point, the Pregnancy Centers don't perform an impending medical procedure, so there's nothing that requires the patient's informed consent.

And it's not just a timing issue.  There's a relationship disconnect.  A prototypical informed consent provision would pertain to the impending procedure's

---

[13] The Court identifies the ultrasound (as opposed to the urine test) as the underlying procedure, because its more invasive nature permits a broader set of disclosures, which in turn maximizes the likelihood that the disclosures are constitutional.

[14] The Plaintiffs contend that the ultrasound doesn't qualify as a medical "diagnosis." But the Court construes it as a diagnostic procedure for these purposes.  It blinks reality to assert that an ultrasound performed at a crisis pregnancy center is not performed to obtain images for medical diagnostic purposes. *Diagnostic ultrasound*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

35

(here an ultrasound) nature, risks, and benefits. To that end, the medical professional might need to inform a woman about the ultrasound's benefits. For example, the medical professional might need to inform the patient that the ultrasound provides an image of the fetus; that it can determine a fetus' age and condition; or that it can identify risky health conditions. And the health care professional might also be compelled to disclose that an ultrasound requires abdominal or vaginal contact; that less invasive procedures, like a urine test, can accomplish some of the same goals; or that an image of a fetus will appear on screen or that the woman may hear certain sounds. That type of information might inform the woman's decision as to whether to undergo the ultrasound procedure.

But the compelled disclosures required by Section 6.1(1) (i.e. the risks and benefits of abortion and childbirth) both occur after the ultrasound and substantively don't relate to that procedure. So, they don't fit within the doctrinal understanding of informed consent statutes.

(ii) <em>Medical Options Counseling</em>

The Court next considers whether the Pregnancy Centers' "medical options counseling" could qualify as a medical procedure that could anchor incidental disclosures. The State groups much of the Pregnancy Centers' activities together, terming them "medical options counseling." And the Plaintiffs admit they engage in this type of counseling. Dkt. 282-1 at 16. The Court understands that to essentially mean a discussion regarding pregnancy status (pregnant or not pregnant) and a woman's associated options (if pregnant, then childbirth or abortion). If all of that

36

counseling itself is a "medical procedure," then the State could regulate that conversation under the theory that the discussion is actually conduct. Put simply, the speech itself is treatment, which would be conduct. Under that kind of reading, the Court wouldn't even need to consider whether particular speech was "incidental" or to a procedure, because the procedure necessarily encompasses the speech. Stated differently, according to the State, "medical options counseling" is conduct, not speech.

There's support for this type of reading. (In the near future, the Supreme Court might have something to say about this type of reading.) In *Tingley v. Ferguson*, the Ninth Circuit considered whether conversion therapy[15] constituted conduct or speech. 47 F.4th 1055. The therapist-plaintiff alleged that Washington's ban on the practice violated his free speech rights. But citing its pre-*Becerra* decision in *Pickup v. Brown*, 740 F. 3d 1208 (2014) the Ninth Circuit held that the therapy constituted conduct and therefore didn't implicate the First Amendment's free speech clause. 740 F.3d at 1221. The *Tingley* court reasoned that the therapy wasn't any less of a medical treatment "merely because [the treatment is] implemented through speech rather than conduct." *See also Chiles v. Salazar*, 116 F. 4th 1178, 1203–09 (10th Cir. 2024) (*cert. granted*, No. 24-539, 2025 U.S. LEXIS 1025 (Mar. 10, 2025)) (upholding a district court's preliminary injunction finding talk therapy a "medical treatment," and therefore "conduct.").

---

[15] "Within the field of psychology, conversion therapy is also known as 'reparative therapy' or 'sexual orientation and gender identity change efforts." 47 F.4th at 1064. Conversion therapy employs counseling and psychotherapy.

But not all circuit courts are on board. The Eleventh Circuit, in *Otto v. City of Boca Raton, Florida*, held that conversion therapy constituted speech. 981 F.3d 854. States couldn't regulate that speech, the *Otto* court held, by relabeling it "conduct." *Id.* at 861. The court recognized that it wasn't "entirely wrong" to characterize speech-based therapy as a "course of conduct." But the *Otto* court stressed that what the enacting governments called a "medical procedure" actually "consist[ed]— entirely—of words." *Id.* at 865. So, the Eleventh Circuit concluded that the First Amendment applied to therapy regulations.

The State says *Otto* doesn't apply. In its view, *Otto* didn't involve a "physician disclosure law of the kind at issue in *Casey* and *Rokita*, which require[d] providers to disclose certain information in connection with the provision of healthcare services." NIFLA dkt. 275 at 23. According to the State, "*Casey* and *Rokita* make clear that giving patients full information to make medical decisions is part of the 'practice of medicine, subject to reasonable licensing and regulation by the state.'" *Id.* (citing *Casey*, 505 U.S. at 884)). As explained above, the Court disagrees with the State's reading, because it largely ignores *Becerra* and sidesteps important language in *Rokita*. The State must either establish that it's solely regulating conduct (without implicating any speech) or otherwise demonstrate that the speech is incidental. Though *Otto*'s holding doesn't help the State demonstrate that therapy is fully conduct, *Tingley*'s and *Salazar*'s could.

But beyond its appearance in a string cite, the State didn't rely on either case. Absent further briefing, the Court isn't willing to say categorically whether all

counseling/therapy constitutes speech or conduct. The Court only concludes that the State hasn't persuaded the Court to adopt *Tingley*/*Salazar*'s reasoning over *Otto*'s. So, the Court can't find that the Pregnancy Centers' "medical options counseling" qualifies as a "medical procedure" for purposes of the *Casey*/*Becerra*/*Rokita* doctrine. And because it's not a "procedure," it doesn't trigger an informed consent analysis.[16]

*Non-Informed Consent Analysis*

Concluding that Section 6.1(1) isn't an informed consent provision, the Court considers whether it's nevertheless incidental to some conduct. *Rokita* underscored that a state action need not qualify as an informed consent provision to be "incidental." So, for example, unlike an informed consent statute, compelled speech could follow a procedure or not need to be provided by the rendering physician at all. If the state is regulating a specific course of conduct, it has leeway to implicate directly related speech.

However, stretching *Rokita* too far ultimately reverts to a *Casey*-only world, one in which the state may regulate the amorphous "practice of medicine." *Becerra* limited the universe in which *Casey* applied, barring disclosures even when they appeared in the pregnancy center's waiting room. It's true that the disclosure doesn't have to qualify as an informed consent statute, but there isn't much space between constitutional informed consent provisions and *Becerra*'s unconstitutional compelled

---

[16] The Court applies strict scrutiny, because Section 6.1(1) is content-based, and not incidental to any recognized medical procedure. What's more, Section 6.1(1) isn't entitled to *Zauderer* deference. So, the Court doesn't see a doctrinal avenue to apply something like intermediate scrutiny. However, the Court notes that Section 6.1(1) would fail intermediate scrutiny on fit, for the reasons discussed below.

RSA-039

materials. The Court finds that Section 6.1(1) doesn't squeeze through that narrow path.

*Rokita* involved a statute regulating the disposal of fetal remains. To that end, after an abortion, a woman could choose to take possession of the fetus or the provider could dispose of it consistent with the statute. *Rokita*, 54 F.4th at 519. So, the provider necessarily had to determine which route the woman wanted to take. This was a binary decision. No discussion was required, let alone the thorough discussion the State contends Public Act 99-690 mandates. What's more, the provider had to speak by asking this question. It didn't otherwise compel any discussion, such as the provider informing the woman of the risks and benefits of each option. *Id.* There was a proximate relationship, both temporally and substantively, between the disclosures in *Rokita* and the medical conduct.[17] Contrastingly, Section 6.1(1) demands a wide-ranging, hypothetical conversation unrelated to any procedure or other medical conduct. Indeed, Section 6.1(1) requires a wide-ranging conversation that might be completely divorced from the reality of the situation; for example, the thrilled patient who is not reasonably likely to encounter medical difficulties because of the pregnancy. What's more, that compelled speech isn't necessary to further future conduct. Any link under those circumstances is far too attenuated to satisfy *Becerra* or *Rokita*. Finding Section 6.1(1) not incidental to conduct, the Court must apply strict scrutiny.

---

[17] Similarly, as discussed below, Section 6.1(3) tethers any cognizable speech to specific conduct.

RSA-040

*Strict Scrutiny Analysis*

When a government restricts or requires speech based on content or viewpoint, the government action must survive strict scrutiny analysis. *Reed*, 576 U.S. at 171. Under this standard, the government must prove that the restrictions or required speech not only furthers a compelling interest but also that they do so in a narrowly tailored way to achieve that goal. *Id.* Restrictions that are underinclusive or overinclusive are not narrowly tailored. Indeed, to be narrowly tailored, the action must eliminate "no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

The State argues that it has a compelling interest in ensuring that conscience-based objections don't impair patients' health. *See* 745 ILCS § 70/6.1. To that end, the State asserts, it must demand that patients "receive accurate, timely information about their treatment options necessary to make autonomous medical choices, as well as reliable information about other providers who offer the care they have chosen." NIFLA dkt. 275 at 21. The Plaintiffs argue that's not a compelling interest because there's no evidence patients lack any information. NIFLA dkt. 282 at 13.

"[T]here can be no doubt," the Supreme Court has said, that "the government 'has an interest in protecting the integrity and ethics of the medical profession.'" *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (quoting *Wash. v. Glucksberg*, 521 U.S. 702, 731 (1997) (citing *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954) (noting that a state has "a legitimate concern for maintaining high standards of professional conduct")). The Court will assume, without deciding, that the State

41

has a compelling government interest, despite the State's failure to affirmatively produce evidence at trial on this requirement.

But Section 6.1(1) fails strict scrutiny because it's fatally overbroad. Section 6.1(1) requires compliance consistent with the "standard of care." Perhaps it's possible—after the fact—to discern the standard of care in a particular interaction. Those after-the-fact determinations occur continually in civil trials across Illinois. But testimony established that, prospectively, it's essentially indefinable. Indeed, the State admitted that "full explanation of all treatment options and the risks and benefits isn't required by the standard of care in every situation." Trial Tr. 661:17–20. Even assuming that, in some non-medically necessary cases, the "standard of care" would require a benefits discussion, the Pregnancy Centers have little guidance on what those situations look like. So, in every situation they'll either risk potential liability or utter compelled speech without furthering *any* interest. Under strict scrutiny, the State carries the burden of establishing the provision is narrowly tailored; it falls far short in this case.[18] So, Section 6.1(3) unconstitutionally compels speech, and therefore the State can't demand such speech in exchange for a liability shield.

B)      *Section 6.1(3)*

The Plaintiffs also challenge Section 6.1(3) on First Amendment Free Speech grounds. This Section requires covered providers to transfer, refer, or tender, upon

---

[18] Because the Court finds that Section 6.1(1) compels speech even when it furthers no interest, the Court doesn't assess the Plaintiffs' argument that it's also underinclusive because it applies to those with conscience objections.

request, a list of medical providers that they reasonably believe will provide abortion services. The Court ultimately concludes that Section 6.1(3) doesn't implicate speech, so it doesn't violate the Free Speech Clause, either facially or as applied to the Plaintiffs. Section 6.1(3) provides:

> If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall: (i) refer the patient to, or (ii) transfer the patient to, or; (iii) provide in writing information to the patient about other health care providers who they reasonably believe may offer the health care service the health care facility, physician, or health personnel refuses to permit, perform, or participate in because of a conscience-based objection.

Whereas Section 6.1(1) requires health care professionals to *say* something to obtain immunity from civil or criminal liability, Section 6.1(3) explains what covered people and entities must *do* to earn immunity after the triggering event occurs: refer, transfer, or provide written information. As discussed more below, those three options are all conduct; none of them cognizably implicate speech.

Nor do the Pregnancy Centers engage in inherently expressive activities. The Court understands that the Plaintiffs run these Pregnancy Centers for the very sake of communicating pro-life messages. But conduct doesn't become expressive merely because the person engaged therein intended to express an idea. *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Juxtapose the line of cases extending First Amendment protections to inherently expressive conduct—such as dancing, flag burning, or web-design—with a doctor referring a patient to physical therapy.

Stripped of its controversy, the difference is easy to see. Actions like transfers, referrals, or listing potential alternatives aren't inherently creative processes.

Further, the State grants conscientious objectors three different avenues to immunity. In lieu of referring the patient, a health care provider may "transfer the patient" to another facility or provide information about "other health care providers who they *reasonably believe may* offer" the unavailable service. § 6.1(3)(iii) (emphasis added). Most obviously, the option to transfer a patient doesn't implicate speech.[19]

When viewed through the lens of common sense, the Court has no trouble concluding that Section 6.1(3) doesn't implicate protected First Amendment activities. But, in reaching this holding, the Court also relies on trial testimony, persuasive precedent, analogies, common usage of the terms, and legal and medical dictionaries. The Court first acknowledges the uncontested fact that the State intended for Section 6.1(3) to facilitate the provision of medical services. This provision narrowly applies when a patient expressly asks a medical provider for information regarding potential abortion providers. Stated differently, Section 6.1(3) contains an explicit and mandatory trigger that is directly linked to the action. And even then, the provider need only comply if he intends to use the HCRCA as an affirmative defense.

From this narrow and purposeful drafting, the Court deduces that Section 6.1(3) doesn't target speech. And dictionary definitions compel the same conclusion.

---

[19] The Court gives slightly more attention to the referral option because that's what the Parties emphasized. However, Section 6.1(3) provides *three options*, and all three are conduct.

RSA-044

For example, The National Cancer Institute defines "referral" as an act. *Referral*, *Nat. cancer. Inst.* ("In medicine, the act of sending from one health care provider to another . . . ."). Black's Law Dictionary defines the term similarly as "[t]he act . . . of *sending or directing* to another for information, service, consideration, or decision." *Referral*, Black's Law Dictionary (12th ed. 2024) (emphasis added).

What's more, courts around the country have expressly stated that medical providers engage in pure conduct when writing prescriptions. 360 *Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 274 (4th Cir. 2024); *Kory v. Bonta*, No. 24-cv-00001, 2024 U.S. Dist. LEXIS 73845, *11. As with prescriptions, the "key component" of a medical referral is the provision of treatment. *Kory*, 2024 U.S. Dist. LEXIS 73845, *11 (quoting *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1046 (9th Cir. 2000). Prescriptions and referrals are both standard responsibilities among health care providers. They serve clinical—not expressive—goals. Again, contrast the goals of doctors with the goals of dancers. As this analogy shows, referrals aren't protected First Amendment activities.

There's also a trump card for this analysis. The Court finds clear guidance in the Seventh Circuit's decision in *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 629 (7th Cir. 2024). At the heart of *K.C.* were several First Amendment challenges to SEA 480: an Indiana statute banning health care professionals from providing, discussing, or referring minor patients for gender conversion therapy. Indiana and Illinois' referral provisions are two halves of the same whole; one state *restricts* medical referrals for controversial procedures,

45

whereas another state *requires* them. The Seventh Circuit ultimately resolved the First Amendment issues in *K.C.* on other grounds. But, importantly, it reversed the lower court's holding that SEA 480 burdens speech "on its face or in its practical operation." *Id.* (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). To the contrary, the Seventh Circuit suggested that restrictions on referrals are valid regulations of professional conduct. *Id.*

As the *K.C.* court explained, "SEA 480's secondary liability provision burdens speech incidentally because it targets conduct: facilitating the provision of gender transition procedures." *Id.* This logic applies with full force to statutes targeting referrals for any other medical procedure. "After all, in the law, what is sauce for the goose is normally sauce for the gander." *Heffernan v. City of Paterson,* 578 U.S. 266, 273 (2016). The First Amendment certainly doesn't discriminate between topics of protected speech. *Otto*, 981 F.3d at 871 (11th Cir. 2020). So, if SEA 480's heavy restrictions on referrals for controversial medical treatment stand, so can their mirror image. *See id.*

*K.C.* and the additional cited authorities compel the Court's conclusion that medical referrals—and so certainly potential resource lists or transfers—are pure conduct, subject to reasonable state regulation. The Plaintiffs disagree. In their view, Public Act 99-690 is subject to strict scrutiny in its entirety because the practice of medicine necessarily implicates speech. Though it's true a few words are often necessary to carry out a course of conduct, words don't automatically turn the conduct into speech. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Consider,

for example, the hypothetical in *Schneiderman*, where, by adopting economic regulations, a state incidentally regulates merchants' speech:

> [A New York statute preventing credit card surcharges] is not like a typical price regulation. Such a regulation—for example, a law requiring all New York delis to charge $10 for their sandwiches—would simply regulate the amount that a store could collect. In other words, it would regulate the sandwich seller's conduct. To be sure, in order to actually collect that money, a store would likely have to put "$10" on its menus or have its employees tell customers that price. Those written or oral communications would be speech, and the law—by determining the amount charged—would indirectly dictate the content of that speech. But the law's effect on speech would be only incidental to its primary effect on conduct, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).

Similarly, minimum wage laws don't implicate speech just because they require a supervisor to write a certain number on the check.[20] In these hypotheticals, as in this case, speech is a means to an end. Each regulation holds conduct at its core; limitations on employee speech are only a necessary means of enforcing compliance with the central regulatory scheme. In short, it's not enough to show that Public Act 99-690 implicates the First Amendment broadly. Given the option of severability, the Plaintiffs must show that this section, standing alone, abridges the

---

[20] Contrastingly, minimum wage laws would implicate the First Amendment if they compelled the supervisor to discuss the benefits and downsides of paying certain salaries. That's the difference between Sections 6.1(1) and Section 6.1(3).

47

covered health care providers' rights not to speak. They haven't done so. Section 6.1(3) is a wholesale regulation of professional conduct with no cognizable downstream effects on speech.

Even if the Court took the Plaintiffs at their word that Section 6.1(3) incidentally restricts some cognizable amount of speech, this Section would still be constitutional. As explained at length already, *Becerra*, *Rokita*, and its progeny allow states to regulate speech incidental to professional conduct, even beyond drafting informed consent disclosures.[21] *Otto*, 981 F.3d at 865; *360 Virtual Drone Servs. LLC,* 102 F.4th at 273. In this case, the necessary speech—either writing a list or drafting a referral—bears a direct nexus to the underlying conduct that's necessarily effectuated by speaking or writing.

Ironically, though, the impact on speech is also incidental. The State's only goal in regulating things like referrals is to facilitate patients' access to their preferred medical treatment. The State doesn't intend to control the flow of discussion between doctors and patients—nor could it, for that matter.[22] Nothing in the HCRCA restricts the Plaintiffs' rights to express their own opinions, especially now that the Court finds Section 6.1(1) unconstitutional.

---

[21] No doubt, Section 6.1(3) isn't an informed consent requirement. Medical referrals only take place after an ultrasound or options counseling (that is, once the patient has confirmed that she is pregnant and decided what to do about it), and a referral isn't directly linked to either qualifying "procedure." The Court's analysis here essentially duplicates the discussion of Section 6.1(1) as an informed-consent requirement.

[22] Contrastingly, the benefits discussion in Section 6.1(1) wholly regulates the exchange of information between providers and patients. In that scenario, the State takes the drivers' seat in deciding which ideas should factor into a woman's decision to have an abortion. In this one, the State exercises its police powers to facilitate a woman's choice only after she's decided for herself.

RSA-048

The Court understands the Plaintiffs' position that, while complying with Section 6.1(3), they are required to effectively endorse a course of conduct they find morally abhorrent. That's more of a Free Exercise issue, discussed below. But, in any event, if the Plaintiffs are unhappy with this legislation, "the remedy to be applied is more speech." *United States v. Alvarez*, 567 U.S. 709, 727–28 (2012) (quoting Justice Brandeis' concurrence in *Whitney v. California*, 274 U.S. 357, 377 (1927)). When meeting the requirements of Section 6.1(3), covered providers may rearticulate their stance on abortion or explain that their conduct is required by the State. Many will. Section 6.1(3) establishes a floor, not a ceiling, of information that must be provided to patients. So, Section 6.1(3) doesn't offend the Plaintiffs' rights not to speak; it's simply a valid exercise of the State's police powers to improve citizens' access to health care by regulating professional conduct. Consequently, the State may require such conduct in exchange for the HCRCA's liability shield.

**Free Exercise Claim**

Because the Court found Section 6.1(3) constitutional on Free Speech grounds, it now considers the Plaintiffs' contention that this Section violates the Free Exercise Clause. The Court recognizes that the peculiar circumstances presented by the facts, the HCRCA, and Public Act 99-690 put it in uncharted waters. As explained earlier, *supra* Part I(C), Public Act 99-690 arises in a unique statutory scheme; it works alongside the HCRCA to "respect and protect the right of conscience" for all heath care providers. 745 ILCS 70/2. The initial version of the HCRCA (now, almost fifty years old) protects conscientious objectors from all liability resulting from their

"refus[al] to act contrary to their conscience." *Id.*[23] But after collecting evidence—albeit minimal—that the HCRCA was *too strong* of a shield, in 2015, the General Assembly amended the HCRCA via Public Act 99-690. This statutory context guides the following discussion of the Plaintiffs' Free Exercise claims.

The Free Exercise Clause of the First Amendment, as applied to the states through the Fourteenth, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. Again, the Plaintiffs argue that Section 6.1(3) imposes unconstitutional conditions on their receipt of a public benefit. The Parties agree that the Plaintiffs have a sincere religious practice in refraining from facilitating abortions. NIFLA dkt. 275-2 at 4–5. The trial testimony confirmed this agreement beyond doubt. To end the analysis here, however, "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." *Reynolds v. United States*, 98 U.S. 145, 167 (1878).

The Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990). Instead, courts determine the appropriate level of scrutiny by asking if a challenged regulation "targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation . . . ." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S.

---

[23] Note, this part of the HCRCA has remained unchanged since its enactment. *See* P.A. 80-616 § 2; P.A. 90-246 § 5.

RSA-050

520, 531 (1993). Laws that "single out" religious conduct for discriminatory treatment are subject to strict scrutiny. *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 483 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 479 (2017) (Kagan, J., dissenting) (cleaned up). A "neutral law of general applicability," on the other hand, triggers rationality review, "even if [it has] the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531.

To avoid burying the lede, the State correctly argues that Public Act 99-690 is a neutral law of general applicability. These "interrelated" requirements forbid the government from selectively imposing burdens only on conduct motivated by religious belief—partly by asking whether "the object of the law is to infringe upon or restrict practices because of their religious motivation." *Id.* at 531, 533; *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 743 (7th Cir. 2015). Public Act 99-690 does no such thing.

Ordinarily, "[t]he minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi*, 508 U.S. 520, 546 (1993). But, for the reasons already given, Section 6.1(3) doesn't fit neatly into the Free Exercise doctrine. Unlike the "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause," *Bowen v. Roy*, 476 U.S. 693, 703 (1986), Public Act 99-690 and the HCRCA expand conscientious objectors' rights to the free exercise of religion by immunizing

them from liability. This context is important. *See In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989). "Considering the Act in isolation, as Plaintiffs insist the [C]ourt should, would mean that religious exemptions are a one-way ratchet: once extended, they could never be narrowed or abolished without violating the Free Exercise Clause because religious accommodations are, by their very nature, neither neutral nor generally applicable." NIFLA dkt. 176 at 35.

The Court wholeheartedly agrees with Judge Pallmeyer's discussion "about what law is the proper subject of analysis." *Id*. at 34. As she explained, the proper question is whether Public Act 99-690 *and* the HCRCA subject conscientious objectors to "unequal treatment" by imposing additional burdens on conscientious objectors over secular providers. *Lukumi*, 508 U.S. at 542 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 148 (1987) (Stevens, J., concurring)). Judge Pallmeyer hoped that the statewide "standard of care" may be dispositive; if Public Act 99-690 doesn't impose additional burdens on conscientious objectors, she reasoned, the Amendments must be neutral and generally applicable. NIFLA dkt. 176 at 20. As noted earlier, however, trial testimony made it impossible to prospectively and abstractly establish the standard of care for all providers in all circumstances.[24] *Supra* Part II(B). And, again, that conclusion is unsurprising given

---

[24] Importantly, the Court doesn't decide whether the standards of care do or don't match Section 6.1(3)'s provisions. It's possible that a conscientious objector might fail to comply with Section 6.1(3) and still satisfy the standard of care. As explained more later, the Court only concludes that the Plaintiffs can be called to court to make such a showing, as could anyone else.

that standard of care determinations are specific to the circumstances presented to the health care professional. *See Edelin*, 510 N.E.2d at 962.

So, this Court takes a different route, starting with a hypothetical from before the HCRCA: Two providers—one a conscientious objector and the other secular—both fail to provide a woman with requested information about abortion providers. The conscientious objector refuses because of his sincerely held beliefs. The secular provider doesn't provide the requested information because he's too busy. Both patients sue. Before the HCRCA, both suits could've gone forward, requiring the plaintiff in both cases to show that the health care providers fell below the standard of care.[25] After the HCRCA's enactment, the conscientious objector—but not the secular provider—is wholly protected, regardless of whether the provider's actions fell below the standard of care.

Along comes Public Act 99-690—partially restoring the pre-HCRCA universe. Now, as before, all health care providers are amenable to suit for failure to refer, transfer, or provide written information about potential abortion providers. Relative to each other, the secular provider isn't in any *better* position than before the HCRCA and the conscientious objector isn't any worse for the wear.

---

[25] As Judge Pallmeyer explained, there's no indication that the pre-HCRCA liability regime wasn't neutral and generally applicable. Put differently, absent the HCRCA, it's not necessarily unconstitutional to sue a doctor who didn't meet the standard of care because of her conscientious objection. In any event, the Amendments don't ban any other affirmative defenses.

As this hypothetical shows, the latest Amendments to the HCRCA don't impose additional burdens on conscientious objectors because of their beliefs.[26]  It's true that conscientious objectors can no longer rely on the HCRCA's once-expansive immunity. But as discussed previously, conscientious objectors were never constitutionally entitled to those benefits.  NIFLA dkt. 176 at 35.  The General Assembly was formerly inclined to offer an optional shield and now it isn't.  It's not the Court's place to second-guess the wisdom of that decision.  *Grand Trunk W. Ry. Co. v. Indus. Comm'n*, 291 Ill. 167, 172 (1919).

In a further attempt to bind the General Assembly to its own generosity, the Plaintiffs suggest that the State passed Public Act 99-690 at least partially "because of" its adverse effect on religious activities.  *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, n. 24 (1979).  They don't support that argument with any evidence of legislative malintent.  *Compare Lukumi*, 508 U.S. at 540 (challenged city ordinances were designed to prevent religious activities because city councilmembers viewed the religion as "a sin, 'foolishness,' 'an abomination to the Lord,' and the worship of 'demons'") *with* S.B 1564, 99th Gen. Assemb. 2d Sess. (Ill. 2015) (Public Act 99-690 is designed to ensure that the HCRCA doesn't frustrate women's access to health care).  Even if Public Act 99-690 has discriminatory effects in operation, "[a]dverse impact will not always lead to a finding of impermissible targeting."

---

[26] For the mathematically inclined lawyer (if one exists):  0 [what the two providers had pre-HCRCA] + 1 [what the conscientious objector had after the HCRCA] − 1 [what the provider has after P.A. 99-690] = 0.  So, the two are once again on equal footing.  (In fact, that oversimplifies it because the conscientious objector, unlike the secular provider earns absolute immunity after complying with Section 6.1(3)).

RSA-054

*Lukumi*, 508 U.S. at 535.[27]  "The law's text and history . . . suggest instead that the legislature adopted the changes due to legitimate concerns about patient access to healthcare and not out of a desire to stifle religiously-motivated conduct."  NIFLA dkt. 176 at 38.  So, under the circumstances, Public Act 99-690 is neutral and generally applicable.

Finally, the Plaintiffs urge the Court to apply heightened scrutiny on a "hybrid rights" theory.  NIFLA dkt. 282 at 9–10.  "In *Smith*, the Supreme Court noted that, in cases implicating the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech . . . the First Amendment" may require courts to apply strict scrutiny even to neutral, generally applicable laws.  *C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 764 (7th Cir. 2007) (citing *Smith*, 494 U.S. at 881–82).  Though a plaintiff doesn't need to *succeed* on another First Amendment claim, he "does not allege a hybrid rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right."  *Id.* at 765 (quoting *Miller v. Reed*, 176 F.3d 1202, 1207–08 (9th Cir. 1999)).

The doctrine rests on a teetering foundation.  As Judge Pallmeyer noted, it "originates in [*Smith*'s] dictum."  NIFLA dkt. 176 at 36.  And it's "hard" to "justif[y]

---

[27] Likewise, the Plaintiffs didn't produce any evidence that Section 6.1(3) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."  *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 534 (2021).  Depending on the standard of care, health care providers may be liable if they unreasonably delay a woman's access to abortion by failing to transfer, refer, or provide her with written information *for any reason.*

RSA-055

the curious [hybrid rights] doctrine," some circuits essentially abandoning it entirely. *Fulton*, 593 U.S. at 599, 604 (2021) (Alito, J., concurring); *see also Henderson v. Kennedy,* 253 F.3d 12, 19 (D.C. Cir. 2001) ("For this argument to prevail, one would have to conclude that although the regulation does not violate the Free Exercise Clause, and although they have no viable First Amendment claim against the regulation, the combination of two untenable claims equals a tenable one. But in law as in mathematics zero plus zero equals zero." (citations omitted.)). "Telling[ly]," the Supreme Court "has never once accepted a 'hybrid rights' claim in the more than three decades since [*Smith*]." *Fulton*, 593 U.S. at 600. The Seventh Circuit similarly rejected hybrid rights theories in the two cases that considered them. *See Ill. Bible Coll. Assoc. v. Anderson*, 631, 641 (7th Cir. 2017); *Civil Liberties*, 342 F.3d at 764–65; *see also Maum Meditation House of Truth v. Lake County, Ill.*, 55 F.3d 1081, 1088 (N.D. Ill. 2014) (rejecting application); *Mahwikizi v. Ctr. for Control & Prevention*, 573 F. Supp. 3d 1245, 1253 (N.D. Ill. 2021) (same).

In any event, the Seventh Circuit seems to follow the Ninth in requiring, at minimum, a summary judgment level showing on the non-Free Exercise claim. *See C.L for Urb. Believers*, 342 F.3d at 765 (rejecting a hybrid rights theory because it "f[oun]d [the other claims] individually lacking the merit necessary to withstand summary judgment"). As to Section 6.1(3), the Plaintiffs' weak Free Speech claims fall short of the summary judgment standard, because the provisions only regulate conduct. The Court found a Free Speech violation in Section 6.1(1), but it severed the sections and assessed the two individually. It won't now resew them with a tenuous

56

doctrinal thread. So, the Court doesn't believe the hybrid rights doctrine compels it to apply strict scrutiny to Section 6.1(3).

*Rational Basis Analysis*

Having reached the end of a long front walk, *see Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 102 (1998), the Court finds that Section 6.1(3) triggers (and withstands) rational-basis review. Under this test, a court "need only find a reasonably conceivable state of facts that could provide a rational basis for the classification." *Ind. Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015); *Lukaszczyk v. Cook Cnty.*, 47 F.4th 587, 602–03 (7th Cir. 2022) (collecting cases). This isn't an onerous test. The law comes to court bearing a strong presumption of validity, and the challengers must negate every conceivable basis which might support it. *Ind. Petroleum Marketers & Convenience Store Ass'n.*, 808 F.3d at 322.

Conceivably, the State has a legitimate interest in facilitating abortions provided by health care professionals to reduce the number of "self-managed abortions" or "self-induced abortions," which are inherently dangerous. Requiring the Plaintiffs to provide the requested information is a rational means of meeting that goal. So, Section 6.1(3) doesn't offend the Free Exercise Clause of the First Amendment.

**CONCLUSION**

Based on these findings of fact and conclusions of law, the Court holds that Section 6.1(1) violates the First Amendment's Free Speech Clause, but that Section

6.1(3) is constitutional. So, the Court grants Plaintiff's request for declaratory and permanent injunctive relief as to Section 6.1(1), finding this provision of Public Act 99-690 is unconstitutional and cannot be enforced. It denies the Plaintiffs' Motion as to Section 6.1(3).

Entered: April 4, 2025                                       By:_____

                                              Iain D. Johnston
                                              United States District Judge

RSA-058

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| National Institute of Family and Life Advocates, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 16 CV 50310 |
| | ) |
| Mario Treto Jr., | ) |
| | ) |
| Defendant. | ) |

## <u>RULE 58 JUDGEMENT ORDER</u>

The Court enters judgment in favor of National Institute of Family and Life Advocates, Tri-County Crisis Pregnancy Center, The Life Center, Inc., and Mosaic Pregnancy & Health Centers granting declaratory relief against Mario Treto, Jr., in his official capacity, that Section 6.1(1) of the Health Care Right of Conscience Act (created by P.A. 99-690), 745 ILCS 70/6.1(1), violates the First Amendment's Freedom of Speech Clause and permanently enjoining the enforcement of Section 6.1(1) by Mario Treto Jr. in his official capacity, and his officers, agents, servants, employees, and attorneys, and others who are in active concert or participation with any of these individuals.

The Court denies all other relief.

Entered: __4/4/2025_____        By:_____

Iain D. Johnston
U.S. District Judge

RSA-059

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| National Institute of Family and Life Advocates, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 16 CV 50310 |
| | ) |
| Mario Treto Jr., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |
| Ronald Schroeder, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 17 CV 4663 |
| | ) |
| Mario Treto Jr., | ) |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OF DECISION</u>

This Memorandum of Decision contains the Court's findings of fact and

conclusions of law under Rule 52(a). The Court will separately enter Rule 58

judgment orders in each case.[1]  The Court concludes that Public Act 99-690 Section

6.1(1), in exchange for a liability shield, compels speech, requiring a discussion about

the risks and benefits of childbirth and abortion.  That compelled discussion violates

the First Amendment.  Section 6.1(1) isn't a doctrinally qualifying informed consent

---

[1] The Court thanks counsel for all the Parties for their work in these cases.  Without doubt, the subject matter of this litigation can result in intemperate language and behavior.  But throughout the Court's involvement with this case, counsel have been courteous and professional among themselves and with the Court.  What's more, the Court appreciates the quality of the presentations and filings by all counsel.  Thank you. X

RSA-060

statute, and the compelled speech isn't "incidental" to conduct. However, unlike Section 6.1(1), Section 6.1(3) doesn't compel speech. Instead, Section 6.1(3) merely regulates professional conduct, instructing clinicians, upon request, to either refer or transfer a patient to another physician, or at least provide her with a list of potential providers. These types of conduct regulations don't implicate the First Amendment's Speech clause. And because Section 6.1(3) returns conscientious objectors to their earlier, generally applicable liability exposure, it doesn't violate the Free Exercise Clause either. So, the Court finds Section 6.1(3) constitutional. Constitutionally, to obtain the liability shield, the State can't require medical professionals to discuss with patients what the State believes are the benefits of abortions; however, if patients request abortions, at a minimum, the State can require medical professionals to provide information of other medical professionals whom they reasonably believe might perform abortions.

**INTRODUCTION**

Before launching into the legal analysis, the Court is compelled underscore the narrow legal and factual issues in this case.

First, as described in more detail later, the legislative evidence presented to the Illinois General Assembly in support of Public Act 99-690[2] was underwhelming. Nevertheless, in its wisdom, the State of Illinois sought to address a perceived

---

[2] A note on citations: As discussed shortly, Public Act 99-690 amended the Health Care Right of Conscience Act ("HCRCA"). Public Act 99-690 encompasses Section 6.1(1) and 6.1(3). When the Court refers to the amendment generally, it uses "Public Act 99-690." It otherwise identifies the particular section (e.g. 6.1(1) or 6.1(3)) at issue. Citations to the Illinois Code (ILCS) refer to the HCRCA.

RSA-061

problem, which it has every right to do in support of the public's health, safety, and welfare. It is not this Court's role to judge the wisdom of a public act. Instead, the Court's limited function is to determine whether Public Act 99-690 is constitutional, in whole or in part.

Second, a preliminary injunction enjoining enforcement of Public Act 99-690 has been in place for nearly a decade. Despite the General Assembly's determinations and the State's assertions that—absent Public Act 99-690—the health of women was in grave peril, no evidence has been presented to this Court that supports that concern. Dkt. 48 at 26–27. Despite extensive summary judgment briefing and a three-day bench trial, no evidence was presented showing that a single woman's health was compromised because Public Act 99-690 was enjoined.

Third, the lack of this evidence should not be surprising. Public Act 99-690 amended the HCRCA to limit its use as an affirmative defense in civil and criminal proceedings. This factual scenario is highly unusual and rarely (if ever) occurs. Indeed, the Parties cited no instances in which this aspect of the HCRCA has been litigated, and the Court was unable to find a single reported case involving this aspect of the HCRCA.

Fourth, the lack of evidence of women's health being imperiled but for Public Act 99-690 is unsurprising because the HCRCA provides no protections for health care professionals who fail to treat emergencies. 745 ILCS 70/6 ("Nothing in this Act shall be construed so as to relieve a physician or other health care personnel from obligations under the law of providing emergency medical care."); 745 ILCS 70/9

3

RSA-062

("Nothing in this Act shall be construed so as to relieve a physician, health care personnel, or a health care facility from obligations under the law of providing emergency medical care."). Health care professionals who fail to treat pregnant women in a medical emergency find no quarter in the HCRCA, regardless of the amendments contained in Public Act 99-690.

None of the foregoing should be interpreted as minimizing the constitutional issues at stake in this litigation, the role of the State to address perceived concerns about public health, safety, and welfare, or a woman's access to medical care. Instead, the Court notes that its decision is cabined to the statutory scheme at issue and the HCRCA and its subsequent amendments.

## I. BACKGROUND

### A. *Parties*

This case involves two sets of plaintiffs: the National Institute of Family and Life Advocates ("NIFLA") Plaintiffs and the Schroeder Plaintiffs. NIFLA is a religious organization comprised of member pregnancy centers from across the country. NIFLA dkt. 275-2. ¶ 1.[3] The NIFLA Plaintiffs also include three individual Illinois pregnancy centers. *Id.* The Schroeder Plaintiffs include Dr. Ronald Schroeder, the volunteer medical director at Options-Now/Thrive Metro-East, as well as two other pregnancy centers. Schroeder dkt. 236-1 ¶ 1.[4]

---

[3] The Court cites 16-cv-50310 as "NIFLA" and 17-cv-04663 as "Schroeder."
[4] For this decision's purposes, the two sets of Plaintiffs and the Pregnancy Centers' work are essentially identical. So, unless otherwise noted, the Court simply refers to them as "Plaintiffs," and assumes they're all engaged in the same activities.

RSA-063

Defendant is the Director of the Illinois Department of Financial and Professional Regulation. The action is brought against that individual in the individual's official capacity. The current Director—and therefore, Defendant—is Mario Treto Jr. Rather than call out the latest person to hold this office, the Court will simply refer to the Defendant as "the State." The Court is mindful that some adherents of the Eleventh Amendment might be shocked at this approach. But they'll get over it. It's just a label for purposes of this decision.

B.      *The Health Care Right of Conscience Act (HCRCA)*

As the Court previously mentioned, Public Act 99-690 purports to amend the HCRCA. Since its enactment in 1977, the HCRCA has addressed many issues, including prohibiting discrimination and providing a right of action if discrimination occurs. Relevant to this action, the HCRCA provides an affirmative defense against civil and criminal liability. 745 ILCS 70/4, 70/9. Section 4 of the HCRCA contains one of the affirmative defenses:

> No physician or health care personnel shall be civilly or criminally liable to any person, estate, public or private entity or public official by reason of his or her refusal to perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care service which is contrary to the conscience of such physician or health care personnel. 745 ILCS 70/4.

Section 9 of the HCRCA contains the other provision providing a defense:

> No person, association, or corporation, which owns, operates, supervises, or manages a health care facility shall be civilly or criminally liable to any person, estate, or public or private entity by reason of refusal of the health care facility to permit or provide any particular form of health care service which violates the facility's conscience as documented in its ethical guidelines, mission statement,

5

RSA-064

> constitution, bylaws, articles of incorporation, regulations,
> or other governing documents. 745 ILCS 70/9.

In 2016, the General Assembly held hearings regarding the HCRCA because of concerns raised by Illinois residents regarding their health care treatment.

### C.      *Legislative History of Amendments to the HCRCA*

Relating to the issues raised in this case, the legislative support for Public Act 99-690 was sparce. Only two examples have been identified. First, there appear to be two letters from an anesthesiologist who refused to provide his services when abortions were performed. Second, there was heartbreaking testimony from a witness about her treatment during a pregnancy that was not viable. But nothing in the challenged provisions (what would become Section 6.1(1) and Section 6.1(3)) would have remedied any of problems highlighted by these two examples, because Public Act 99-690 neither requires conscientious objectors to personally perform abortion services nor excuses them from facilitating emergency treatment.

Following these hearings, by way of Public Act 99-690, Illinois amended the HCRCA in several ways. First, Illinois added a provision identifying the public policy for the HCRCA and presumably the amendments to the HCRCA. According to the amendments, "[i]t is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care." Second, the amendments added the definition of "undue delay," which "means unreasonable delay that causes impairment of the patient's health." Third, the amendments added to the list of duties of medical "practices and care" not relieved by the immunity provided by the HCRCA, specifically identifying the duty to inform

6

RSA-065

patients of "legal treatment options" and "benefits of treatment options." Fourth, the amendments to the HCRCA made two significant additions—one entitled "access to care and information protocols" and the other entitled "permissible acts related to access to care and information protocols." Access to care and information protocols are the important parts.

The amendments adding the protocols provision to Section 6.1 are the crux of this litigation. Section 6.1 requires all health care facilities to adopt protocols that allegedly would ensure that conscience-based objections did not impair patients' health. Critically, the affirmative defenses contained in Section 4 and Section 9 of the HCRCA "only apply if conscience-based refusals occur in accordance with these protocols." The consequence being that for physicians, health care personnel, and persons, associations, or corporations that own, operate, supervise, or manage a health care facility to receive the benefits of the affirmative defense, they are forced to comply with the requirements of Public Act 99-690. Their conscience-based actions are unprotected unless they comply with Illinois' mandates in Public Act 99-690, which require physicians to "inform," "give[] information" to, "refer," or "transfer" patients when they are unable to act or provide information to a patient because of a "conscience-based objection."

To obtain the immunity protections, the protocols minimally need to address the requirements of Section 6.1(1) and Section 6.1(3). The Plaintiffs challenge both provisions. Under Section 6.1(1), health care facilities, physicians, and health care personnel are mandated to inform a patient of, among other things, "legal treatment

RSA-066

options, and the risks and benefits of the treatment options in a timely manner."
Under Section 6.1(3), if requested by a patient or a patient's representative, health
care facilities, physicians, and health care personnel must take one of three actions:
(a) refer the patient, (b) transfer the patient, or (c) provide written information about
other health care providers who they reasonably believe may offer the service that
the facility, physician, or personnel can't provide because of a conscience-based
objection. Note a critical difference between Section 6.1(1) and Section 6.1(3): the
former mandates speech regardless of anything else; whereas, the latter requires
actions when prompted by a patient.

The amendment regarding "permissible acts" allows a health care facility to
require physicians and health care personnel working at the facility to comply with
the protocols. In full, this amendment states, "[n]othing in this Act shall be construed
to prevent a health care facility from requiring that physicians or health care
personnel working in the facility comply with access to care and information protocols
that comply with the provisions of this Act." 745 ILCS 70/6.2.

Fifth, as to liability, the HCRCA's amendments added that a health care
facility is not relieved from providing emergency medical care under the HCRCA.
Stated differently, the HCRCA—which is an immunity statute—explicitly doesn't
provide any immunity when physicians, health care personnel, or health care
facilities fail to meet their legal obligations to provide emergency medical care. 745
ILCS 70/9.

RSA-067

D.     *Procedural History of the Litigation*

This litigation started in 2016, when the NIFLA Plaintiffs filed an action in this Court.  The Schroeder Plaintiffs then filed an action in the Eastern Division of the Northern District of Illinois, which was consolidated with the NIFLA action in this Court.  On July 19, 2017, then-Judge Fredrick Kapala entered a preliminary injunction, enjoining the State from enforcing Public Act 99-690.

On December 15, 2017, based on an unopposed motion, the Court stayed both actions pending the Supreme Court's ruling in *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018).  Following the Supreme Court's decision, the Plaintiffs asserted that the decision supported their position and the preliminary injunction. The State asserted that *Becerra* "provided some guidance" but was not "dispositive."

After then-Judge Kapala took inactive status, the actions were assigned to then-Chief Judge Rebecca Pallmeyer.  The Plaintiffs moved for summary judgment, seeking permanent injunctive relief.  They contended that Public Act 99-690 violated their rights to free speech and to free exercise of religion under the First Amendment. On September 3, 2020, Judge Pallmeyer denied the summary judgment motions, concluding that "genuine disputes of material facts remain[ed]."  Dkt. 176.  In doing so, Judge Pallmeyer found "that expert discovery about the standard of care [was] necessary before the court [could]" resolve the litigation.  Dkt. 176 at 36.

Following Judge Pallmeyer's ruling on summary judgment, three events occurred.  First, the undersigned was confirmed by the United States Senate and received a commission, resulting in these actions being transferred.  Second, the

RSA-068

Parties engaged in expert discovery per Judge Pallmeyer's order. Third, following expert discovery, the Court held a three-day bench trial.

## II.  FACTUAL FINDINGS

### A.  *Pregnancy Centers' Work*

Pregnancy Centers ("Pregnancy Centers") are pro-life clinics that will not perform or refer for an abortion. NIFLA dkt. 282-1 ¶ 23. The Pregnancy Centers generally offer free ultrasounds, pregnancy testing, STI testing and treatment. *See* NIFLA dkt. 275-2 ¶¶ 2–15. At least one Pregnancy Center offers "abortion pill reversals." *Id.* ¶ 5. The Pregnancy Centers also provide material assistance to pregnant women and engage in "pregnancy options" and "post-abortion" counseling. *Id.* That counseling includes discussion about the risks of abortion, but it doesn't include a benefits discussion, because the Pregnancy Centers don't believe any benefits exist. *Id.*; NIFLA dkt. 282-1 ¶¶ 31–32. They further believe that counseling about abortion benefits would encourage the procedure. *Id.* ¶ 33. The Pregnancy Centers "rely on the visuals of the ultrasound itself and the health care provider's diagnoses to try to convince pregnant patients to carry to term and not have an abortion." *Id.* ¶ 20. The Parties dispute the extent to which the Pregnancy Centers engage in "medical conduct."

### B.  *Standard of Care and Informed Consent*

On summary judgment, Judge Pallmeyer applied intermediate scrutiny and identified an unresolved factual question: whether Public Act 99-690 "burden[ed] more speech than necessary" and whether secular doctors, upon request, generally

RSA-069

transferred, referred, or provided alternative resources. NIFLA dkt. 176 at 23. The State said Public Act 99-690 wasn't overly burdensome because the "standard of care" already required all doctors to discuss a treatment option's benefits and risks. *Id.* at 24. So, the State argued, Public Act 99-690 merely imposed that same standard on the Plaintiffs. *Id.* The Plaintiffs disagreed, claiming that the "standard of care" didn't universally require these types of discussions. *Id.* So, the Plaintiffs contended Public Act 99-690 was underinclusive, applying only to conscientious objectors. *Id.* Judge Pallmeyer ordered a trial to determine what the "standard of care" required.

As discussed later, the Court analyzes the legal issues differently, in a way that turns less on the "standard of care" question. Regardless, a three-day bench trial demonstrated only that, in the abstract, there's no single administrable definition of the standard of care. During that trial, the Parties also discussed "informed consent." Those two issues—standard of care and informed consent—intertwine with one another. However, for later analytical purposes, the Court discusses them separately. All Parties relied on credible and persuasive opinion witnesses. And all Parties agree that any medical organizations pronouncements are only nonmandatory guidelines. NIFLA dkt. 275-2 ¶ 34.

*Standard of Care*

The trial testimony was, by and large, consistent with the Parties' briefing: The State argued that Public Act 99-690 simply repeats the professional standards that already bind all health care professionals, while the Plaintiffs argued that the pre-existing standard of care doesn't require a so-called benefits discussion. NIFLA

11

dkt. 275 at 22; dkt. 271 at 4–8. According to all Parties' retained experts, medical standards of care turn on individualized assessments of a patient's needs, including a woman's medical history, mental health, spirituality, stated goals and expectations, reaction to her pregnancy, the providers' own abilities and expertise, and other factual inquiries. *See e.g.*, Trial Tr. 600:5–13; 629:13–630:21; Trial Tr. 61:6–62:25; *compare* Trial Tr. 431:21–432:9 (Dr. Fernandes encouraging physicians to balance a patient's wishes against other factors) *with id.* at 587:1–25 (Dr. Burcher suggesting patient autonomy is the preeminent principle in modern bioethics). This testimony is unsurprising. Under Illinois law, standard of care depends on the specific factual circumstances presented to the health care professional. *Edelin v. Westlake Comm. Hosp.*, 510 N.E.2d 957, 962 (Ill. App. Ct. 1987). Indeed, Illinois juries are instructed to this effect. Illinois Pattern Jury Instructions, Civil, No. 105.00 (2020). This highly fact-specific inquiry is incompatible with requiring a doctor to discuss so-called benefits with *every* patient—largely because the State never presented evidence that every pregnant woman needs the "thorough[]" discussion that the State tries to impose. NIFLA dkt. 275-1 ¶¶ 90–110.

The State argued that professional organizations create ethical standards of care that encourage health care professionals to provide neutral options counseling and requested abortion referrals. NIFLA dkt. 275 at 5–6. But those standards aren't binding. Trial Tr. 316:8–10; NIFLA dkt. 275-1 ¶¶ 75–78, 106–09.[5] In an amicus brief before the Court, the American College of Obstetrics and Gynecology ("ACOG") cites

---

[5] Like the Pirate's Code, trial testimony established that these standards are more what you'd call "guidelines" than actual rules. https://www.youtube.com/watch?v=WJVBvvS57j0.

RSA-071

its own Code of Professional Ethics, stating that obstetrician-gynecologists must discuss the "risks, benefits, possible complications, and anticipated results" of terminating a pregnancy, and the American Medical Association ("AMA") statement that health care providers "should" present accurate information about "the burdens, risks, and expected benefits of all options." NIFLA dkt. 279 at 3. As the experts testified at trial, ACOG and AMA standards for discussing abortion make no sense when a patient is thrilled to learn of her pregnancy and no reasonable concerns exist for the patient to continue with the pregnancy. Trial Tr. 168:8–13, 629:18–630:2. And, not surprisingly, given the contentious nature of elective abortion, other professional groups have conflicting opinions. *See* Trial Tr. 473:15–475:23. So, all the evidence shows is that the standard of care doesn't require a binding, uniform benefits discussion.

## *Informed Consent*

The Court's best efforts to define "informed consent" were similarly futile. The Parties disagree on the medical definition of "informed consent." According to the Plaintiffs, a doctor's ethical obligations to a specific patient "arise out of the nature of the doctor–patient relationship . . . specifically what has that patient come to the physician for and what is the physician offering to the patient." NIFLA dkt. 271-1 ¶ 28. Accordingly, "[i]nformed consent is the responsibility of the physician who will provide the treatment for which consent is sought, not the referring physician or any other physician." *Id.* ¶ 29. So, according to the Plaintiffs, "a physician need not discuss the risks and benefits of treatments like abortion that they do not personally provide." *Id.* ¶ 30.

RSA-072

The State takes a different view. According to the State, "[i]nformed consent is not limited to seeking authorization for an imminent medical procedure." NIFLA dkt. 275-1 ¶ 107. Instead, informed consent can "apply to counseling both about a specific medical intervention by a health care provider or more broadly about different relevant medical options available to a patient, because both involve choosing a treatment option or a plan of care." *Id.* ¶ 108. So, "[h]ealth care personnel are obligated to advise patients of risks and benefits of relevant procedures and treatment options, even if those treatments are not available at that particular medical facility." *Id.* ¶ 109. According to the State, proper medical care then requires "medical options counseling," in which providers "present[] patients with medically appropriate treatment options for their condition and the risks and benefits of those options." *Id.* ¶ 96. Again, this view makes no sense if the patient is thrilled to learn of the pregnancy and no reasonable medical concerns exist for the patient to continue the pregnancy.

As with the standard of care issue, the witnesses drew their definitions from competing ethical and moral principles. For example, the State says the "*central approach* to biomedical ethics is the 'principalist theory,'" which emphasizes "autonomy, beneficence, nonmaleficence, and justice." *Id.* ¶ 66. But the Plaintiffs stress that some medical professionals—and organizations—adhere to other ethical regimes that balance values differently. *Schroeder* dkt. 236-1 ¶¶ 61–78. So, the Court can't define, in the abstract, a binding, universal definition of "informed consent."

## III.   CONCLUSIONS OF LAW

The Court now addresses the legal questions.  It first considers whether either Section 6.1(1) or Section 6.1(3) violates the First Amendment's Free Speech Clause.[6] If warranted, the Court also considers whether either Section violates the Free Exercise Clause.  In making these assessments, this Court recognizes that "[w]here fairly possibl[e], [it] should construe a statute to avoid a danger of unconstitutionality." *Zbaraz v. Madigan*, 572 F.3d 370, 383 (7th Cir. 2009) (citations omitted); *see Rescue Army v. Mun. Ct.*, 331 U.S. 549, 568–74 (1947).  Further, in addressing the constitutionality of a state statute, a federal court may not formulate a rule of constitutional law broader than is required by the precise facts to which is to be applied.  *United States v. Raines*, 362 U.S. 17, 21 (1960).  And, if a federal court is required to grant injunctive relief, the relief should be no more burdensome than necessary.  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Injunctive relief must be tailored to the scope of the violation and the specific harm established.  *DraftKings Inc. v. Hermalyn*, 118 F. 4th 416, 423 (1st Cir. 2024); *e360 Insight v. Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007).

**Unconstitutional Conditions**

The Plaintiffs argue that Public Act 99-690 imposes unconstitutional conditions on the receipt of a public benefit.  Importantly, a state cannot condition the receipt of a public benefit—such as a liability shield—on a citizen surrendering their constitutional rights.  *See Elrod v. Burns*, 427 U.S. 347, 361 (1976) (plurality

---

[6] The Court only addresses Sections 6.1(1) and (3), because the others aren't contested. *See* NIFLA dkt. 275 at 9. Section 6.1(2) is not mentioned. *Id.*

RSA-074

opinion); *Libertarian Party of Ind. v. Packard*, 741 F.2d 981, 988 (7th Cir. 1984) ("What a government cannot compel, it should not be able to coerce."). So, the unconstitutional conditions doctrine is a theory of First Amendment liability, not a claim in itself. As discussed more in the Free Exercise section, Public Act 99-690 offers a benefit, namely a liability shield. In making that offer, however, the State can't demand a constitutional violation. So, the threshold question is whether each Section violates the constitution.

**First Amendment Free Speech Claim**

The First Amendment, applicable to the states through the Fourteenth, prohibits laws "abridging the freedom of speech." U.S. Const. amend. I; *Becerra*, 585 U.S. at766. In any challenge to government action that allegedly violates the First Amendment, the first step is to determine whether a particular state-action provision regulates speech (implicating the First Amendment) or conduct (not entitled to First Amendment protections).[7] Next, if the state action regulates speech based on its content, the court applies strict scrutiny, unless a doctrinal exception pulls the state action to a lesser tier of scrutiny. The First Amendment protects both the "right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The Court analyzes Sections 6.1(1) and 6.1(3) in turn.

---

[7] Just as Everlast explained in *What It's Like*, *see* https://genius.com/Everlast-what-its-like-lyrics, where a court starts its analysis—by concluding that the state action regulates speech or regulates conduct—is essentially dispositive. *See Dana's R.R. v. AG*, 807 F.3d 1235, 1242 (11th Cir. 2015) (describing speech conduct determination as being determinative).

16

RSA-075

A.        *Section 6.1(1)*

The Supreme Court's precedents have "long drawn a line" between speech and conduct.  *Becerra*, 585 U.S. at 769 (collecting cases).    Although, in some circumstances, that line might be "difficult" to draw, *id.*, Section 6.1(1) falls on the speech side.    The provision demands that health care providers "*inform*" patients about the risks and benefits associated with their treatment options.  § 1 (emphasis added).    And the State imagines a "thorough discuss[ion]" between the health care provider and the patient.    NIFLA dkt. 275-1 ¶¶ 90–110 (terming the discussion "counseling").[8]  So, Section 6.1(1) regulates speech, implicating the First Amendment.

Next, the Court considers whether Section 6.1(1) is content-based or content-neutral.    Content-based state actions "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).    A statute alters the content of a speaker's speech by compelling individuals to speak a particular message or share particular pieces of information.  *Becerra*, 585 U.S. at 755 (2018).

Section 6.1(1) is a content-based regulation because it governs a health care provider's discussion on pregnancy and abortion.    The state action is especially suspect because it's also view-point discriminatory.  *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 704 (N.D. Ill. 2023) (citing *Rosenberger*, 515 U.S. 819 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more

---

[8] The Court discusses below whether counseling can be considered "conduct."

17

blatant."). The Plaintiffs contend that abortion confers no medical benefits. NIFLA dkt. 271-1 ¶ 18; Schroeder dkt. 236-1 ¶ 41. It is important to note that the Plaintiffs' definition of abortion basically only encompasses elective abortions (which seems to mean all abortions where there's a viable fetus). Schroeder dkt. 236-1 ¶ 38. For example, the Plaintiffs don't argue that terminating an ectopic pregnancy is an "abortion" as they define the term. *See* Trial Tr. 52:20–53:4. This view is consistent— albeit perhaps for different reasons—with the fact that even the medical profession doesn't consider terminating an ectopic pregnancy to be an "abortion." *See Procedural Abortion*, UptoDate.com (Feb. 2025) ("[W]hen a trained health care provider does a procedure to remove the pregnancy *from [a] uterus*.") (emphasis added). This limited definition of abortion is at least somewhat consistent with the Act, which doesn't provide immunity when health care professionals fail to act in an emergency. 745 ILCS 70/9.

The State disagrees with the Plaintiffs, believing that an abortion (however it is defined) is beneficial in certain circumstances. Whether the State or the Plaintiffs are correct, however, doesn't factor into this constitutional analysis. In demanding that health care professionals discuss the benefits (and thereby concede to the State's view), the State makes the providers "instruments" in delivering a particular message. *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572 (7th Cir. 2001) (quoting *Wooley v. Maynard*, 430 U.S. 705, 715 (1977)).

Ordinarily, the First Amendment bars a state from commanding this type of speech, unless it survives strict scrutiny. This level of scrutiny requires the state to

identify a compelling interest and narrowly tailored means to achieve it. The State says it's entitled to deferential treatment in this case because Section 6.1(1) targets professional conduct and only incidentally implicates speech. The Plaintiffs disagree, arguing that Section 6.1(1) unconstitutionally compels speech. To determine whether Section 6.1(1) receives deferential treatment, the Court considers two First Amendment doctrines: (a) the *Zauderer* commercial speech and (b) the "speech incidental to conduct" exceptions.

a)      *Zauderer* Commercial Speech

In limited, narrow circumstances, the government has leeway to regulate speech relating to professional activities. *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626 (1985); *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 573 (1995). The *Zauderer* exception applies only to "purely factual and uncontroversial information" in commercial advertising. *Becerra*, 585 U.S. at 768–69; *Hurley*, 515 U.S. at 573.

*Zauderer*'s narrow scope doesn't apply to this case for three reasons. First, none of the speech in this case is "commercial" speech. Generally, "[c]ommercial speech is speech that proposes a commercial transaction." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014) (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 475 (1989); *see also Commerce*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining commerce as the "exchange"—not the free provision—of "goods and services"); *In re Primus*, 436 U.S. 412, 437–38 n. 32 (1978) (finding an attorney

19

engaged in noncommercial speech by advertising free services intended to advance "beliefs and ideas," as opposed to financial gain).

In this case, there's no economic transaction: None of the Pregnancy Centers charge for their services, so there's no financial exchange. *See NIFLA v. Raoul*, 685 F. Supp. 3d 688, 705 (N.D. Ill. 2023) (This Court made the same conclusion involving largely the same facts, because "there [was] no economic motivation for the speech."). Moreover, "abortion [is] anything but an 'uncontroversial' topic." *Becerra*, 585 U.S. at 769. Ordinary life experiences support that conclusion: Try talking about abortion in public amongst strangers and see what reaction it spawns. Third, as discussed more below, the information Public Act 99-690 requires "in no way relates to the services" that the Plaintiffs provide. *See Becerra*, 585 U.S. at 769. In *Becerra*, the Supreme Court held that the compelled disclosures (information about abortion) weren't "commercial speech," in part because the pregnancy centers didn't provide abortions. That's the same in this case. The Plaintiffs don't provide abortions, so the State can't rely on the *Zauderer* exception to compel speech about the procedure. So, the commercial speech exception won't shield the disclosures from heightened review.

b)      Speech Incidental to Conduct

The First Amendment also permits a state to regulate conduct, even when doing so incidentally burdens speech. Whether the regulation remains "incidental" depends on how to read (and reconcile) *Becerra* and *Planned Parenthood v. Casey*, 505 U.S. 833 (1992) (*overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)). The Parties excise favorable sentences from one case while

nearly ignoring the other. *See e.g.*, NIFLA Plaintiffs' Table of Authorities, dkt. 275 at 3 (citing *Becerra* "*passim*" and *Casey* once); the State's Table of Authorities, dkt. 271 at 3, (citing *Casey* "*passim*" and *Becerra* twice). The Court also must examine whether and to what extent the Seventh Circuit's decision in *Doe v. Rokita* affects the interpretation of those two cases. 54 F. 4th 518. The Court is duty bound to harmonize all three cases. *United States v. Hansen*, 929 F.3d 1238, 1254 (10th Cir. 2019) ("[W]e must endeavor to interpret our cases in a manner that permits them to coexist harmoniously with overarching and controlling Supreme Court precedent and with each other."); *Kimberly-Clark Corp. v. Fort Howard Paper Co.*, 772 F.2d 860 63 (Fed. Cir. 1985) ("Thus, statements in opinions of this court must be read harmoniously with prior precedent, not in isolation.").

In *Casey*, abortion-provider plaintiffs challenged Pennsylvania's law requiring them to provide patients with certain information before performing an abortion. 505 U.S. at 880. Specifically, the law required the physician to discuss the "nature of the procedure, the health risks of the abortion and of childbirth, and the probable gestational age of the unborn child." *Id.* at 881. Further, the law required the physician to note the availability of state-published materials on child-support assistance, adoption agencies, and other abortion alternatives. *Id.*

The *Casey* plurality didn't evaluate the Pennsylvania law under heightened review. *Id.* Instead, the plurality termed the mandated disclosures an "informed consent requirement." *Id.* It suggested that a state doesn't violate the First Amendment when it requires a doctor to provide "truthful, nonmisleading

21

RSA-080

information about the nature of [a] procedure." *Id.* at 882. Though such requirements implicated the doctor's right not to speak, they did so "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Id.*

The State is correct that *Casey*'s language gives it some constitutional leeway to enact Section 6.1(1). But the *Casey* decision doesn't stand in isolation. Both the Supreme Court and the Seventh Circuit had more to say.

In *Becerra*, the Supreme Court considered a California statute that required certain pro-life pregnancy centers to display a state-drafted notice regarding abortion availability. *Becerra*, 585 U.S. at 763. The notice had to be "posted in the waiting room, printed and distributed to all clients, or provided digitally at check-in." *Id.*

Rejecting a so-called "professional speech" First Amendment exception, the Supreme Court held that "speech is not unprotected merely because it is uttered by professionals.'" *Id.* at 766. Citing *Casey*, the Court acknowledged that "States may regulate professional conduct, even though that conduct incidentally involves speech." *Id.* at 769. In doing so, *Becerra* immediately categorized the action at issue in *Casey* as more akin to conduct, rather than speech. Moving forward, the Supreme Court then held *Casey*'s lower standard didn't apply to the California statute. Instead, according to the *Becerra* Court, the law "regulate[d] speech as speech." *Id.* at 770. The *Becerra* Court reasoned that the Pennsylvania statute in *Casey* was an "informed consent" law; whereas, the California statute was "neither an informed consent requirement nor any other regulation of professional conduct." *Id.*

22

RSA-081

Although it didn't overrule *Casey*, *Becerra*'s dicta revealed the Court's dim view of compelled speech, even when it occurs in a medical context. "Doctors help patients make deeply personal decisions, and their candor is crucial," the Court said. *Id.* at 771 (citations omitted). And "[t]hroughout history, 'governments have 'manipulated the content of doctor-patient discourse' to increase state power and suppress minorities." *Id.* (citations omitted). "Doctors and nurses might disagree about the ethics of assisted suicide or the benefits of medical marijuana . . . [but] the people lose when government is the one deciding which ideas should prevail." *Id.* at 772.

***

The Court detours here to discuss "informed consent," for purposes of *Becerra*'s "speech incidental to conduct." *Becerra*, *Casey*, *Rokita*, and other abortion-related cases refer to informed consent. And, as the Parties recognize, this loaded term of art does a decisive amount of work: If a disclosure fits within an "informed consent" statute, *Becerra* deemed it "incidental to professional conduct," and thereby immune from heightened review. Indeed, post-*Becerra*, if a disclosure *isn't* an informed consent statute, few avenues permit deferential review. *But see Rokita infra.* Yet, there's apparently "no[] legal authority reciting the contours of 'informed consent.'" *E.M.W. Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F. 3d 421, 448 (6th Cir. 2019) (Donald, J., dissenting).

The Parties in this case offer conflicting definitions of informed consent. A three-day trial devolved into disagreements about the competing ethical principles underpinning medical practice and which values should be prioritized over others.

23

RSA-082

*See* Trial Tr. 426–35; 603–10. To the extent the American Medical Association or similar groups adopt a definition, the record demonstrates those are nonbinding guidelines. NIFLA dkt. 275-2 ¶ 34. So, under these circumstances, the Court has two options: examine legal precedent and derive a definition from that caselaw or choose between competing experts and trade associations on an issue fraught with scientific, moral, and philosophical controversy. Some judges take the latter approach, looking to the normative medical definition promulgated by groups like AMA and ACOG. *See E.M.W.*, 920 F. 3d at 454–55. (6th Cir. 2019) (Donald, J., dissenting); *Camnitz*, 774 F.3d at 251–53. A court would then conclude that whatever falls within the medical groups' informed consent definition automatically meets *Becerra*'s "speech incidental to conduct."

But there are significant problems with that approach, an approach this Court refuses to take. First, that process ultimately nullifies *Becerra*: "Speech isn't unprotected," the *Becerra* Court held, "merely because it's uttered by professionals." Yet if the State or professional groups could tuck the compelled speech under an "informed consent" labeled shield, then they could routinely evade scrutiny. *See Becerra*, at 755 ("[S]tate labels cannot be dispositive of [the] degree of First Amendment Protection." (cleaned up)). Further, that approach forces the Court to decide what's constitutional based on the normative, conventional perspectives. That conflicts with the First Amendment's entire purpose, aiming to protect *"unpopular* ideas [and] information." *See Becerra*, 585 U.S. at 773 (emphasis added).

24

RSA-083

More importantly, doctors and lawyers are talking past each other. *Becerra* didn't say "informed consent" status alone is a get-out-of-First-Amendment-free card. Instead, *Becerra* held that such provisions are acceptable *because they're incidental to professional conduct*. Indeed, the Supreme Court pointed to the specific informed consent provision at issue in *Casey*. 585 U.S. at 769–70. So, the Court must determine whether the medical definition of informed consent remains incidental to conduct. If the scope of the medical community's definition captures protected speech—i.e. amounts to more than an incidental burden—then it violates the First Amendment. A court can't abdicate its responsibility to determine constitutional protections to trade associations.

Ultimately, when medical experts disagree as to what constitutes "informed consent," the Court can't pick a side. It's not only unqualified do so, but, more importantly, *Becerra* doesn't care about the abstract definition. Instead, the Court examines abortion-related cases to discern some of the contours of informed consent. When "informed consent" meets *those* qualifications, it necessarily satisfies *Becerra*'s "incidental to professional conduct." The Court finds that "informed consent" is incidental to conduct when it meets the following four minimum requirements.

First, informed consent necessarily requires a "medical procedure." The *Becerra* statute wasn't an informed consent provision, because it wasn't "tied to a procedure at all," instead applying to "all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered or performed." *Becerra*, 585 U.S. at 756; *see also Rokita*, 54 F. 4th at 520 (noting that

25

RSA-084

states may require "informed consent to risky procedures"). That's also consistent with the term "incidental to conduct." If there's not an identifiable procedure—i.e. no conduct—then the informed consent can't latch on to anything.

Second, as the term suggests, an informed consent provision must "afford the patient the ability to make an informed, intelligent decision regarding medical treatment he is to receive," including "the general nature of the contemplated procedure, the risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." *Roberts v. Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985). *Canterbury v. Spence*, 464 F.2d 772, 781 (D.C. Cir. 1972) (physicians generally must "warn the patient of any risks to his well-being which the contemplated therapy may involve").

So, by definition, a disclosure only qualifies as an informed consent provision if it occurs *before* a patient undergoes a medical procedure. *See Patel*, 620 F. Supp. at 325 ("The doctrine of informed consent requires that *prior to* administering medical treatment . . . .) (emphasis added); *Becerra*, 585 U.S. at 769 (noting that *Casey* required "informed consent *before* they could perform an abortion." (emphasis added); *Karlin v. Foust*, 188 F.3d 446, 454 (7th Cir. 1999) (discussing informed consent before a procedure); *Stuart v. Camnitz*, 774 F.3d 238, 252 (4th Cir. 2014) ("The informed consent process typically involves a conversation between the patient . . . and the physician . . . before the procedure begins."). Both legal and medical dictionaries agree on this fundamental principle of informed consent. *Informed Consent*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A person's agreement to allow something to

26

RSA-085

happen, made with full knowledge of the risks involved and the alternatives."); *Informed Consent*, STEDMAN'S MED. DICTIONARY ("Voluntary agreement given by a person . . . for participation in a . . . treatment regime . . . after being informed of the purpose, methods, procedures, benefits, and risks.").

Third, to be incidental to conduct, the informed consent provision must substantively relate to the impending medical procedure. In other words, a state can't throw whatever it wants into a compelled disclosure and label it informed consent. Before surgery, the State can't require a doctor to tell her patient that ketchup should never be put on a hotdog. Courts have interpreted that requirement broadly, allowing discussions of such things as adoption and parental support, *Casey*, 505 U.S. at 881, and descriptive ultrasounds, *E.M.W.*, 920 F. 3d 421, 424. (6th Cir. 2019); *but see Camnitz*, 774 F.3d at 252 (holding such ultrasounds don't fit within informed consent). But in all those scenarios, the disclosures aimed to articulate the factual "risks involved, the prospects of success, the prognosis if the procedure is not performed and alternative medical treatment." *Patel*, 620 F. Supp. 323, 325 (N.D. Ill. 1985). The relational requirement essentially tracks the "truthful, non-misleading and relevant" standard articulated in *E.M.W.*, 920 F.3d at 424.[9]

---

[9] The State argues that "truthful, non-misleading, and relevant" standard should govern compelled disclosures, like Section 6.1(1). But the State skips a step. The *E.M.W.* court had already concluded that the statute at issue was an informed consent provision. *See* 420 F.3d at 424 ("Even though an *abortion-informed-consent* law compels a doctor's disclosure of certain information, it should be upheld so long as the disclosures is truthful, non-misleading, and relevant to an abortion.") (emphasis added); *id.* at 429 ("[S]uch incidental regulation includes mandated informed-consent requirements, provided that the disclosures are truthful, non-misleading, and relevant."). Moreover, the Court shares some

RSA-086

Fourth, doctrinally, an informed consent provision is incidental to conduct only when it regulates the health care provider performing the identified medical procedure. *See Casey*, 505 U.S. at 881–82 (explaining how the statute applied to the doctor performing the abortion); *A Woman's Choice-East Side Women's Clinic v. Newman*, 305 F.3d 684, 684–85 (discussing what the Court called an "informed consent" statute that regulated the "*physician who is to perform* the abortion") (emphasis added); *E.M.W.*, 920 F.3d at 424 (discussing what the court termed an informed consent provision that "direct[ed] a doctor, prior to performing an abortion"); *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012) (same); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008) (same). All of those cases are doctrinally consistent with the goal of informed consent that a physician can't operate on a person without the patient's permission. *See Becerra*, at 770 (citing *Chloendorff v. Soc'y of N.Y. Hosp.*, 105 N.E. 92, 93 (1914) (Cardozo, J.) ("[A] surgeon who performs an operation without his patient's consent commits an assault."). That rationale only carries weight when the operating physician obtains the patient's consent for *that* impending procedure.

The State calls this an "invent[ed]" rule that imposes "a novel limitation" on the State's power. NIFLA dkt. 275 at 15. It's true that neither *Casey* nor those other cases said in exact words that a disclosure is only an informed consent provision when

---

of the *E.M.W.* dissent's concern that *Casey* may have used that language in an undue burden analysis, not a First Amendment one. *Id.* at 449.

28

it's regulating the procedure-providing doctor. But those were the factual circumstances. And cases must be read and their holdings interpreted in the factual context presented to the court making the decision. *See Pampered Chef v. Alexian*, 804 F. Supp. 2d 765, 782 (N.D. Ill. 2011); *MB Fin. Bank, N.A. v. Walker*, 741 F. Supp. 2d 912, 919 (N.D. Ill. 2010). Indeed, the Supreme Court found *Becerra*'s counterfactual (i.e. a state compelling speech from someone not necessarily performing the medical procedure) unconstitutional. What's more, the State has things backwards. The State cites no case that construes "informed consent" in this type of expansive manner, one that applies "informed consent" to health care providers who never offer the underlying-yet-to-occur procedure. Instead, the *State* breaks doctrinal ground by pioneering a novel definition without authority. In doing so, the State—not the Plaintiffs—are the inventors.

The State notes that *Casey* required the operating physicians to inform women about "subjects far beyond the health care they offered," including paternal child support and adoption. NIFLA dkt. 275 at 12. So, the State asserts, the physician need not provide the triggering medical procedure. *Id.* But the State confuses the necessary and sufficient conditions. If a doctor performs a medical procedure, then a state may require an informed consent disclosure. The doctor must perform a medical procedure for the state to constitutionally compel that disclosure. However, the doctor doesn't need to also perform the procedures (if any) contained within those disclosures. For example, a state may compel a surgeon to inform a patient that

29

surgery will consequentially require physical therapy, even though the surgeon doesn't offer physical therapy.

The State proposes a broader definition of informed consent. It contends that "[i]nformed consent is not limited to seeking authorization for an imminent medical procedure." NIFLA dkt. 275-1 ¶¶ 107–08. Instead, "[h]ealth care personnel are obligated to advise patients of risks and benefits of relevant procedures and treatment options, even if those treatments are not available at that particular medical facility." NIFLA dkt. 275-1 ¶¶107–08. The State derives that definition from the AMA's Code of Ethics and other professional bodies. *See* NIFLA dkt. 275-1 ¶¶ 75–78, 106–09. The State admits those ethical guidelines are "not binding professional or legal standards, but they provide a normative set of guidelines within the medical profession that health care professional consult to inform their practice." *Id.*[10] The State cites no case in which courts stretch informed consent to apply to doctors who don't perform the impending procedure. The Plaintiffs and their experts disagree with the State, offering a definition similar to the Court's definition. *See* NIFLA dkt. 271 at 3 ("To qualify as an informed consent requirement, a law must be tied to a medical procedure that the regulated parties perform.").

---

[10] To be clear, the Court doesn't doubt that "informed consent" also prizes "patient autonomy" and "self-determination." *Camnitz*, 774 F.3d at 251; *see also Canterbury v. Spence*, 464 F.2d 772, 787 (D.C. Cir. 1972) (emphasizing "patients right to self-decision" and determination). But the doctrine still requires certain other predicates to be satisfied for the term to qualify as "speech incidental to conduct." *Camnitz* found that an ultrasound-description requirement fell outside informed consent—essentially because it demanded *too much* information—but the necessary elements discussed above still existed.

The State's definition falls outside *Becerra*'s scope. *Becerra* carved out room for informed consent provisions as incidental to conduct. But that's because they were nearly contemporaneous with and in furtherance of the underlying procedure. "Incidental to conduct" is incompatible with a definition of informed consent that would require doctors to discuss hypothetical medical procedures they won't perform.

So, to summarize: Doctrinally, a statute qualifies as an informed consent provision—and therefore incidental to conduct—when it requires a health care professional, before she performs a medical procedure, to discuss the nature or consequences of the impending medical procedure.

\*\*\*

In medical cases, informed consent occupies most of the "speech incidental to professional conduct" universe. *See Becerra*, 885 U.S. at 768 (citing only two examples: the informed consent statute in *Casey* and legal advertising regulations). But *Becerra* leaves some room for non-informed consent qualifying statutes that are nonetheless incidental to professional conduct. *See id*. at 770 (noting that the California statute was "not an informed consent requirement *or any other regulation of professional conduct*."). *Rokita* provides such an example.

In *Rokita*, Indiana regulated the disposal of fetal remains. Specifically, the state required abortion providers (but not women who kept the remains) to dispose of the remains by either burial or cremation. 54 F. 4th 518, 519 (2022). The disposal requirements didn't apply to women who kept the remains themselves. *Id*. The

RSA-090

provider could explain those options after the procedure, and the information didn't aim to inform her consent to a procedure; nor did *Rokita* call the statute an informed consent provision. Two doctors sued, arguing that the First Amendment barred Indiana from requiring them to ask the women to select an option: burial or cremation. *Id.* at 520.

In a brief decision, the Seventh Circuit held Indiana's law constitutional. On the one hand (and as the State highlights), the *Rokita* Court stressed that "states may require medical providers to give truthful notices," including disclosures that enable "informed consent to risky procedures." *Id.* Characterizing *Becerra*, *Rokita* explained that although a "state may not enforce requirements disconnected from medical care,"[11] the state could still demand that "medical professionals alert patients to laws that affect medical choices." *Id.* at 521. That precise language gives states some latitude to demand certain speech, so long as that speech related to "medical choices" or falls within "medical care." But, as the Seventh Circuit has reminded district courts, that sentence must be read in context, including in the context of the facts of the case. *Livingston v. Trustguard Ins.*, 558 Fed. Appx. 681, 683 (7th Cir. 2014) *citing United States v. Costello*, 663 F.3d 1040, 1044 (7th Cir. 2012).[12] The Seventh Circuit's reminder is critical because, as the Plaintiffs emphasize, later language in *Rokita* limits its scope. Characterizing *Becerra*'s characterization of *Casey*, *Rokita* held that "a state may require medical professionals to provide

---

[11] This is the "ketchup on the hot dog" example the Court used previously.
[12] For example, although *Rokita* used the phrase "risky procedures," no risky procedures were implicated under the challenged statute or facts of the case.

RSA-091

information that facilitates patients' choices directly linked to procedures that have been or may be performed." *Rokita*, 54 F.4th at 521.

Reading *Casey*, *Becerra*, and *Rokita* together, the Court derives the following rule: States may regulate the practice of medicine, but to the extent the regulation implicates speech, to be constitutional, that speech must be "incidental to professional conduct." *Becerra*, 885 U.S. at 768. In the medical context, qualifying informed consent provisions will occupy most of the "speech incidental to professional conduct" universe. But *Rokita* makes clear that there's still room for some other speech-implicating conduct regulations, so long as the speech remains incidental to the underlying conduct.

*Application to Section 6.1(1)*

With that background, the Court now assesses Section 6.1(1). It first considers whether the mandated disclosures are "informed consent" provisions, as earlier defined. It then weighs whether the provisions are otherwise "incidental to conduct."

As discussed above, to secure a liability shield, Section 6.1(1) compels certain speech; namely a discussion about a patient's "condition, prognosis, legal treatment options, and risks and benefits of the treatment options." NIFLA dkt. 275-1 ¶ 100 (imagining a "thorough[] discuss[ion]" between the provider and the patient; *id.* ¶¶ 90–110 (terming the discussion "counseling"). As discussed, the mandated disclosures don't qualify as commercial speech. So, the Court subjects it to heightened scrutiny, unless the speech is only incidental to conduct.

RSA-092

*Informed Consent Analysis*

If the disclosures fall under the definition of informed consent, then the *Becerra*, *Casey*, and *Rokita* decisions teach that the disclosures are necessarily incidental to conduct and therefore don't trigger strict scrutiny. Recall that a state action doctrinally qualifies as an informed consent provision when it requires a health care professional, before she performs a medical procedure, to discuss the nature or consequences of the impending medical procedure. Under Section 6.1(1):

> "The health care facility, physician, or health care personnel shall inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner, consistent with current standards of medical practice or care."

The Pregnancy Centers engage in some medical-like conduct. They discuss medical histories, maternal health, abortion, and childbirth. In some cases, they administer STI and/or pregnancy tests as well as abortion pill reversals. And the Pregnancy Centers also perform transvaginal and abdominal ultrasounds. None of the Pregnancy Centers themselves perform abortions.

Although the cases on informed consent don't define a "medical procedure," under these facts, the Court is able to identify only two procedures from the list of medical conduct that could possibly anchor an informed consent provision: (i) sonogram/pregnancy test, and (ii) "medical options counseling." The Court considers whether either are qualifying "medical procedures," and, if so, whether the disclosures meet the other qualifications for informed consent.

34

i)     *Ultrasound*

The Pregnancy Centers perform abdominal and transvaginal ultrasounds and conduct pregnancy tests.[13]  In doing so, a woman is "assigned a medical professional," and brought to an ultrasound exam room.  Tr. 361:12–22.  The Court finds these exams to be "medical procedures."  And because it's a qualifying medical procedure, the State has leeway to require informed consent for these procedures.

As applied to the Pregnancy Centers, the disclosure's timing doesn't fit the informed consent definition.  Section 6.1(1) kicks-in *after* the ultrasound procedure.  *See* Section 6.1(1) (the provider must inform the patient of her "condition, prognosis, legal treatment options, and risks and benefits of the treatment options.").[14]  These types of discussions could only occur following a pregnancy determination.  But after the ultrasound the woman is either "free to go," Trial Tr. 97:13–16, or otherwise discusses her pregnancy options with a nurse or patient advocate.  Trial Tr. 155:17–21.  At that point, the Pregnancy Centers don't perform an impending medical procedure, so there's nothing that requires the patient's informed consent.

And it's not just a timing issue.  There's a relationship disconnect.  A prototypical informed consent provision would pertain to the impending procedure's

---

[13] The Court identifies the ultrasound (as opposed to the urine test) as the underlying procedure, because its more invasive nature permits a broader set of disclosures, which in turn maximizes the likelihood that the disclosures are constitutional.

[14] The Plaintiffs contend that the ultrasound doesn't qualify as a medical "diagnosis." But the Court construes it as a diagnostic procedure for these purposes.  It blinks reality to assert that an ultrasound performed at a crisis pregnancy center is not performed to obtain images for medical diagnostic purposes.  *Diagnostic ultrasound*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

35

(here an ultrasound) nature, risks, and benefits. To that end, the medical professional might need to inform a woman about the ultrasound's benefits. For example, the medical professional might need to inform the patient that the ultrasound provides an image of the fetus; that it can determine a fetus' age and condition; or that it can identify risky health conditions. And the health care professional might also be compelled to disclose that an ultrasound requires abdominal or vaginal contact; that less invasive procedures, like a urine test, can accomplish some of the same goals; or that an image of a fetus will appear on screen or that the woman may hear certain sounds. That type of information might inform the woman's decision as to whether to undergo the ultrasound procedure.

But the compelled disclosures required by Section 6.1(1) (i.e. the risks and benefits of abortion and childbirth) both occur after the ultrasound and substantively don't relate to that procedure. So, they don't fit within the doctrinal understanding of informed consent statutes.

(ii)     *Medical Options Counseling*

The Court next considers whether the Pregnancy Centers' "medical options counseling" could qualify as a medical procedure that could anchor incidental disclosures. The State groups much of the Pregnancy Centers' activities together, terming them "medical options counseling." And the Plaintiffs admit they engage in this type of counseling. Dkt. 282-1 at 16. The Court understands that to essentially mean a discussion regarding pregnancy status (pregnant or not pregnant) and a woman's associated options (if pregnant, then childbirth or abortion). If all of that

36

counseling itself is a "medical procedure," then the State could regulate that conversation under the theory that the discussion is actually conduct. Put simply, the speech itself is treatment, which would be conduct. Under that kind of reading, the Court wouldn't even need to consider whether particular speech was "incidental" or to a procedure, because the procedure necessarily encompasses the speech. Stated differently, according to the State, "medical options counseling" is conduct, not speech.

There's support for this type of reading. (In the near future, the Supreme Court might have something to say about this type of reading.) In *Tingley v. Ferguson*, the Ninth Circuit considered whether conversion therapy[15] constituted conduct or speech. 47 F.4th 1055. The therapist-plaintiff alleged that Washington's ban on the practice violated his free speech rights. But citing its pre-*Becerra* decision in *Pickup v. Brown*, 740 F. 3d 1208 (2014) the Ninth Circuit held that the therapy constituted conduct and therefore didn't implicate the First Amendment's free speech clause. 740 F.3d at 1221. The *Tingley* court reasoned that the therapy wasn't any less of a medical treatment "merely because [the treatment is] implemented through speech rather than conduct." *See also Chiles v. Salazar*, 116 F. 4th 1178, 1203–09 (10th Cir. 2024) (*cert. granted*, No. 24-539, 2025 U.S. LEXIS 1025 (Mar. 10, 2025)) (upholding a district court's preliminary injunction finding talk therapy a "medical treatment," and therefore "conduct.").

---

[15] "Within the field of psychology, conversion therapy is also known as 'reparative therapy' or 'sexual orientation and gender identity change efforts.'" 47 F.4th at 1064. Conversion therapy employs counseling and psychotherapy.

But not all circuit courts are on board. The Eleventh Circuit, in *Otto v. City of Boca Raton, Florida*, held that conversion therapy constituted speech. 981 F.3d 854. States couldn't regulate that speech, the *Otto* court held, by relabeling it "conduct." *Id.* at 861. The court recognized that it wasn't "entirely wrong" to characterize speech-based therapy as a "course of conduct." But the *Otto* court stressed that what the enacting governments called a "medical procedure" actually "consist[ed]— entirely—of words." *Id.* at 865. So, the Eleventh Circuit concluded that the First Amendment applied to therapy regulations.

The State says *Otto* doesn't apply. In its view, *Otto* didn't involve a "physician disclosure law of the kind at issue in *Casey* and *Rokita*, which require[d] providers to disclose certain information in connection with the provision of healthcare services." NIFLA dkt. 275 at 23. According to the State, "*Casey* and *Rokita* make clear that giving patients full information to make medical decisions is part of the 'practice of medicine, subject to reasonable licensing and regulation by the state.'" *Id.* (citing *Casey*, 505 U.S. at 884)). As explained above, the Court disagrees with the State's reading, because it largely ignores *Becerra* and sidesteps important language in *Rokita*. The State must either establish that it's solely regulating conduct (without implicating any speech) or otherwise demonstrate that the speech is incidental. Though *Otto*'s holding doesn't help the State demonstrate that therapy is fully conduct, *Tingley*'s and *Salazar*'s could.

But beyond its appearance in a string cite, the State didn't rely on either case. Absent further briefing, the Court isn't willing to say categorically whether all

38

counseling/therapy constitutes speech or conduct. The Court only concludes that the State hasn't persuaded the Court to adopt *Tingley*/*Salazar*'s reasoning over *Otto*'s. So, the Court can't find that the Pregnancy Centers' "medical options counseling" qualifies as a "medical procedure" for purposes of the *Casey*/*Becerra*/*Rokita* doctrine. And because it's not a "procedure," it doesn't trigger an informed consent analysis.[16]

*Non-Informed Consent Analysis*

Concluding that Section 6.1(1) isn't an informed consent provision, the Court considers whether it's nevertheless incidental to some conduct. *Rokita* underscored that a state action need not qualify as an informed consent provision to be "incidental." So, for example, unlike an informed consent statute, compelled speech could follow a procedure or not need to be provided by the rendering physician at all. If the state is regulating a specific course of conduct, it has leeway to implicate directly related speech.

However, stretching *Rokita* too far ultimately reverts to a *Casey*-only world, one in which the state may regulate the amorphous "practice of medicine." *Becerra* limited the universe in which *Casey* applied, barring disclosures even when they appeared in the pregnancy center's waiting room. It's true that the disclosure doesn't have to qualify as an informed consent statute, but there isn't much space between constitutional informed consent provisions and *Becerra*'s unconstitutional compelled

---

[16] The Court applies strict scrutiny, because Section 6.1(1) is content-based, and not incidental to any recognized medical procedure. What's more, Section 6.1(1) isn't entitled to *Zauderer* deference. So, the Court doesn't see a doctrinal avenue to apply something like intermediate scrutiny. However, the Court notes that Section 6.1(1) would fail intermediate scrutiny on fit, for the reasons discussed below.

RSA-098

materials. The Court finds that Section 6.1(1) doesn't squeeze through that narrow path.

*Rokita* involved a statute regulating the disposal of fetal remains. To that end, after an abortion, a woman could choose to take possession of the fetus or the provider could dispose of it consistent with the statute. *Rokita*, 54 F.4th at 519. So, the provider necessarily had to determine which route the woman wanted to take. This was a binary decision. No discussion was required, let alone the thorough discussion the State contends Public Act 99-690 mandates. What's more, the provider had to speak by asking this question. It didn't otherwise compel any discussion, such as the provider informing the woman of the risks and benefits of each option. *Id.* There was a proximate relationship, both temporally and substantively, between the disclosures in *Rokita* and the medical conduct.[17] Contrastingly, Section 6.1(1) demands a wide-ranging, hypothetical conversation unrelated to any procedure or other medical conduct. Indeed, Section 6.1(1) requires a wide-ranging conversation that might be completely divorced from the reality of the situation; for example, the thrilled patient who is not reasonably likely to encounter medical difficulties because of the pregnancy. What's more, that compelled speech isn't necessary to further future conduct. Any link under those circumstances is far too attenuated to satisfy *Becerra* or *Rokita*. Finding Section 6.1(1) not incidental to conduct, the Court must apply strict scrutiny.

---

[17] Similarly, as discussed below, Section 6.1(3) tethers any cognizable speech to specific conduct.

RSA-099

*Strict Scrutiny Analysis*

When a government restricts or requires speech based on content or viewpoint, the government action must survive strict scrutiny analysis. *Reed*, 576 U.S. at 171. Under this standard, the government must prove that the restrictions or required speech not only furthers a compelling interest but also that they do so in a narrowly tailored way to achieve that goal. *Id.* Restrictions that are underinclusive or overinclusive are not narrowly tailored. Indeed, to be narrowly tailored, the action must eliminate "no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

The State argues that it has a compelling interest in ensuring that conscience-based objections don't impair patients' health. *See* 745 ILCS § 70/6.1. To that end, the State asserts, it must demand that patients "receive accurate, timely information about their treatment options necessary to make autonomous medical choices, as well as reliable information about other providers who offer the care they have chosen." NIFLA dkt. 275 at 21. The Plaintiffs argue that's not a compelling interest because there's no evidence patients lack any information. NIFLA dkt. 282 at 13.

"[T]here can be no doubt," the Supreme Court has said, that "the government 'has an interest in protecting the integrity and ethics of the medical profession.'" *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (quoting *Wash. v. Glucksberg*, 521 U.S. 702, 731 (1997) (citing *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954) (noting that a state has "a legitimate concern for maintaining high standards of professional conduct")). The Court will assume, without deciding, that the State

41

has a compelling government interest, despite the State's failure to affirmatively produce evidence at trial on this requirement.

But Section 6.1(1) fails strict scrutiny because it's fatally overbroad. Section 6.1(1) requires compliance consistent with the "standard of care." Perhaps it's possible—after the fact—to discern the standard of care in a particular interaction. Those after-the-fact determinations occur continually in civil trials across Illinois. But testimony established that, prospectively, it's essentially indefinable. Indeed, the State admitted that "full explanation of all treatment options and the risks and benefits isn't required by the standard of care in every situation." Trial Tr. 661:17– 20. Even assuming that, in some non-medically necessary cases, the "standard of care" would require a benefits discussion, the Pregnancy Centers have little guidance on what those situations look like. So, in every situation they'll either risk potential liability or utter compelled speech without furthering *any* interest. Under strict scrutiny, the State carries the burden of establishing the provision is narrowly tailored; it falls far short in this case.[18] So, Section 6.1(3) unconstitutionally compels speech, and therefore the State can't demand such speech in exchange for a liability shield.

B)       *Section 6.1(3)*

The Plaintiffs also challenge Section 6.1(3) on First Amendment Free Speech grounds. This Section requires covered providers to transfer, refer, or tender, upon

---

[18] Because the Court finds that Section 6.1(1) compels speech even when it furthers no interest, the Court doesn't assess the Plaintiffs' argument that it's also underinclusive because it applies to those with conscience objections.

request, a list of medical providers that they reasonably believe will provide abortion services. The Court ultimately concludes that Section 6.1(3) doesn't implicate speech, so it doesn't violate the Free Speech Clause, either facially or as applied to the Plaintiffs. Section 6.1(3) provides:

> If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall: (i) refer the patient to, or (ii) transfer the patient to, or; (iii) provide in writing information to the patient about other health care providers who they reasonably believe may offer the health care service the health care facility, physician, or health personnel refuses to permit, perform, or participate in because of a conscience-based objection.

Whereas Section 6.1(1) requires health care professionals to *say* something to obtain immunity from civil or criminal liability, Section 6.1(3) explains what covered people and entities must *do* to earn immunity after the triggering event occurs: refer, transfer, or provide written information. As discussed more below, those three options are all conduct; none of them cognizably implicate speech.

Nor do the Pregnancy Centers engage in inherently expressive activities. The Court understands that the Plaintiffs run these Pregnancy Centers for the very sake of communicating pro-life messages. But conduct doesn't become expressive merely because the person engaged therein intended to express an idea. *United States v. O'Brien*, 391 U.S. 367, 376 (1968). Juxtapose the line of cases extending First Amendment protections to inherently expressive conduct—such as dancing, flag burning, or web-design—with a doctor referring a patient to physical therapy.

Stripped of its controversy, the difference is easy to see. Actions like transfers, referrals, or listing potential alternatives aren't inherently creative processes.

Further, the State grants conscientious objectors three different avenues to immunity. In lieu of referring the patient, a health care provider may "transfer the patient" to another facility or provide information about "other health care providers who they *reasonably believe may* offer" the unavailable service. § 6.1(3)(iii) (emphasis added). Most obviously, the option to transfer a patient doesn't implicate speech.[19]

When viewed through the lens of common sense, the Court has no trouble concluding that Section 6.1(3) doesn't implicate protected First Amendment activities. But, in reaching this holding, the Court also relies on trial testimony, persuasive precedent, analogies, common usage of the terms, and legal and medical dictionaries. The Court first acknowledges the uncontested fact that the State intended for Section 6.1(3) to facilitate the provision of medical services. This provision narrowly applies when a patient expressly asks a medical provider for information regarding potential abortion providers. Stated differently, Section 6.1(3) contains an explicit and mandatory trigger that is directly linked to the action. And even then, the provider need only comply if he intends to use the HCRCA as an affirmative defense.

From this narrow and purposeful drafting, the Court deduces that Section 6.1(3) doesn't target speech. And dictionary definitions compel the same conclusion.

---

[19] The Court gives slightly more attention to the referral option because that's what the Parties emphasized. However, Section 6.1(3) provides *three options*, and all three are conduct.

RSA-103

For example, The National Cancer Institute defines "referral" as an act. *Referral*, *Nat. cancer. Inst.* ("In medicine, the act of sending from one health care provider to another . . . ."). Black's Law Dictionary defines the term similarly as "[t]he act . . . of *sending or directing* to another for information, service, consideration, or decision." *Referral*, Black's Law Dictionary (12th ed. 2024) (emphasis added).

What's more, courts around the country have expressly stated that medical providers engage in pure conduct when writing prescriptions. 360 *Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 274 (4th Cir. 2024); *Kory v. Bonta*, No. 24-cv-00001, 2024 U.S. Dist. LEXIS 73845, *11. As with prescriptions, the "key component" of a medical referral is the provision of treatment. *Kory*, 2024 U.S. Dist. LEXIS 73845, *11 (quoting *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1046 (9th Cir. 2000). Prescriptions and referrals are both standard responsibilities among health care providers. They serve clinical—not expressive—goals. Again, contrast the goals of doctors with the goals of dancers. As this analogy shows, referrals aren't protected First Amendment activities.

There's also a trump card for this analysis. The Court finds clear guidance in the Seventh Circuit's decision in *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 629 (7th Cir. 2024). At the heart of *K.C.* were several First Amendment challenges to SEA 480: an Indiana statute banning health care professionals from providing, discussing, or referring minor patients for gender conversion therapy. Indiana and Illinois' referral provisions are two halves of the same whole; one state *restricts* medical referrals for controversial procedures,

45

whereas another state *requires* them. The Seventh Circuit ultimately resolved the First Amendment issues in *K.C.* on other grounds. But, importantly, it reversed the lower court's holding that SEA 480 burdens speech "on its face or in its practical operation." *Id.* (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). To the contrary, the Seventh Circuit suggested that restrictions on referrals are valid regulations of professional conduct. *Id.*

As the *K.C.* court explained, "SEA 480's secondary liability provision burdens speech incidentally because it targets conduct: facilitating the provision of gender transition procedures." *Id.* This logic applies with full force to statutes targeting referrals for any other medical procedure. "After all, in the law, what is sauce for the goose is normally sauce for the gander." *Heffernan v. City of Paterson,* 578 U.S. 266, 273 (2016). The First Amendment certainly doesn't discriminate between topics of protected speech. *Otto*, 981 F.3d at 871 (11th Cir. 2020). So, if SEA 480's heavy restrictions on referrals for controversial medical treatment stand, so can their mirror image. *See id*.

*K.C.* and the additional cited authorities compel the Court's conclusion that medical referrals—and so certainly potential resource lists or transfers—are pure conduct, subject to reasonable state regulation. The Plaintiffs disagree. In their view, Public Act 99-690 is subject to strict scrutiny in its entirety because the practice of medicine necessarily implicates speech. Though it's true a few words are often necessary to carry out a course of conduct, words don't automatically turn the conduct into speech. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Consider,

for example, the hypothetical in *Schneiderman*, where, by adopting economic regulations, a state incidentally regulates merchants' speech:

> [A New York statute preventing credit card surcharges] is not like a typical price regulation. Such a regulation—for example, a law requiring all New York delis to charge $10 for their sandwiches—would simply regulate the amount that a store could collect. In other words, it would regulate the sandwich seller's conduct. To be sure, in order to actually collect that money, a store would likely have to put "$10" on its menus or have its employees tell customers that price. Those written or oral communications would be speech, and the law—by determining the amount charged—would indirectly dictate the content of that speech. But the law's effect on speech would be only incidental to its primary effect on conduct, and "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).

Similarly, minimum wage laws don't implicate speech just because they require a supervisor to write a certain number on the check.[20] In these hypotheticals, as in this case, speech is a means to an end. Each regulation holds conduct at its core; limitations on employee speech are only a necessary means of enforcing compliance with the central regulatory scheme. In short, it's not enough to show that Public Act 99-690 implicates the First Amendment broadly. Given the option of severability, the Plaintiffs must show that this section, standing alone, abridges the

---

[20] Contrastingly, minimum wage laws would implicate the First Amendment if they compelled the supervisor to discuss the benefits and downsides of paying certain salaries. That's the difference between Sections 6.1(1) and Section 6.1(3).

RSA-106

covered health care providers' rights not to speak. They haven't done so. Section 6.1(3) is a wholesale regulation of professional conduct with no cognizable downstream effects on speech.

Even if the Court took the Plaintiffs at their word that Section 6.1(3) incidentally restricts some cognizable amount of speech, this Section would still be constitutional. As explained at length already, *Becerra*, *Rokita*, and its progeny allow states to regulate speech incidental to professional conduct, even beyond drafting informed consent disclosures.[21]  *Otto*, 981 F.3d at 865; *360 Virtual Drone Servs. LLC,* 102 F.4th at 273. In this case, the necessary speech—either writing a list or drafting a referral—bears a direct nexus to the underlying conduct that's necessarily effectuated by speaking or writing.

Ironically, though, the impact on speech is also incidental. The State's only goal in regulating things like referrals is to facilitate patients' access to their preferred medical treatment. The State doesn't intend to control the flow of discussion between doctors and patients—nor could it, for that matter.[22]  Nothing in the HCRCA restricts the Plaintiffs' rights to express their own opinions, especially now that the Court finds Section 6.1(1) unconstitutional.

---

[21] No doubt, Section 6.1(3) isn't an informed consent requirement. Medical referrals only take place after an ultrasound or options counseling (that is, once the patient has confirmed that she is pregnant and decided what to do about it), and a referral isn't directly linked to either qualifying "procedure." The Court's analysis here essentially duplicates the discussion of Section 6.1(1) as an informed-consent requirement.

[22] Contrastingly, the benefits discussion in Section 6.1(1) wholly regulates the exchange of information between providers and patients. In that scenario, the State takes the drivers' seat in deciding which ideas should factor into a woman's decision to have an abortion. In this one, the State exercises its police powers to facilitate a woman's choice only after she's decided for herself.

The Court understands the Plaintiffs' position that, while complying with Section 6.1(3), they are required to effectively endorse a course of conduct they find morally abhorrent. That's more of a Free Exercise issue, discussed below. But, in any event, if the Plaintiffs are unhappy with this legislation, "the remedy to be applied is more speech." *United States v. Alvarez*, 567 U.S. 709, 727–28 (2012) (quoting Justice Brandeis' concurrence in *Whitney v. California*, 274 U.S. 357, 377 (1927)). When meeting the requirements of Section 6.1(3), covered providers may rearticulate their stance on abortion or explain that their conduct is required by the State. Many will. Section 6.1(3) establishes a floor, not a ceiling, of information that must be provided to patients. So, Section 6.1(3) doesn't offend the Plaintiffs' rights not to speak; it's simply a valid exercise of the State's police powers to improve citizens' access to health care by regulating professional conduct. Consequently, the State may require such conduct in exchange for the HCRCA's liability shield.

**Free Exercise Claim**

Because the Court found Section 6.1(3) constitutional on Free Speech grounds, it now considers the Plaintiffs' contention that this Section violates the Free Exercise Clause. The Court recognizes that the peculiar circumstances presented by the facts, the HCRCA, and Public Act 99-690 put it in uncharted waters. As explained earlier, *supra* Part I(C), Public Act 99-690 arises in a unique statutory scheme; it works alongside the HCRCA to "respect and protect the right of conscience" for all heath care providers. 745 ILCS 70/2. The initial version of the HCRCA (now, almost fifty years old) protects conscientious objectors from all liability resulting from their

RSA-108

"refus[al] to act contrary to their conscience." *Id.*[23] But after collecting evidence—albeit minimal—that the HCRCA was *too strong* of a shield, in 2015, the General Assembly amended the HCRCA via Public Act 99-690. This statutory context guides the following discussion of the Plaintiffs' Free Exercise claims.

The Free Exercise Clause of the First Amendment, as applied to the states through the Fourteenth, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. Again, the Plaintiffs argue that Section 6.1(3) imposes unconstitutional conditions on their receipt of a public benefit. The Parties agree that the Plaintiffs have a sincere religious practice in refraining from facilitating abortions. NIFLA dkt. 275-2 at 4–5. The trial testimony confirmed this agreement beyond doubt. To end the analysis here, however, "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." *Reynolds v. United States*, 98 U.S. 145, 167 (1878).

The Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990). Instead, courts determine the appropriate level of scrutiny by asking if a challenged regulation "targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation . . . ." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S.

---

[23] Note, this part of the HCRCA has remained unchanged since its enactment. *See* P.A. 80-616 § 2; P.A. 90-246 § 5.

520, 531 (1993). Laws that "single out" religious conduct for discriminatory treatment are subject to strict scrutiny. *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 483 (2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 479 (2017) (Kagan, J., dissenting) (cleaned up). A "neutral law of general applicability," on the other hand, triggers rationality review, "even if [it has] the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531.

To avoid burying the lede, the State correctly argues that Public Act 99-690 is a neutral law of general applicability. These "interrelated" requirements forbid the government from selectively imposing burdens only on conduct motivated by religious belief—partly by asking whether "the object of the law is to infringe upon or restrict practices because of their religious motivation." *Id.* at 531, 533; *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 743 (7th Cir. 2015). Public Act 99-690 does no such thing.

Ordinarily, "[t]he minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi*, 508 U.S. 520, 546 (1993). But, for the reasons already given, Section 6.1(3) doesn't fit neatly into the Free Exercise doctrine. Unlike the "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause," *Bowen v. Roy*, 476 U.S. 693, 703 (1986), Public Act 99-690 and the HCRCA expand conscientious objectors' rights to the free exercise of religion by immunizing

them from liability. This context is important. *See In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989). "Considering the Act in isolation, as Plaintiffs insist the [C]ourt should, would mean that religious exemptions are a one-way ratchet: once extended, they could never be narrowed or abolished without violating the Free Exercise Clause because religious accommodations are, by their very nature, neither neutral nor generally applicable." NIFLA dkt. 176 at 35.

The Court wholeheartedly agrees with Judge Pallmeyer's discussion "about what law is the proper subject of analysis." *Id.* at 34. As she explained, the proper question is whether Public Act 99-690 *and* the HCRCA subject conscientious objectors to "unequal treatment" by imposing additional burdens on conscientious objectors over secular providers. *Lukumi*, 508 U.S. at 542 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 148 (1987) (Stevens, J., concurring)). Judge Pallmeyer hoped that the statewide "standard of care" may be dispositive; if Public Act 99-690 doesn't impose additional burdens on conscientious objectors, she reasoned, the Amendments must be neutral and generally applicable. NIFLA dkt. 176 at 20. As noted earlier, however, trial testimony made it impossible to prospectively and abstractly establish the standard of care for all providers in all circumstances.[24] *Supra* Part II(B). And, again, that conclusion is unsurprising given

---

[24] Importantly, the Court doesn't decide whether the standards of care do or don't match Section 6.1(3)'s provisions. It's possible that a conscientious objector might fail to comply with Section 6.1(3) and still satisfy the standard of care. As explained more later, the Court only concludes that the Plaintiffs can be called to court to make such a showing, as could anyone else.

52

RSA-111

that standard of care determinations are specific to the circumstances presented to the health care professional. *See Edelin*, 510 N.E.2d at 962.

So, this Court takes a different route, starting with a hypothetical from before the HCRCA: Two providers—one a conscientious objector and the other secular—both fail to provide a woman with requested information about abortion providers. The conscientious objector refuses because of his sincerely held beliefs. The secular provider doesn't provide the requested information because he's too busy. Both patients sue. Before the HCRCA, both suits could've gone forward, requiring the plaintiff in both cases to show that the health care providers fell below the standard of care.[25] After the HCRCA's enactment, the conscientious objector—but not the secular provider—is wholly protected, regardless of whether the provider's actions fell below the standard of care.

Along comes Public Act 99-690—partially restoring the pre-HCRCA universe. Now, as before, all health care providers are amenable to suit for failure to refer, transfer, or provide written information about potential abortion providers. Relative to each other, the secular provider isn't in any *better* position than before the HCRCA and the conscientious objector isn't any worse for the wear.

---

[25] As Judge Pallmeyer explained, there's no indication that the pre-HCRCA liability regime wasn't neutral and generally applicable. Put differently, absent the HCRCA, it's not necessarily unconstitutional to sue a doctor who didn't meet the standard of care because of her conscientious objection. In any event, the Amendments don't ban any other affirmative defenses.

RSA-112

As this hypothetical shows, the latest Amendments to the HCRCA don't impose additional burdens on conscientious objectors because of their beliefs.[26]  It's true that conscientious objectors can no longer rely on the HCRCA's once-expansive immunity. But as discussed previously, conscientious objectors were never constitutionally entitled to those benefits.  NIFLA dkt. 176 at 35.  The General Assembly was formerly inclined to offer an optional shield and now it isn't.  It's not the Court's place to second-guess the wisdom of that decision.  *Grand Trunk W. Ry. Co. v. Indus. Comm'n*, 291 Ill. 167, 172 (1919).

In a further attempt to bind the General Assembly to its own generosity, the Plaintiffs suggest that the State passed Public Act 99-690 at least partially "because of'" its adverse effect on religious activities.  *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, n. 24 (1979).  They don't support that argument with any evidence of legislative malintent.  *Compare Lukumi*, 508 U.S. at 540 (challenged city ordinances were designed to prevent religious activities because city councilmembers viewed the religion as "a sin, 'foolishness,' 'an abomination to the Lord,' and the worship of 'demons'") *with* S.B 1564, 99th Gen. Assemb. 2d Sess. (Ill. 2015) (Public Act 99-690 is designed to ensure that the HCRCA doesn't frustrate women's access to health care).  Even if Public Act 99-690 has discriminatory effects in operation, "[a]dverse impact will not always lead to a finding of impermissible targeting."

---

[26] For the mathematically inclined lawyer (if one exists):  0 [what the two providers had pre-HCRCA] + 1 [what the conscientious objector had after the HCRCA] − 1 [what the provider has after P.A. 99-690] = 0.  So, the two are once again on equal footing.  (In fact, that oversimplifies it because the conscientious objector, unlike the secular provider earns absolute immunity after complying with Section 6.1(3)).

*Lukumi*, 508 U.S. at 535.[27]  "The law's text and history . . . suggest instead that the legislature adopted the changes due to legitimate concerns about patient access to healthcare and not out of a desire to stifle religiously-motivated conduct."  NIFLA dkt. 176 at 38.  So, under the circumstances, Public Act 99-690 is neutral and generally applicable.

Finally, the Plaintiffs urge the Court to apply heightened scrutiny on a "hybrid rights" theory.  NIFLA dkt. 282 at 9–10.  "In *Smith*, the Supreme Court noted that, in cases implicating the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech . . . the First Amendment" may require courts to apply strict scrutiny even to neutral, generally applicable laws.  *C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 764 (7th Cir. 2007) (citing *Smith*, 494 U.S. at 881–82).  Though a plaintiff doesn't need to *succeed* on another First Amendment claim, he "does not allege a hybrid rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right."  *Id.* at 765 (quoting *Miller v. Reed*, 176 F.3d 1202, 1207–08 (9th Cir. 1999)).

The doctrine rests on a teetering foundation.  As Judge Pallmeyer noted, it "originates in [*Smith*'s] dictum."  NIFLA dkt. 176 at 36.  And it's "hard" to "justif[y]

---

[27] Likewise, the Plaintiffs didn't produce any evidence that Section 6.1(3) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."  *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 534 (2021).  Depending on the standard of care, health care providers may be liable if they unreasonably delay a woman's access to abortion by failing to transfer, refer, or provide her with written information *for any reason*.

the curious [hybrid rights] doctrine," some circuits essentially abandoning it entirely. *Fulton*, 593 U.S. at 599, 604 (2021) (Alito, J., concurring); *see also Henderson v. Kennedy,* 253 F.3d 12, 19 (D.C. Cir. 2001) ("For this argument to prevail, one would have to conclude that although the regulation does not violate the Free Exercise Clause, and although they have no viable First Amendment claim against the regulation, the combination of two untenable claims equals a tenable one.  But in law as in mathematics zero plus zero equals zero." (citations omitted.)).  "Telling[ly]," the Supreme Court "has never once accepted a 'hybrid rights' claim in the more than three decades since [*Smith*]." *Fulton*, 593 U.S. at 600.  The Seventh Circuit similarly rejected hybrid rights theories in the two cases that considered them.  *See Ill. Bible Coll. Assoc. v. Anderson*, 631, 641 (7th Cir. 2017); *Civil Liberties*, 342 F.3d at 764–65; *see also Maum Meditation House of Truth v. Lake County, Ill.*, 55 F.3d 1081, 1088 (N.D. Ill. 2014) (rejecting application); *Mahwikizi v. Ctr. for Control & Prevention*, 573 F. Supp. 3d 1245, 1253 (N.D. Ill. 2021) (same).

In any event, the Seventh Circuit seems to follow the Ninth in requiring, at minimum, a summary judgment level showing on the non-Free Exercise claim.  *See C.L for Urb. Believers*, 342 F.3d at 765 (rejecting a hybrid rights theory because it "f[oun]d [the other claims] individually lacking the merit necessary to withstand summary judgment").  As to Section 6.1(3), the Plaintiffs' weak Free Speech claims fall short of the summary judgment standard, because the provisions only regulate conduct.  The Court found a Free Speech violation in Section 6.1(1), but it severed the sections and assessed the two individually.  It won't now resew them with a tenuous

56

doctrinal thread. So, the Court doesn't believe the hybrid rights doctrine compels it to apply strict scrutiny to Section 6.1(3).

*Rational Basis Analysis*

Having reached the end of a long front walk, *see Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 102 (1998), the Court finds that Section 6.1(3) triggers (and withstands) rational-basis review. Under this test, a court "need only find a reasonably conceivable state of facts that could provide a rational basis for the classification." *Ind. Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015); *Lukaszczyk v. Cook Cnty.*, 47 F.4th 587, 602–03 (7th Cir. 2022) (collecting cases). This isn't an onerous test. The law comes to court bearing a strong presumption of validity, and the challengers must negate every conceivable basis which might support it. *Ind. Petroleum Marketers & Convenience Store Ass'n.*, 808 F.3d at 322.

Conceivably, the State has a legitimate interest in facilitating abortions provided by health care professionals to reduce the number of "self-managed abortions" or "self-induced abortions," which are inherently dangerous. Requiring the Plaintiffs to provide the requested information is a rational means of meeting that goal. So, Section 6.1(3) doesn't offend the Free Exercise Clause of the First Amendment.

**CONCLUSION**

Based on these findings of fact and conclusions of law, the Court holds that Section 6.1(1) violates the First Amendment's Free Speech Clause, but that Section

6.1(3) is constitutional. So, the Court grants Plaintiff's request for declaratory and permanent injunctive relief as to Section 6.1(1), finding this provision of Public Act 99-690 is unconstitutional and cannot be enforced. It denies the Plaintiffs' Motion as to Section 6.1(3).

Entered: April 4, 2025

By:_____
Iain D. Johnston
United States District Judge

RSA-117

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| Ronald L. Schroeder, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 17 CV 4663 |
| | ) |
| Mario Treto Jr., | ) |
| | ) |
| Defendant. | ) |

**<u>RULE 58 JUDGEMENT ORDER</u>**

The Court enters judgment in favor of Ronald L. Schroeder, 1st Way Pregnancy Support Services, and Pregnancy Aid South Suburbs, granting declaratory relief against Mario Treto, Jr., in his official capacity, that Section 6.1(1) of the Health Care Right of Conscience Act (created by P.A. 99-690), 745 ILCS 70/6.1(1), violates the First Amendment's Freedom of Speech Clause and permanently enjoining enforcement of Section 6.1(1) by Mario Treto, Jr. in his official capacity, and his officers, agents, servants, employees, and attorneys, and others who are in active concert or participation with any of these individuals.

The Court denies all other relief.

Entered: __4/4/2025_____

By:_____
Iain D. Johnston
U.S. District Judge

RSA-118