IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| RONALD L. SCHROEDER, *et al*., | ) | Appeal from the United States |
| | ) | District Court for the Northern |
| and | ) | District of Illinois, Western Division |
| | ) | |
| NATIONAL INSTITUTE OF FAMILY | ) | |
| AND LIFE ADVOCATES, *et al*., | ) | |
| | ) | |
| Plaintiffs-Appellants/Cross- | ) | |
| Appellees, | ) | No. 1:17-cv-04663 |
| | ) | No. 3:16-cv-50310 |
| v. | ) | |
| | ) | |
| MARIO TRETO, JR., in his official | ) | |
| capacity as Secretary of the Illinois | ) | |
| Department of Financial and | ) | |
| Professional Regulation, | ) | |
| | ) | The Honorable |
| Defendants-Appellee/Cross- | ) | IAIN D. JOHNSTON, |
| Appellant. | ) | Judge Presiding. |

**COMBINED PRINCIPAL AND RESPONSE BRIEF AND SUPPLEMENTAL
APPENDIX OF DEFENDANT-APPELLEE/CROSS-APPELLANT**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

**LEIGH J. JAHNIG**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 793-1473 (office)
(773) 590-7877 (cell)
Leigh.Jahnig@ilag.gov

Attorneys for Defendant-
Appellee/Cross-Appellant

**ORAL ARGUMENT REQUESTED**

*(full caption on following page)*

| | | |
|---|---|---|
| RONALD L. SCHROEDER; 1ST WAY PREGNANCY SUPPORT SERVICES; and PREGNANCY AID SOUTH SUBURBS, | ) ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Western Division |
| Plaintiffs-Appellants/Cross-Appellees, | ) ) ) ) | |
| v. | ) ) | No. 1:17-cv-04663 |
| MARIO TRETO, JR., in his official capacity as Secretary of the Illinois Department of Financial and Professional Regulation, | ) ) ) ) ) | The Honorable |
| Defendant-Appellee/Cross-Appellant. | ) ) ) | IAIN D. JOHNSTON, Judge Presiding. |
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES; TRI-COUNTY CRISIS PREGNANCY CENTER; LIFE CENTER, INC.; and MOSAIC PREGNANCY & HEALTH CENTERS, | ) ) ) ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Western Division |
| Plaintiffs-Appellants/Cross-Appellees, | ) ) ) | No. 3:16-cv-50310 |
| v. | ) ) ) | |
| MARIO TRETO, JR., in his official capacity as Secretary of the Illinois Department of Financial and Professional Regulation, | ) ) ) ) ) | The Honorable |
| Defendant-Appellee/Cross-Appellant. | ) ) ) | IAIN D. JOHNSTON, Judge Presiding. |

# TABLE OF CONTENTS

*Page*

JURISDICTIONAL STATEMENT ............................................................................... 1

ISSUES PRESENTED FOR REVIEW ........................................................................... 6

STATEMENT OF THE CASE ...................................................................................... 7

SUMMARY OF ARGUMENT ..................................................................................... 15

ARGUMENT ............................................................................................................. 17

I.      This court reviews the district court's legal conclusions *de novo* and its findings of fact for clear error. .............................................................................. 18

II.     Neither the Referral Protocol nor the Discussion Protocol violates the Free Speech Clause of the First Amendment. ............................................................ 18

        A.      The Referral Protocol and the Discussion Protocol, at most, regulate speech incidental to the professional conduct of medical providers. ..... 19

                1.      The Referral Protocol regulates non-expressive conduct. ........... 20

                2.      Alternatively, the Referral Protocol regulates speech only incidentally, as part of regulating the practice of medicine. ....... 23

                3.      The Discussion Protocol also regulates speech only incidentally to regulating professional conduct. .................................................. 30

                4.      Because the Protocols burden speech only incidentally to regulating professional conduct, no further analysis is needed. ......................................................................................... 35

        B.      Neither the Referral Protocol nor the Discussion Protocol is Content-Based. ................................................................................................... 36

                1.      The Referral Protocol is content-neutral. ................................... 37

                2.      The Discussion Protocol is content-neutral. ............................... 40

        C.      Both Protocols pass intermediate scrutiny. ............................................. 42

                1.      The Referral Protocol passes intermediate scrutiny ................... 42

                2.      The Discussion Protocol passes intermediate scrutiny. .............. 47

        D.      The Protocols would also pass strict scrutiny. ........................................ 52

III.    Neither the Referral Protocol nor the Discussion Protocol violates the Free
        Exercise Clause............................................................................................. 53

        A.    The Referral Protocol does not violate the Free Exercise Clause. ......... 54

        B.    The Discussion Protocol does not violate the Free Exercise Clause. ..... 57

IV.     Even accepting the district court's analysis, the court erred in declaring the
        Discussion Protocol unconstitutional in all applications................................... 59

CONCLUSION ............................................................................................................ 63

# TABLE OF AUTHORITIES

**Cases**

*Page(s)*

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  570 U.S. 205 (2013) ................................................................... 18

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) ................................................................... 22

*BLET GCA UP v. Union Pac. R.R. Co.,*
  988 F.3d 409 (7th Cir. 2021) ................................................... 34

*Brandt v. Griffin,*
  147 F.4th 867 (8th Cir. 2025) ......................................... 20, 22, 23, 26

*Brokamp v. James,*
  66 F.4th 374 (2d Cir. 2023) ..................................................... 39

*Cap. Associated Indus., Inc. v. Stein,*
  922 F.3d 198 (4th Cir. 2019) ................................................... 30

*Ctr. for Individual Freedom v. Madigan,*
  697 F.3d 464 (7th Cir. 2012) ................................................... 60

*Chiles v. Salazar,*
  116 F.4th 1178 (10th Cir. 2024) .............................................. 22

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ......................................................... 53, 54, 56

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
  596 U.S. 61 (2022) ............................................................. 40, 42

*City of Erie v. Pap's A.M.,*
  529 U.S. 277 (2000) ................................................................. 43

*City of Renton v. Playtime Theatres, Inc.,*
  475 U.S. 41 (1986) ................................................................... 43

*Combs v. Homer-Ctr. Sch. Dist.,*
  540 F.3d 231 (3d Cir. 2008) ..................................................... 58

*Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n,*
  149 F.3d 679 (7th Cir. 1998) ................................................. 60, 62

*Crim ex rel. Crim v. Dietrich,*
  2016 IL App (4th) 150843 ............................................... 24, 33, 51

iii

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
26 F.4th 1214 (11th Cir. 2022)............................................................. 31

*Doe v. City of Lafayette*,
377 F.3d 757 (7th Cir. 2004) .............................................................. 20

*Doe v. Rokita*,
54 F.4th 518 (7th Cir. 2022)..........................................................*passim*

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*,
920 F.3d 421 (6th Cir. 2019) ............................................. 27, 28, 33

*Fulton v. City of Phila.*,
593 U.S. 522 (2021) ............................................................. 53, 54, 57

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) ........................................................................ 20

*Gonzales v. Carhart*,
550 U.S. 124 (2007) ........................................................................ 17

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ................................................................... 45, 50

*Hackett v. City of S. Bend*,
956 F.3d 504 (7th Cir. 2020) ............................................................ 58

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*,
452 U.S. 640, (1981) ............................................................. 37, 40, 44

*Hodgkins ex rel. Hodgkins v. Peterson*,
355 F.3d 1048 (7th Cir. 2004) .......................................................... 39

*Ill. Bible Colleges Assoc. v. Anderson*,
870 F.3d 631 (7th Cir. 2017) ......................................... 53, 54, 56, 57, 58

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) ........................................................................ 60

*Johnson v. West*,
218 F.3d 725 (7th Cir. 2000) ............................................................ 18

*Jones v. Chi. HMO Ltd. of Ill.*,
191 Ill. 2d 278 (2000)...................................................................... 51

*Knowlton v. City of Wauwatosa*,
119 F.4th 507 (7th Cir. 2024)............................................................ 38

iv

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.*,
121 F.4th 604 (7th Cir. 2024) ............................................ 20, 22, 23, 30

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013) ............................................................. 18

*Listecki v. Off. Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) ............................................. 53

*Locke v. Davey*,
540 U.S. 712 (2004) ........................................................... 54

*MacDonald v. City of Chi.*,
243 F.3d 1021 (7th Cir. 2001) ....................................... 45, 50

*McCullen v. Coakley*,
573 U.S. 464 (2014) .............................................. 39, 40, 41, 42, 52

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
466 U.S. 789 (1984) ....................................................... 44, 61

*Miller v. Downey*,
915 F.3d 460 (7th Cir. 2019) ............................................. 60

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ............................................... 59, 60, 61

*Morr-Fitz, Inc. v. Quinn*,
2012 IL App (4th) 110398 ................................................. 48

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ....................................................*passim*

*Nicodemus v. City of S. Bend*,
137 F.4th 654 (7th Cir. 2025) .......................... 37, 38, 42, 46, 51

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ...................................... 22, 28

*Patriotic Veterans, Inc. v. Zoeller*,
845 F.3d 303 (7th Cir. 2017) ............................................. 37

*Planned Parenthood of Se. Pennsylvania v. Casey*,
505 U.S. 833 (1992) ................................. 26, 27, 29, 32, 35

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)) ......................................................... 36

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ........................................................ 38

*Rust v. Sullivan*,
500 U.S. 173 (1991) ........................................................ 21

*Sekerez v. Rush Univ. Med. Ctr.*,
2011 IL App (1st) 090889 ........................................ 46, 56

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .................................................. 24, 29

*Spivack v. City of Phila.*,
109 F.4th 158 (3d Cir. 2024) ........................................ 55

*St. John's United Church of Christ v. City of Chi.*,
502 F.3d 616 (7th Cir. 2007) ........................................ 55

*Tagami v. City of Chi.*,
875 F.3d 375 (7th Cir. 2017) ........................................ 20

*Tandon v. Newsom*,
593 U.S. 61 (2021) ........................................................ 56

*Telco Commc'ns, Inc. v. Carbaugh*,
885 F.2d 1225 (4th Cir. 1989) ...................................... 45

*Texas Med. Providers Performing Abortion Servs. v. Lakey*,
667 F.3d 570 (5th Cir. 2012) ............................ 17, 33, 34

*The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*,
76 F.4th 569 (7th Cir. 2023) ........................................ 21

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) .................................................. 42, 45

*Tingley v. Ferguson*,
47 F.4th 1055 (9th Cir. 2022) ...................................... 38

*Tobias v. Winkler*,
156 Ill. App. 3d 886 (4th Dist. 1987) .......................... 50

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ...................................................... 62

*Turner Broad. Sys., Inc. v. F.C.C.*,
512 U.S. 622 (1994) ........................................ 36, 37, 39, 40

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ........................................................... 45

*United States v. Stevens*,
    559 U.S. 460 (2010) ........................................................... 59

*Varandani v. Bowen*,
    824 F.2d 307 (4th Cir. 1987) ............................................ 42

*Vision Church v. Vill. of Long Grove*,
    468 F.3d 975 (7th Cir. 2006) ............................................ 53

*Walski v. Tiesenga*,
    72 Ill. 2d 249 (1978) .......................................................... 50

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ......................................... 36, 37, 40, 44, 47, 52

*We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*,
    76 F.4th 130 (2d Cir. 2023) .............................................. 55

*Xeniotis v. Cynthia Satko, D.D.S., M.S., P.C.*,
    2014 IL App (1st) 131068 .................................................. 50

*Yellowbear v. Lampert*,
    741 F.3d 48 (10th Cir. 2014) ............................................ 55

**Statutes and Regulations**

225 ILCS 60/22 ....................................................................... 51

745 ILCS 70/2 .................................................................... 37, 40

745 ILCS 70/4 .................................................................... 24, 52

745 ILCS 70/6 (2016) .............................................................. 48

745 ILCS 70/6.1 ...............................................................*passim*

**Other Authorities**

99th General Assembly, Senate Proceedings, Apr. 22, 2015 ....................... 47

99th General Assembly, House Proceedings, May 25, 2016 ....................... 47

# JURISDICTIONAL STATEMENT

The jurisdictional statement of Plaintiffs-Appellants/Cross-Appellees National Institute of Family and Life Advocates ("NIFLA"); Tri-County Crisis Pregnancy Center; The Life Center, Inc.; Mosaic Pregnancy & Health Centers; Dr. Ronald L. Schroeder; 1st Way Pregnancy Support Services; and Pregnancy Aid South Suburbs (together, "plaintiffs") is not complete and correct. As required by 7th Cir. R. 28(b), Defendant-Appellee/Cross-Appellant Mario Treto Jr., in his official capacity as the Secretary of the Illinois Department of Financial and Professional Regulation ("the Secretary"), provides this statement.

## *NIFLA v. Treto*, Nos. 25-1655 and 25-1657

On September 29, 2016, NIFLA, Tri-County Crisis Pregnancy Center, The Life Center, Inc., and Mosaic Pregnancy & Health Centers (together, "*NIFLA* plaintiffs"), along with Dr. Tina Gingrich and Tina M.F. Gingrich, M.D., P.C., filed a complaint in the district court challenging a newly-enacted state law, 745 ILCS 70/6.1, which amended the Illinois Health Care Right of Conscience Act, 745 ILCS 70/1 *et seq*. *NIFLA* Doc. 1.[1] The complaint raised five counts, alleging that aspects of section 6.1 violated: the Free Speech Clauses of the First Amendment to the United States Constitution and Article I, Section 4 of the Illinois Constitution (count I); the Illinois

---

[1] Documents filed in *NIFLA* are cited as "*NIFLA* Doc. _," and documents filed in *Schroeder* are cited as "*Schroeder* Doc. _." The trial transcript, found at *NIFLA* Docs. 260-62, is cited as "Tr. at _." The district court's memorandum opinion after trial, which is contained in plaintiffs' required short appendix, is cited as "RSA_," and plaintiffs' opening brief is cited as "AT Br. _." The Secretary's supplemental appendix, which contains the summary judgment opinion, is cited as "Supp.A_."

Religious Freedom Restoration Act, 775 ILCS 35/1 *et seq.* (count II); the Free

Exercise Clauses of the First Amendment to the United States Constitution and

Article I, Section 3 of the Illinois Constitution (count III); 42 U.S.C. § 238n (count

IV); and the Equal Protection Clauses of the Fourteenth Amendment to the United

States Constitution and Article I, Section 2 of the Illinois Constitution (count V).

*NIFLA* Doc. 1. *NIFLA* plaintiffs sought a declaratory judgment and an order

enjoining the Secretary from enforcing section 6.1. *Id.* at 31. The district court had

subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331 because

they raised federal questions, and over the state claims under 28 U.S.C. § 1367(a).

On July 19, 2017, the district court dismissed counts II, IV, and V, as well as

the portions of counts I and III that were based on the Illinois Constitution. *NIFLA*

Doc. 65 at 3-4. The district court also entered a preliminary injunction enjoining the

Secretary from enforcing "the amended act to the extent that enforcement would

penalize" health care providers who had conscience-based objections to abortion. *Id.*

at 9-10. The claims that remained alleged that section 6.1 violated the Free Speech

and Free Exercise Clauses of the First Amendment. *See id.* at 3-4.

### *Schroeder v. Treto*, Nos. 25-1603 and 25-1659

On March 16, 2017, Ronald Schroeder, 1st Way Pregnancy Support Services,

and Pregnancy Aid Southwest Suburbs (together, "*Schroeder* plaintiffs") filed a

complaint that also challenged section 6.1. *Schroeder* Doc. 1. *Schroeder* plaintiffs

raised nine claims, alleging that section 6.1 violated: the Free Speech Clause of the

First Amendment to the United States Constitution, both directly (count 1) and

because section 6.1 is allegedly overbroad (count 2); the Due Process Clause of the Fourteenth Amendment to the United States Constitution (count 3); *Schroeder* plaintiffs' right to free association under the First Amendment to the United States Constitution (count 4); the Free Exercise Clause of the First Amendment to the United States Constitution (count 5); the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (count 6); the federal Consolidated Appropriations Act of 2016, Pub. L. 114-113, Title V, § 507(d) (count 7); 42 U.S.C. § 300a-7 (count 8); and 42 U.S.C. § 238n (count 9). *Id. Schroeder* plaintiffs also sought declaratory and injunctive relief. *Id.* at 24-25. The district court had subject matter jurisdiction over *Schroeder* plaintiffs' federal claims under 28 U.S.C. § 1331 because they raised federal questions, and supplemental jurisdiction over *Schroeder* plaintiffs' state law claims under 28 U.S.C. § 1367(a).

The district court dismissed the due process (count 3), equal protection (count 6), and federal statutory (counts 7-9) claims. *Schroeder* Doc. 58. The claims that remained were the free speech (count 1), overbreadth (count 2), free association (count 4), and free exercise (count 5) claims. *See id.* at 2.

**The Consolidated Bench Trial and Judgment**

The district court consolidated the two matters for a bench trial, *NIFLA* Doc. 244, at which plaintiffs focused on two subsections of section 6.1 (6.1(1) and 6.1(3)). On April 4, 2025, following the bench trial, the district court entered a memorandum opinion in both cases, determining that section 6.1(1) violated the Free Speech Clause. RSA57. It also determined that section 6.1(3) "is constitutional." RSA57-58.

The same day, a separate judgment order was entered on the district court docket in both cases pursuant to Fed. R. Civ. P. 58. *NIFLA* Doc. 295; *Schroeder* Doc. 257. The judgment did the following: (1) "grant[ed] declaratory relief" that section 6.1(1) violated the Free Speech Clause of the First Amendment; (2) "permanently enjoin[ed]" the Secretary from enforcing section 6.1(1); and (3) stated "[t]he Court denies all other relief." *Id*. No motion to alter or amend the judgment was filed.

### *NIFLA* **Appellate Jurisdiction**

The district court's judgment disposed of all claims against all parties in *NIFLA*. *See NIFLA* Docs. 294, 295. *NIFLA* plaintiffs filed a notice of appeal on April 17, 2025, *NIFLA* Doc. 297, which was timely under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(1)(A) because it was filed within 30 days of the judgment's entry. On April 18, 2025, the Secretary filed a notice of cross-appeal, *NIFLA* Doc. 300, which was timely under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(3) because it was filed within 14 days of *NIFLA* plaintiffs' notice of appeal. The court therefore has jurisdiction over appeal no. 25-1655 and cross-appeal no. 25-1657 as appeals from a final judgment under 28 U.S.C. § 1291.

### *Schroeder* **Appellate Jurisdiction**

A district court decision is generally final and appealable only when it resolves all claims against all parties. *Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792, 795 (7th Cir. 2018). Here, the district court's memorandum opinion did not expressly address *Schroeder* plaintiffs' overbreadth (count 2) and free association (count 4) claims as to section 6.1(3). *See* RSA1-58.

If this court construes the statement in the judgment that the district court "denie[d] all other relief" to resolve those claims in the Secretary's favor, then the judgment is final. *See Schroeder* Doc. 257. The judgment would also be final if the court construes any of *Schroeder* plaintiffs' statements in the district court to have repudiated those claims. *See Minnesota Life Ins. Co. v. Kagan*, 724 F.3d 843, 848 (7th Cir. 2013) (party's repudiation of potentially remaining claim converted non-final order into final and appealable one); *see also Schroeder* Doc. 109 at 8 (*Schroeder* plaintiffs' statement that if they prevailed on their free speech or free exercise claim, they would not "proceed" on other claims). *But see Schroeder* Doc. 146 at 15 n.8 (*Schroeder* plaintiffs would not withdraw "remaining claims" if they prevailed on free speech or free exercise claim); Tr. at 302 (overbreadth claim remained part of case). Otherwise, the *Schroeder* judgment would not be final and the court would lack jurisdiction over appeal no. 25-1603 and cross-appeal no. 25-1659.

Assuming the judgment is final, this court has jurisdiction over appeal no. 25-1603 and cross-appeal no. 25-1659 as appeals from final judgment under 28 U.S.C. § 1291. *Schroeder* plaintiffs filed a notice of appeal on April 9, 2025, *Schroeder* Doc. 259, which was timely under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(1)(A) because it was filed within 30 days of the judgment's entry. On April 17, 2025, the Secretary filed a notice of cross-appeal, *Schroeder* Doc. 262, which was timely under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(3) because it was filed within 14 days of *Schroeder* plaintiffs' notice of appeal.

**ISSUES PRESENTED FOR REVIEW**

1.      Whether the Referral Protocol and the Discussion Protocol found in section 6.1 of the Health Care Right of Conscience Act, 745 ILCS 70/6.1, violate the Free Speech Clause of the First Amendment.

2.      Whether the Referral Protocol and the Discussion Protocol violate the Free Exercise Clause of the First Amendment.

3.      Whether the district court erred in enjoining the Discussion Protocol in all applications to all types of conscience objectors, when the evidence, and the district court's reasoning, focused on the Discussion Protocol's impact on plaintiffs.

# STATEMENT OF THE CASE

**The Conscience Act**

The Illinois Health Care Right of Conscience Act ("Conscience Act"), 745 ILCS 70/1 *et seq.*, protects health care providers who refuse to provide certain health care services based on their conscience. *See* 745 ILCS 70/3(e) (defining "conscience" as "a sincerely held set of moral convictions arising from belief in and relation to God" or similar convictions); *id.* § 2 ("[i]t is the public policy of the State of Illinois to respect and protect the right of conscience" of health care providers). The Conscience Act prohibits, for example, discrimination against health care providers and facilities based on their conscience beliefs. *Id.* §§ 5, 7, 8, 10, 11. And, most relevant here, the Conscience Act also immunizes health care personnel with conscience objections from any civil or criminal liability that might arise from the objector's refusal to provide health care services. *Id.* § 4; *see id.* § 9 (similar immunity for health care facilities).

These protections, including this immunity shield, have never been absolute. The Conscience Act does not, for example, relieve health care personnel from the obligation to provide emergency medical care. 745 ILCS 70/6; *see* 745 ILCS 70/6 (2016). Nor has the Conscience Act ever — including before the 2016 amendment at issue here — relieved health care providers of the duty to inform their patients about their "condition, prognosis, and risks." 745 ILCS 70/6 (2016).

**The 2016 Conscience Act Amendment**

In 2016, the Illinois legislature amended the Conscience Act to add a new section, 745 ILCS 70/6.1, which was to take effect in 2017. *See* Pub. Act 99-690. Section 6.1 requires that "[a]ll health care facilities" adopt certain protocols

7

"designed to ensure that conscience-based objections do not cause impairment of patients' health." 745 ILCS 70/6.1. The General Assembly made these changes when faced with evidence that the Conscience Act's broad immunity had prevented patients from obtaining health care. For example, the legislature's human services committee heard testimony from a patient who endured a weeks-long miscarriage of a wanted pregnancy because the religious hospital where she obtained care would not assist with terminating the pregnancy or release her records to a hospital that would. *NIFLA* Doc. 275-29 at 14-17. The 2016 amendment, accordingly, were designed to balance the State's policy of respecting and protecting the conscience beliefs of health care providers, with the State's additional policy of "ensur[ing] that patients receive timely access to information and medically appropriate care." 745 ILCS 70/2.

Two aspects of section 6.1 are relevant here. Section 6.1(1) establishes a protocol ("the Discussion Protocol") that directs providers to inform a patient "of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner, consistent with current standards of medical practice or care." *Id*. § 6.1(1). The second relevant protocol, established by section 6.1(3) ("the Referral Protocol"), provides that, if a patient requests a treatment that the provider does not offer because of a conscience objection, the provider must (1) refer the patient, (2) transfer the patient, or (3) provide written information about other providers whom they reasonably believe may offer the treatment. *Id*. § 6.1(3). The Conscience Act does not require a provider to follow either Protocol, but provides that its protections, including the liability shield, "only apply if conscience-based

refusals occur in accordance with these protocols." *Id.* § 6.1. Legislators discussed how the Protocols would ensure that anyone who sought treatment from a doctor with a moral objection to certain treatments — such as blood transfusions, AIDS and HIV treatment, and end-of-life care, along with abortion and contraception — would be able to obtain these treatments. *See* 99th General Assembly, Senate Proceedings, Apr. 22, 2015 ("Senate Proceedings"), at 202; 99th General Assembly, House Proceedings, May 25, 2016 ("House Proceedings"), at 76-77.

**Proceedings in the District Court**

The Department oversees the licensing of health care personnel, including imposing regulatory discipline where appropriate. *See, e.g.*, 225 ILCS 60/22 (Department can impose discipline for "[g]ross negligence" or "dishonorable, unethical, or unprofessional conduct" that is "likely to deceive, defraud, or harm the public"). Plaintiffs are crisis pregnancy centers (along with one organization whose members comprise such centers and one medical director of such a center) — that is, entities that provide certain health care services, primarily ultrasounds and tests for sexually transmitted infections, to pregnant patients for the purpose of convincing them to carry their pregnancies to term. *NIFLA* Doc. 1 at 2-3; *Schroeder* Doc. 1 at 1-2; *see* Tr. at 207, 253-57, 277. Plaintiffs hold religious objections to abortion and contraception. *See NIFLA* Doc. 1 at 3; *Schroeder* Doc. 1 at 2.

Shortly after the passage of the 2016 amendment, plaintiffs filed their complaints in the district court. Relevant here, they alleged that the Discussion and Referral Protocols violate their free speech and free exercise rights. *NIFLA* Doc. 1 at

22-25, 27-28; *Schroeder* Doc. 1 at 16, 20-21. The district court preliminarily enjoined section 6.1 during the pendency of the litigation, *NIFLA* Doc. 65 (Kapala, J.), and that injunction remains in place with the parties' consent, *NIFLA* Docs. 304, 305.

Before the close of discovery, plaintiffs moved for summary judgment, which the district court denied. *See* Supp.A1-41 (Pallmeyer, J.). Turning first to the free speech claim, the court explained that the Protocols are "regulation[s] of professional conduct that only incidentally burden[ ] speech." Supp.A18; *see* Supp.A26-27. The Discussion Protocol, the court reasoned, does not require a uniform script, but rather incorporates the prevailing medical standard of care and thus directs providers to "align the benefits discussed with the health and circumstances of each patient." Supp.A20. And, the court added, the Referral Protocol, which applies only when the patient asks for a treatment, is akin to regulations in which medical providers are directed to inform patients about "alternatives" to a particular procedure. Supp.A26. The court then applied intermediate scrutiny, though it recognized a lower level of scrutiny might be appropriate. Supp.A22-23. And it held that plaintiffs had not met their summary-judgment burden to establish that the Protocols would fail intermediate scrutiny because there was evidence that the Protocols were narrowly tailored to achieve the State's interest in ensuring that patients can access care. Supp.A23-25, 27-29.

The district court also denied summary judgment on the free exercise claims because, it determined, the Protocols are neutral laws of general applicability and evince no hostility toward religion. Supp.A34-38. The court explained that the

Conscience Act as a whole is an "accommodation" of religion, and such accommodations are not a "one-way ratchet." Supp.A35. Thus, the court held, the State did not hinder plaintiffs' free exercise of religion by placing new requirements on that accommodation, which still provides conscience objectors with a liability shield unavailable to "the rest of the [health care] field." *See id.*

**The Consolidated Bench Trial**

At the consolidated bench trial, plaintiffs presented witnesses who testified about plaintiffs' medical practices. These witnesses explained that plaintiffs' medical services primarily consist of ultrasounds and STI testing for pregnant patients. *E.g.*, Tr. at 95. Many of plaintiffs' patients come from vulnerable populations, and include women who are homeless, abused, cannot read English, or have limited financial means. *See* Tr. at 158, 191, 266-28, 395-96; *NIFLA* Doc. 275-36 at 7. Plaintiffs use "search engine optimization," a form of paid advertising, to ensure that when patients use the internet to search for terms like "abortion," "clinic," "pregnancy," and "help," plaintiffs' clinics will be the top results. Tr. at 127-28, 166.

Plaintiffs' witnesses explained that plaintiffs provide these medical procedures to discourage patients from having abortions. Tr. at 207, 255-57, 277. This discouragement is not based on any medical opinion — or anything about the patient's medical history — but rather on plaintiffs' personal beliefs against abortion. Tr. at 205; *see* Tr. at 108. Plaintiff Schroeder acknowledged, however, that sometimes abortions can be medically necessary to save a patient's life. Tr. at 329-30; *see* Tr. at 339; *see also* Tr. at 623-25, 628, 631-32, 642 (testimony from the

Secretary's expert about medical benefits of abortion and contraception). And, witnesses explained, plaintiffs urge patients to seek emergency care if they experience bleeding, cramping, or pain. *E.g.*, Tr. at 188, 227. Plaintiffs' expert likewise testified that there can be medical benefits to contraception. Tr. at 63-64.

The parties also presented expert evidence about the medical standard of care. Both sets of experts agreed that the standard of care in a given situation is not one-size-fits-all, but rather incorporates the individual circumstances of each patient. *See* Tr. at 50, 425-26, 514, 583; *see* Tr. at 599-600; *see also NIFLA* Doc. 275-17 at 10 (health care providers base decisions and recommendations on patient's needs). The Secretary's expert, for instance, explained that if a patient was "leaping for joy" upon learning she was pregnant and was not at risk of complications, the standard of care would not dictate discussing abortion, even though that would be a legal option. Tr. at 599-600. The parties' evidence also included guidelines promulgated by professional medical organizations about what providers should do when they "decline[ ] to offer" a treatment that a patient wants. *NIFLA* Doc. 275-17 at 7. In that situation, the provider "should" refer the patient to another health care facility — or at least offer "impartial guidance" about accessing the treatment. *Id.*; *see* Tr. at 620-21, 672.

**The District Court's Opinion and Judgment**

After trial, the district court entered an opinion holding that the Referral Protocol is constitutional, but the Discussion Protocol violates the Free Speech Clause. *See* RSA1-58 (Johnston, J.). The court's factual findings primarily

concerned the standard of care.  RSA10-14.  The court found, consistent with both

parties' experts, that the "standard of care depends on the specific factual

circumstances" of each patient.  RSA12.  Thus, the standard of care does not require

a "uniform benefits discussion."  RSA13.  And, the court recognized, standards

promulgated by professional health care organizations direct medical personnel to

discuss treatment options with patients and refer patients to alternate providers if

necessary.  RSA12.  But, the court noted, these professional standards are not

"binding."  RSA12.

Turning to the Discussion Protocol, the district court held that it regulated

speech, not professional conduct, notwithstanding the summary judgment opinion.

RSA20-40.  The court relied on its determination that the Discussion Protocol was

not an "informed consent" provision, a conclusion it reached because this Protocol

does not precede or discuss alternatives to the ultrasounds that plaintiffs themselves

perform.  RSA23-30, 34-36.  The court then stated that "informed consent occupies

most of the 'speech incidental to professional conduct' universe."  RSA31.  And,

notwithstanding its finding that the standard of care is individualized, the court

determined that the Discussion Protocol required plaintiffs to present abortion as an

option even it was "completely divorced from the reality of the situation," such as

when a patient was pleased to be pregnant.  RSA40.

The district court then described the Discussion Protocol as content-based

because it "governs a health care provider's discussion on pregnancy and abortion."

RSA17.  And the court held that the Protocol failed strict scrutiny because plaintiffs

13

would have to assess when discussing abortion and its benefits was appropriate under the standard of care for each patient. RSA42. The court acknowledged the problems confronting the Illinois legislature when it amended the Conscience Act, but, the court determined, these problems were irrelevant because the Protocols do not require conscience objectors to "personally perform abortion services." *See* RSA6. Based on its holding that the Discussion Protocol violated plaintiffs' free speech rights, the district court "permanently enjoin[ed]" the Secretary from enforcing it. *NIFLA* Doc. 295.

As for the Referral Protocol, the district court agreed with the summary judgment opinion that the Protocol did not regulate speech and was not expressive conduct. RSA42-47. And even if this Protocol did affect some speech, the court reasoned, it did so only incidentally to regulating the practice of medicine. RSA48-49. The court also held that the Referral Protocol did not violate the Free Exercise Clause. RSA49-57.

## SUMMARY OF ARGUMENT

The Conscience Act offers medical providers with conscience objections broad immunity from the threat of civil liability. In exchange, providers must comply with a fundamental tenet of the medical profession: the requirement that medical providers give their patients medically appropriate information, in line with the patient's circumstances.

This does not violate the Free Speech Clause. The Discussion and Referral Protocols are regulations of professional conduct that, at most, incidentally impact speech. Even if they are speech restrictions, they are not content-based. Thus, they are subject to no more than intermediate scrutiny, which they easily satisfy. The Protocols were enacted to ensure that a provider's personal beliefs do not stymie a patient's ability to obtain health care. And they are narrowly tailored because they require only those disclosures in line with the patient's actual circumstances. The Referral Protocol only applies if a patient asks for a particular treatment, and the Discussion Protocol only requires information consistent with the standard of care, which incorporates a patient's particular circumstances.

The Protocols also do not violate the Free Exercise Clause. The Conscience Act offers health care providers an *accommodation* for their religious beliefs. Adding new conditions — which mirror general practices in the medical profession — on that accommodation is not constitutionally suspect because religious accommodations are not a "one-way ratchet." RSA52 (quoting Supp.A35).

Finally, the district court erred in enjoining the Discussion Protocol on its face. Even if either Protocol was unconstitutional as applied to plaintiffs, the evidence does not support such sweeping relief, nor is it necessary to remedy any violation of the First Amendment.

## ARGUMENT

Health care providers, like all Americans, enjoy the First Amendment's free speech protections. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*Becerra*"), 585 U.S. 755, 767 (2018). These protections, however, do not thwart the States' traditional role in regulating medical professionals, whose words can wield significant power over patients' health and even their lives. *See id.* at 770; *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("[I]t is clear the State has a significant role to play in regulating the medical profession.").

The Discussion and Referral Protocols reflect this tradition. They afford conscience objectors a significant benefit — protection from the risk of civil liability — but condition it on compliance with a fundamental requirement of medical practice, namely that providers give tailored and medically appropriate information to patients. A physician who wants to rely on the Conscience Act's liability shield need only provide patients with information that is consistent with the standard of care (for the Discussion Protocol) or that patients have actually requested (for the Referral Protocol). Patients reasonably expect information of this sort from their medical providers, and they rely on it every day to make critical medical decisions. *See Texas Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 579 (5th Cir. 2012) ("[d]enying [patients] up to date medical information" hinders their ability to choose the best medical care for them). Illinois does not violate the First Amendment by conditioning liability protection on such requirements.

Plaintiffs contend that the Protocols represent an unconstitutional condition, in that they make the Act's liability shield available only if they surrender their constitutional rights. AT Br. 12-13; *see Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (describing unconstitutional conditions doctrine). But a provision that attaches a condition to a government benefit cannot be unconstitutional if the government could require a person to comply with the provision outright, with no benefit attached. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013). This principle controls here. The Protocols accordingly do not violate plaintiffs' free speech or free exercise rights.

## I.     This court reviews the district court's legal conclusions *de novo* and its findings of fact for clear error.

Following a bench trial, this court reviews the district court's conclusions of law *de novo* and its findings of fact for clear error. *Johnson v. West*, 218 F.3d 725, 729 (7th Cir. 2000).

## II.     Neither the Referral Protocol nor the Discussion Protocol violates the Free Speech Clause of the First Amendment.

The Protocols do not violate plaintiffs' free speech rights. Most basically, neither Protocol warrants heightened scrutiny because both regulate professional conduct. The Protocols govern basic interactions between medical providers and their patients, and so they are just one of the ways in which the State regulates medical practice. The First Amendment permits such laws, as the Supreme Court has recognized. *See Becerra*, 585 U.S. at 769-70. Accordingly, the Protocols are subject to, at most, intermediate scrutiny. Indeed, even if the Protocols regulated

speech, not conduct, intermediate scrutiny would still apply because they are not

content-based.  Both Protocols readily pass that hurdle.

### A. The Referral Protocol and the Discussion Protocol, at most, regulate speech incidental to the professional conduct of medical providers.

The Protocols are regulations of professional conduct that, at most, incidentally impact speech.  The Protocols do not hinder plaintiffs from engaging in anti-abortion advocacy; instead, they govern interactions between health care providers and their patients and ensure that those interactions comport with the medical standard of care.  The First Amendment plainly permits such regulations, without which patients would blindly stumble through necessary medical decisions. For this reason, the Protocols must be examined employing, at most, intermediate scrutiny.

Plaintiffs' contrary arguments hinge on a misconception of law.  Plaintiffs (and, with respect to the Discussion Protocol, the district court) suggest that the Protocols are not regulations of professional conduct because they are not "informed consent" provisions.  But no authority supports narrowly limiting professional regulations of medical practice to rules that can be characterized in that manner.  To the contrary, a law permissibly regulates professional conduct — and does not violate the First Amendment — if it facilitates a patient's choice about future medical treatments.  *Doe v. Rokita*, 54 F.4th 518, 521 (7th Cir. 2022).  The Protocols do just that.

## 1.    The Referral Protocol regulates non-expressive conduct.

Governments can regulate conduct that is accomplished through words without running afoul of the First Amendment.  *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").  Such conduct is not protected by the First Amendment unless it contains a "significant expressive element," *Doe v. City of Lafayette*, 377 F.3d 757, 763 (7th Cir. 2004), meaning that "the conduct *itself* must convey a message that can be readily 'understood by those who view[ ] it,'" *Tagami v. City of Chi.*, 875 F.3d 375, 378 (7th Cir. 2017) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (emphasis and alteration in original)).

Under this standard, the Referral Protocol does not implicate the First Amendment.  The first option that providers can employ when complying with it — transferring a patient — involves no speech at all.  And, as the district court held, RSA43-47, referring patients to another provider, the second option in the Protocol, is non-expressive conduct, not speech, *see K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 629 (7th Cir. 2024) (aiding and abetting statute that prohibited referrals for gender transition care prohibited conduct because statute "says physicians must avoid some *action*, not that they must avoid some *language*" (emphasis in original)); *see Brandt v. Griffin*, 147 F.4th 867, 889 (8th Cir. 2025) ("A referral for treatment is not part of the 'speech process.'  Rather, a referral

is part of the treatment process for gender transition procedures."). And the third option — providing information about where to obtain medical treatment — though accomplished through words, also does not "inherently express any message" about the treatment itself. *Cf. The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*, 76 F.4th 569, 577 (7th Cir. 2023). Plaintiffs are thus incorrect that answering the patient's question about alternate providers "recommend[s]" the treatment. *See* AT Br. 19; *cf. Rust v. Sullivan*, 500 U.S. 173, 192, 200 (1991) (regulation prohibiting doctors who received certain grants from providing information about or referring for abortion did not impact doctors' First Amendment rights because regulations did not "require[ ] a doctor to represent as his own any opinion that he does not in fact hold").

Plaintiffs nevertheless insist that the Referral Protocol regulates speech, not conduct, but their arguments fail. They first contend that the district court "carve[d] out a new category of unprotected speech" and resurrected the doctrine of "professional speech" that was adopted in other circuits before being rejected by the Supreme Court. AT Br. 21-23; *see also Becerra*, 585 U.S. at 767 (listing courts that had adopted this doctrine). The district court did no such thing: it simply applied the well-established principle that non-expressive conduct receives no First Amendment protection. RSA43-44; *see, e.g., The Bail Project*, 76 F.4th at 577.

Second, plaintiffs point out that referring patients may involve "spoken" or "written" words. AT Br. 16-17. But, as the district court explained, "words don't automatically turn . . . conduct into speech." RSA46 (citing *Giboney*, 336 U.S. at

21

502).  The cases plaintiffs cite involved speech that bears no resemblance to referring patients.  AT Br. 17; *see Bartnicki v. Vopper*, 532 U.S. 514, 519 (2001) (applying wiretapping statute to recorded conversation broadcast by local news); *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020) (ban on conversion therapy that outlawed an entire category of "advice that therapists may give their clients").[2]

The Referral Protocol also bears no resemblance to the law in *Becerra*, as plaintiffs assert.  *See* AT Br. 17.  The statute in *Becerra* required clinics to disseminate a "government-drafted script" to every patient, regardless of need or desire for that information.  585 U.S. at 766.  The Referral Protocol, by contrast, requires only that a medical professional answer a patient's question about finding alternate providers — an everyday part of the practice of medicine.  *See Brandt*, 147 F.4th at 889-90.  Requiring medical providers to respond to patient requests is hardly imposing a "government-drafted script" upon them.  *See Becerra*, 585 U.S. at 766.

Finally, plaintiffs attack the district court's reliance on *K.C.*, 121 F.4th 604. *See* AT Br. 17-18; RSA45-46.  In that case, an Indiana law prohibited aiding and abetting gender transition procedures for minors.  *K.C.*, 121 F.4th at 612.  A group of doctors argued that this infringed their First Amendment rights because it prohibited "referring patients to other physicians."  *Id.* at 628.  This court rejected this claim, concluding that the statute covered "speech integral to unlawful conduct" — the conduct being the transition procedures themselves.  *Id.*  The court added that

---

[2]  Other courts have rejected the Eleventh Circuit's reasoning in *Otto*.  *E.g., Chiles v. Salazar*, 116 F.4th 1178, 1214 (10th Cir. 2024), *cert. granted*, 145 S. Ct. 1328 (2025).

even "[a]ssuming" that the law targeted more than just unlawful conduct, *id.* at 629, it still did not regulate speech because "it says physicians must avoid some *action*, not that they must avoid some *language*." *Id.* at 630 (emphasis in original).

Plaintiffs contend that *K.C.* has no value in this context because the speech there was part of *unlawful* conduct, and so was unprotected for that reason. AT Br. 17-18. But this argument ignores the additional reason that this court gave for determining that the referrals were not protected: they were "action," not speech. *See K.C.*, 121 F.4th at 630. *K.C.*, accordingly, underscores that referrals are conduct, not speech, *see* RSA45-46, as other courts have also recognized, *see Brandt*, 147 F.4th at 889.

> ### 2. Alternatively, the Referral Protocol regulates speech only incidentally, as part of regulating the practice of medicine.

Even if the Referral Protocol affects some speech, the district court was correct that it does so only incidentally to regulating the practice of medicine. RSA48-49; *cf. Brandt*, 147 F.4th at 889 ("To the extent the Act regulates speech, it does so only as an incidental effect of prohibiting the provision of gender transition procedures to minors."). Consequently, strict scrutiny does not apply. *See Becerra*, 585 U.S. at 768 (courts "afford[ ] less protection" to regulations of "professional conduct, even though that conduct incidentally involves speech").

"The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.* at 769 (cleaned up). "That is why a ban on race-based hiring may require employers to remove 'White

Applicants Only' signs, why 'an ordinance against outdoor fires' might forbid 'burning a flag,' and why antitrust laws can prohibit 'agreements in restraint of trade.'" *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (citations omitted). Regulations of conduct that incidentally burden speech encompass regulations of professionals like health care providers. *Becerra*, 585 U.S. at 769. These regulations include, for example, "[l]ongstanding torts for professional malpractice," *id.*, which can impose liability for what medical professionals tell their patients, *see, e.g., Crim ex rel. Crim v. Dietrich*, 2016 IL App (4th) 150843, ¶¶ 7, 48 (doctor could be liable for failing to inform patient about alternative to natural childbirth). Likewise, "a state may require medical professionals to provide information that facilitates patients' choices directly linked to procedures that have been or may be performed." *Rokita*, 54 F.4th at 521.

The Referral Protocol is a permitted regulation of the practice of medicine, even if it incidentally impacts medical providers' speech. For one thing, the Protocol operates alongside systems of liability recognized in *Becerra* itself as permissible — that is, "[l]ongstanding torts for professional malpractice." *See Becerra*, 585 U.S. at 769. As explained, the Conscience Act establishes a defense available to providers in exactly these kinds of professional malpractice cases, exempting them from liability as long as they establish Protocols to ensure that patients can access care. *See* 745 ILCS 70/4, 70/6.1. A health care provider who does not follow these Protocols is simply subject to ordinary liability and malpractice standards. *See id.* §§ 4, 6.1. So, the Referral Protocol operates as part of the Conscience Act to establish "professional

malpractice" rules of exactly the kind long deemed permissible under the First Amendment. *See Becerra*, 585 U.S. at 769.

The Referral Protocol also regulates speech only incidentally to professional conduct for the additional reason that it "require[s] medical professionals to provide information that facilitates patients' choices directly linked to procedures that have been or may be performed," just as in *Rokita*. *See* 54 F.4th at 521 (citing *Becerra*, 585 U.S. at 769-70). In that case, this court considered an Indiana statute requiring abortion providers to tell patients about their options for disposing of fetal remains. *Id.* at 519-20. That statute did not violate the First Amendment, this court held, because "states may require medical providers to give truthful notices" to their patients. *Id.* at 520. The Referral Protocol, too, "require[s] medical professionals to provide information" about procedures that "may be performed" — namely, information about alternate providers who will offer a specific treatment. *See id.* at 521. And because the Referral Protocol only requires that information when the patient expressly seeks a treatment, the information is "linked" to the patient's "choice[ ]" about that treatment. *See id.* Accordingly, two different district court judges in this case have each agreed that the Referral Protocol regulates speech only incidentally to regulating the conduct of medical professionals. RSA48-49; Supp.A26.

The Supreme Court's opinion in *Becerra*, which applied these same principles, reinforces this conclusion. There, the Court considered a California law requiring certain clinics that offered pregnancy-related services to "disseminate a government-drafted notice" to all clients informing them of state-sponsored abortion and

contraception services. *Becerra*, 585 U.S. at 763. The Court determined that this law did not regulate professional conduct because it was "not tied" to a medical procedure, and instead applied "regardless of whether a medical procedure [wa]s ever sought." *Id.* at 770. The Court contrasted that law with the one in *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), which it cited as an "example" of permissible conduct regulations. *Id.* at 769-70.[3] The law in *Casey* required a physician performing an abortion to, among other things, inform the patient about (1) the risks of abortion and childbirth, (2) obtaining child support, and (3) adoption agencies as "alternatives to abortion." 505 U.S. at 881 (plurality opinion). *Casey* explained that requiring health care providers to provide this "truthful, nonmisleading information," *id.* at 882, impacted their "rights not to speak . . . only as part of the practice of medicine, subject to reasonable licensing and regulation by the State," *id.* at 884. It accordingly rejected the physicians' First Amendment claim without further analysis. *Id.*

*Becerra* and *Casey* make clear that the Referral Protocol impacts speech "only 'as part of the *practice* of medicine.'" *See Becerra*, 585 U.S. at 770 (emphasis in original) (quoting *Casey*, 505 U.S. at 884). "[R]eferral for treatment," transferring patients, and informing patients about alternative providers are "part of the practice of medicine." *See Brandt*, 147 F.4th at 890 (quoting *Casey*, 505 U.S. at 884). These

---

[3] Although *Dobbs* overruled "*Casey*'s holding that states may not substantially burden a woman's ability to obtain an abortion," it did not "disturb[ ]" *Casey*'s First Amendment analysis. *Rokita*, 54 F.4th at 520.

actions — which all facilitate a patient's access to alternate providers — are also akin to *Casey*'s requiring abortion providers to provide information about adoption agencies as "alternatives" to abortion. *See* 505 U.S. at 881, 884; Supp.A26 (Referral Protocol "bears striking similarities" to law in *Casey*). Indeed, the Referral Protocol is even more closely linked with the patient's choice of treatment than the provision in *Casey* because the Referral Protocol applies only when the patient asks for an alternate provider. For the same reason, the Protocol is also more "directly linked" to "facilitat[ing] patients' choices" than the statute in *Rokita*. *See* 54 F.4th at 520-21 (providers required to discuss options for disposing of fetal remains with every patient receiving an abortion). And the Protocol is nothing like *Becerra*'s "government-drafted script," which had to be delivered "regardless of whether a medical procedure is ever sought." *See* 585 U.S. at 766, 770.

Plaintiffs largely ignore *Casey*, and they insist that *Rokita* and certain out-of-circuit decisions applying *Casey* are irrelevant here. *See* AT Br. 22-23, 25-27.[4] As plaintiffs tell it, because *Rokita* and *Casey* involved statutes that were labeled "informed consent" requirements, those cases' analyses are limited to informed consent provisions. AT Br. 22-23; *cf. Rokita*, 54 F.4th at 520-21 (applying *Casey*). Indeed, plaintiffs appear to suggest that *only* informed consent provisions can qualify

---

[4] Other circuits have applied *Casey* and *Becerra* in fashions similar to *Rokita*. *E.g., EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 429 (6th Cir. 2019) (*Casey* and *Becerra* "recognize that First Amendment heightened scrutiny does not apply to incidental regulation of professional speech that is part of the practice of medicine and that such incidental regulation includes mandated informed-consent requirements, provided that the disclosures are truthful, non-misleading, and relevant.").

as permissible regulations of medical practice that incidentally burden speech. *See* AT Br. 22-23, 25-27. Plaintiffs are wrong.

To start, nothing in *Becerra* suggests that a statute can be a regulation of professional conduct only if it governs informed consent. *See* 585 U.S. at 769-70. In fact, *Becerra* confirmed that the opposite is true: the statute there was "not an informed-consent requirement *or any other regulation of professional conduct*." *Id.* at 770 (emphasis added); *see id.* at 769 (regulations of professional conduct include "[l]ongstanding torts for professional malpractice"); *see also EMW Women's Surgical Ctr.*, 920 F.3d at 429 (laws regulating the medical profession that incidentally impact speech "include[ ]" informed consent requirements). And limiting regulations of professional conduct to only provisions that could be characterized as "informed consent" requirements would require courts to unnecessarily grapple with the limits of such requirements, as the district court did by inventing its own novel test. *See* RSA25-28. And contrary to plaintiffs' suggestion, simply labeling a statute an "informed consent" requirement is not dispositive, *see* AT Br. 22, because a statute's label does not control whether it is a regulation of professional conduct, *cf. Otto*, 981 F.3d at 865 ("The government cannot regulate speech by relabeling it as conduct."). Indeed, while the statute in *Rokita* was labeled an "informed consent" requirement, *see* AT Br. 22, that label played no part in *Rokita*'s analysis, *see generally* 54 F.4th 518.

Plaintiffs likewise insist that the Referral Protocol cannot be a regulation of professional conduct because the only medical procedures actually performed at their

centers are ultrasounds, and the Referral Protocol is not relevant to the decision to have an *ultrasound* (as opposed to an abortion). AT Br. 26. But, again, no authority supports limiting regulations of professional conduct in this artificial manner, and *Casey* itself affirmatively refutes it: The Court there upheld a statute that required abortion providers to offer information that was relevant to patient's choices, even though that information related to services the abortion providers did not offer, 505 U.S. at 881, 884 (abortion providers required to give information about childbirth, obtaining child support, and adoption), and more broadly cautioned against defining permissible regulations of the medical profession in "narrow terms," *id.* at 883. *See also* Supp.A21 ("If . . . doctors can be required to obtain informed consent only for procedures they actually perform, how could abortion providers be compelled to speak about such topics as paternal child support and adoption services?"). In any event, whether the Referral Protocol can be understood as an "informed consent" provision is irrelevant. As explained, the question under *Rokita* is simply whether the Referral Protocol "facilitates" a patient's choice "linked" to a medical procedure that "may be performed." *See Rokita*, 54 F.4th at 521. It does.

Plaintiffs' remaining arguments are unavailing. They contend that the Referral Protocol involves "conversation" and therefore "directly targets speech." AT Br. 24. But States can regulate the practice of medicine that is accomplished through words. *See Rokita*, 54 F.4th at 520-21 (regulating doctor's discussion with patient); *Casey*, 505 U.S. at 884 (same); *cf. Sorrell*, 564 U.S. at 567 (antitrust laws can prohibit "agreements" in restraint of trade, though agreements are necessarily

reached with words). They also complain that the Referral Protocol cannot burden speech incidentally because it is content-based. AT Br. 24-25. That is wrong, *infra* pp. 37-40, but it also gets the inquiry backwards. Once a court determines that a regulation affects speech only incidentally, it need not consider whether the regulation is content-based. *See K.C.*, 121 F.4th at 629 (courts examine whether a law's burden on speech is incidental to conduct "or" if it is "targeted . . . based on the content of . . . speech"); *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 209 n.4 (4th Cir. 2019) (when "statutes regulate conduct, [courts] need not engage with . . . descriptors" like "content-based").

At bottom, plaintiffs do not meaningfully contest that the Referral Protocol "facilitates patients' choices" about medical treatment. *See Rokita*, 54 F.4th at 521. Nor can they: the Referral Protocol enables patients to obtain information about treatments they seek — information that they lack for reasons entirely beyond their control, namely, the beliefs of their medical providers. The Referral Protocol does not limit plaintiffs' ability to advocate against having an abortion. But it permissibly conditions immunity from liability on their answering truthfully when patients ask for information relevant to their medical care.

### 3. The Discussion Protocol also regulates speech only incidentally to regulating professional conduct.

The Discussion Protocol, for its part, also regulates speech only as incidental to regulating the practice of medicine. At the outset, the Discussion Protocol, like the Referral Protocol, establishes "professional malpractice" rules of the kind expressly described in *Becerra* as a regulation of professional conduct, *see* 585 U.S. at 769, in

that it does no more than set the limits of providers' liability in medical-malpractice and other cases. *Supra* pp. 24-25.

Even setting that aside, the Discussion Protocol is a regulation of professional conduct under *Casey* and *Rokita*, for many of the same reasons the Referral Protocol is. Information about available treatment options, and those options' risks and benefits, plainly "facilitate patients' choices" about which treatments to undertake. *See Rokita*, 54 F.4th at 521. Indeed, this is particularly true of the Discussion Protocol, which requires a discussion "consistent with current standards of medical practice or care." 745 ILCS 70/6.1(1). As both parties' experts testified, the standard of care is not uniform and is instead tailored to each patient's circumstances. Tr. at 50, 425-26, 514, 583; *see* Tr. at 599-600. Because the Discussion Protocol incorporates the standard of care, it requires a discussion of risks, benefits, and options only as necessary for each patient. *See* Supp.A20 (summary judgment opinion concluding that "the benefits-discussion requirement merely imposes an obligation that the standard of care already requires of other medical professionals"). Such individualized discussions clearly facilitate a patient's choices about medical treatments. *Cf. Rokita*, 54 F.4th at 521; *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1225-26 (11th Cir. 2022) ("[a]ssessing a client's nutrition needs . . . [is] not speech," but is instead professional conduct). They are also a far cry from the "government-drafted script" disapproved of in *Becerra*. *See* 585 U.S. at 766. Finally, requiring providers to inform patients about available options is akin to the provision approved of in *Casey*, which required information about "alternatives to abortion,"

31

including specific information about childbirth, child support, and adoption. *Casey*, 505 U.S. at 881, 884; *see Becerra*, 585 U.S. at 769-70 (*Casey* is an "example" of a regulation of professional conduct that incidentally impacted speech). The Discussion Protocol therefore also regulates professional conduct and impacts speech only incidentally.

The district court held otherwise, based largely on a "detour[ ]" analyzing whether the Discussion Protocol is an "informed consent" provision. RSA23; *see* RSA23-31, 34-39. In doing so, the court applied a novel four-factor test for when a provision qualifies as an informed consent requirement. RSA23-31, 34-39. But as explained, the relevant question is whether the Discussion Protocol regulates the practice of medicine, such that it impacts speech only incidentally. *Supra* pp. 27-29. Authority from the Supreme Court and this court already defines such regulations. *See Becerra*, 585 U.S. at 769-70; *Rokita*, 54 F.4th at 520-21. Whether a law falls within a subset of those regulations — "informed consent" provisions — is irrelevant.

The district court's contrary conclusion appears to rest primarily on its view that, because *Casey* itself involved an "informed consent" provision, such provisions comprised "most of the 'speech incidental to professional conduct' universe." RSA31. But that reasoning is flawed on multiple levels: As discussed, *supra* pp. 27-29, nothing in *Casey* suggests that *only* informed consent provisions can be permissible regulations of "the practice of medicine" that incidentally impact speech, *see Casey*, 505 U.S. at 884, and *Becerra* confirms that a State can regulate the practice of medicine in other ways, *see* 585 U.S. at 770 (notice was "not an informed-consent

requirement *or* any other regulation of professional conduct" (emphasis added)).  In any event, the Discussion Protocol *is* analogous to the informed consent provision in *Casey*, for the reasons discussed above.  *Supra* pp. 31-32.

The district court's "detour[ ]" into informed consent, RSA23, led to two central errors.  First, the court concluded that the Discussion Protocol was not an informed consent provision — and therefore, not a regulation of professional conduct — because it did not precede, or discuss alternatives to, the medical procedures that plaintiffs themselves perform (such as ultrasounds).  RSA35-36; *see* RSA26-28.  It embraced this limitation based on traditional principles of informed consent, in which a doctor obtains a patient's consent for a specific medical procedure, RSA26-27, and based on the facts of other First Amendment cases involving mandated disclosures by a physician performing a procedure, RSA28.  Neither of these supports the district court.  A physician can violate principles of "informed consent" even when he or she does not inform a patient about alternatives that the physician does not personally perform.  *Cf. Crim*, 2016 IL App (4th) 150843, ¶¶ 7, 48 (doctor failed to advise about alternatives to natural childbirth).  And what one medical professional considers to be necessary for "informed consent" does not define what the State can regulate as part of the practice of medicine, as multiple courts have recognized.  *See EMW Women's Surgical Ctr.*, 920 F.3d at 438 (what medical professionals consider to be "necessary for informed consent" is not "material" to whether a law passes muster under *Casey*); *Lakey*, 667 F.3d at 579 n.8 ("[W]hat Appellees think is medically necessary does not cabin, under the state's legitimate power, the regulation of

medicine, as *Casey* holds."); *see id.* at 576 ("'relevant' informed consent may entail not only the physical and psychological risks . . . but also the state's legitimate interests").

Nor are *Casey* and *Rokita* limited to their facts, as the district court seemed to suggest. These cases are a "a set of principles," not "a constitutional ceiling." *Id.* at 579 (rejecting effort to distinguish mandated disclosure of sonogram and fetal heartbeat from *Casey*); *see also BLET GCA UP v. Union Pac. R.R. Co.*, 988 F.3d 409, 415 (7th Cir. 2021) (reading cases in "granular detail" so they are "entirely limited by their exact facts" would "empty the word precedent of any meaning"). At bottom, *Rokita* does not hold that the State can only regulate disclosures that "facilitate[ ] patients' choices directly linked to procedures that have been or may be performed" *by the provider making the disclosure*, as the district court appeared to believe. *See* 54 F.4th at 521. And as the summary judgment opinion explained, such a narrow reading of informed consent contradicts *Casey*, where the Court upheld an informed consent law that "went far beyond information tied to a procedure that the physician was actually performing." Supp.A21 (citing 505 U.S. at 881).

Second, after incorrectly stating that "informed consent provisions will occupy most of the 'speech incidental to professional conduct' universe," RSA33, the district court erred further by concluding that the Discussion Protocol did not fall in this (purportedly narrow) category, RSA39-40. It based this holding on its view that the Discussion Protocol requires a "wide-ranging" conversation "unrelated to any procedure or other medical conduct." RSA40. It accordingly speculated that a doctor

would be required to discuss the option of abortion with a patient who was pleased to be pregnant and had no medical complications. RSA40. That is wrong, as the text of the statute makes plain. The Discussion Protocol mandates a discussion of options, risks, and benefits (along with condition and prognosis) "consistent with current standards of medical practice or care." 745 ILCS 70/6.1. As explained, the statute's incorporation of the standard of care means that a provider must assess a patient's individual circumstances to comply with it. *Supra* p. 31. Indeed, the district court recognized the standard of care is fact-specific, RSA12-13, and the State's expert acknowledged that a provider would not have to discuss abortion in the hypothetical the district court envisioned because that would not fall within the standard of care, Tr. at 599-600. And medical providers regularly tailor their discussions and advice to the needs of their patients. *See NIFLA* Doc. 275-17 at 10 (providers should base decisions and recommendations on patient's needs). The district court thus erred in concluding that the Discussion Protocol is not a regulation of professional conduct.

**4.  Because the Protocols burden speech only incidentally to regulating professional conduct, no further analysis is needed.**

Because both Protocols are regulations of professional conduct that impact speech only incidentally, the court need not go further. Neither *Rokita* nor *Casey* applied any level of scrutiny to statutes classified in that way. *Casey*, 505 U.S. at 884; *Rokita*, 54 F.4th at 520-21. Other circuits have followed suit, as the summary judgment opinion noted. Supp.A22. Though the summary judgment opinion went on

to apply intermediate scrutiny in an abundance of caution, *see* Supp.A23, that was before *Rokita* confirmed such analysis is unnecessary, *see* Supp.A22 n.20.

But even if this court applies intermediate scrutiny, the Protocols easily satisfy it. *Infra* § II.C.

## B. Neither the Referral Protocol nor the Discussion Protocol is Content-Based.

The court need not consider whether the Protocols are content-based because they regulate speech only incidentally, as part of regulating the practice of medicine. *Supra* p. 35. But even if this court were to determine that the Protocols regulated pure speech, intermediate scrutiny would apply because they are content-neutral. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) (content-based regulations are subject to strict scrutiny, while "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny").

Laws are content-based if they "distinguish favored speech from disfavored speech on the basis of the ideas or views expressed." *Id.* at 643. "By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content-neutral." *Id.* "The principal inquiry in determining content-neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). A law can also be content-based "on its face" if it "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). But a facially neutral law does not become content-based simply because it disproportionately affects certain topics. *Ward*, 491

36

U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.").

### 1. The Referral Protocol is content-neutral.

The Referral Protocol is content-neutral on its face. It directs providers to truthfully respond to a patient's inquiry about where they can likely obtain certain medical treatment. *See Nicodemus v. City of S. Bend*, 137 F.4th 654, 666 (7th Cir. 2025) (law that was "trigger[ed]" by individual action, "not any speech or message that one may seek to convey," was content-neutral); *cf. Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305 (7th Cir. 2017) (law permitting robocalls based on "the relation between the caller and the recipient" was content-neutral). And it applies to anyone who seeks to obtain the immunity protections of the Conscience Act, regardless of the type of conscience objection or the treatment objected to. *See Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (law applying to anyone who distributed materials or solicited funds was content-neutral).

The Referral Protocol also was not adopted because of government disagreement with certain speech. *See Ward*, 491 U.S. at 791. The Conscience Act balances respect for conscience-based objections with "ensur[ing] that patients receive timely access to information and medically appropriate care," 745 ILCS 70/2, and the Protocols are "designed to ensure that conscience-based objections do not cause impairment of patients' health," *id.* § 6.1. *See also infra* pp. 42-49 (discussing government interest in Protocols); *Turner Broad.*, 512 U.S. at 646 (accepting

legislative findings about purpose of law); *Nicodemus*, 137 F.4th at 668 (same). Ensuring patient access to care is a content-neutral justification. *Cf. Knowlton v. City of Wauwatosa*, 119 F.4th 507, 515 n.2 (7th Cir. 2024) (curfew ordinance enacted for public safety was content-neutral). To hold otherwise would call into question "other reasonable health and welfare laws that apply to health care professionals." *See Tingley v. Ferguson*, 47 F.4th 1055, 1082 (9th Cir. 2022) (cleaned up).

The Referral Protocol also does not discriminate on the basis of viewpoint. *See* AT Br. 15; *cf. Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (viewpoint discrimination occurs when a law "targets . . . particular views taken by speakers on a subject"). As explained, *supra* p. 21, medical providers who transfer or refer patients or provide a list of providers whom they believe will provide certain treatment — at the patient's request — do not convey endorsement of the treatment itself. So, the Referral Protocol does not require a medical provider to promote a "preferred message," as plaintiffs contend. *See* AT Br. 15. Nor does it regulate speech based on "specific motivating ideology or the opinion or perspective of the speaker." *See Rosenberger*, 515 U.S. at 829. Rather, it promotes patients' access to medical care and ensures that a conscience objection will not be a roadblock for that care. Indeed, plaintiffs are free to advise patients against abortion and retain the protections of the Conscience Act's liability shield; they just cannot withhold a specific category of medically-relevant information if a patient seeks it.

To be sure, because it is part of the overall Conscience Act, the Referral Protocol applies only to conscience-based objectors. Plaintiffs contend that this

evinces content and viewpoint discrimination, *see* AT Br. 15, but a law is not content-based (nor viewpoint-based) simply because it applies to a particular group or addresses a particular problem, as courts have repeatedly held, *see, e.g.*, *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1057 (7th Cir. 2004) (curfew ordinance applying to "minors in public at night" was content-neutral); *Brokamp v. James*, 66 F.4th 374, 393 (2d Cir. 2023) (law applying to "mental health counseling" was content-neutral); *see also Turner Broad.*, 512 U.S. at 645 (law distinguishing between speakers based on "manner" of transmitting and "not upon the messages they carry" was content-neutral). Nor does "a facially neutral law . . . become content-based simply because it may disproportionately affect speech on certain topics." *McCullen v. Coakley*, 573 U.S. 464, 480 (2014) (law establishing "buffer zone" around abortion clinics was content-neutral).

Plaintiffs criticize this content-neutral justification, contending that no "general standard of care" requires health care providers without conscience objections to refer patients, or provide information about alternate providers, in every instance. AT Br. 15.[5] But the Referral Protocol does not "evince[ ] a purpose" to single out conscience-based objectors *because* of their speech. *See McCullen*, 573

---

[5] Plaintiffs assert that the district court found that "there is no general standard of care" about referrals, AT Br. 15, but that is incorrect. The district court simply observed that the professional standards promulgated by various medical groups are not themselves binding, RSA12, and that the standard of care is not "uniform," RSA13, but rather varies with each patient's circumstances, *see* Tr. at 50, 425-26, 514, 583, 599-600. Moreover, the district court correctly recognized that non-objecting providers may be liable in tort for failing to connect patients with alternate providers. RSA53.

U.S. at 481. As explained below, *infra* pp. 42-46, the problem that the General Assembly sought to remedy was, "in its experience," limited to conscience-based objectors. *See McCullen*, 573 U.S. at 482. "'States adopt laws to address the problems that confront them,'" *id.* at 481-82 (quoting *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion)), and here, the legislature had no reason to be concerned about whether patients of non-objecting health care providers had access to their chosen treatments. And the Referral Protocol can hardly be read to "suppress" plaintiffs' speech, *see Turner Broad.*, 512 U.S. at 642, given it operates as part of the Conscience Act to give them a broad immunity from liability not enjoyed by medical providers without conscience objections.

### 2. The Discussion Protocol is content-neutral.

The Discussion Protocol is content-neutral, and viewpoint-neutral, for the same reasons. It applies to anyone who seeks the immunity benefits of the Conscience Act, regardless of belief or viewpoint. *See Heffron*, 452 U.S. at 649. It does not "single out any topic or subject matter for differential treatment." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71 (2022). And its purpose is to ensure that patients receive all relevant information about their condition and potential treatments, *see* 745 ILCS 70/2, 70/6.1, making it "justified without reference to the content" of a conscience objector's speech, *see Ward*, 491 U.S. at 791.

The district court determined that the Discussion Protocol was content-based and viewpoint-based, but this was based on two misapprehensions about the statute.

First, the district court suggested that it targets "pregnancy and abortion." RSA17. That is plainly wrong: the Discussion Protocol applies to all conscience-based objectors, including those with objections unrelated to abortion and contraception. *See* 745 ILCS 70/6.1. To be sure, this Protocol applies to those with objections to abortion and contraception, but, again, "a facially neutral law does not become content-based simply because it may disproportionately affect speech on certain topics." *McCullen*, 573 U.S. at 480. The mere fact that the Discussion Protocol governs counseling about pregnancy and abortion — alongside all other medical care — does not make it content-based. *See id.*

Second, the district court was wrong to hold that the Discussion Protocol requires health care providers to deliver "a particular message" selected by the State. RSA18. Instead, the Discussion Protocol requires an individualized discussion: a medical provider must discuss a patient's risks, benefits, and options "consistent with current standards of medical practice or care." 745 ILCS 70/6.1(1). The standard of care, as even the district court recognized, is not "uniform," RSA13, but rather requires an assessment of each patient's needs and circumstances, *see* Tr. at 50, 425-26, 514, 583, 599-600. Accordingly, providers must use their medical judgment to discuss risks, benefits, and options "consistent with" the standard of care. This may require them to discuss some "benefits" of abortion in some circumstances, *see* RSA18, but any "'incidental effect on some speakers or messages but not others'"

does not render the Discussion Protocol content-based. *See McCullen*, 573 U.S. at 480 (quoting *Ward*, 491 U.S. at 791).[6]

## C. Both Protocols pass intermediate scrutiny.

Because the Protocols impact speech only incidentally to regulating professional conduct, the court need not apply any heightened scrutiny. *Supra* pp. 35-36. But even if the court does apply intermediate scrutiny — whether because the Protocols are regulations of professional conduct or content-neutral regulations of speech — both Protocols pass muster.

A statute survives intermediate scrutiny if it "further[s] an important Government interest unrelated to the suppression of free expression and do[es] not burden substantially more speech than necessary to further that interest." *TikTok Inc. v. Garland*, 604 U.S. 56, 73-74 (2025). "There must be a reasonably close fit between the law's means and its ends," but "perfect calibration is not required." *Nicodemus*, 137 F.4th at 668 (cleaned up).

### 1. The Referral Protocol passes intermediate scrutiny.

The Referral Protocol promotes the State's important interest in "ensur[ing] that conscience-based objections do not cause impairment of patients' health" by enabling patients to get information about other providers who offer the care they seek. 745 ILCS 70/6.1; *see Varandani v. Bowen*, 824 F.2d 307, 311 (4th Cir. 1987) (noting "the government's compelling interest in assuring safe health care for the

---

[6] The district court found it "important" to describe plaintiffs' personal "definition of abortion," RSA18, but those personal views are irrelevant to whether the law is content-based, which turns on whether it "single[s] out any topic or subject matter for differential treatment." *City of Austin*, 596 U.S. at 71.

public"). Prior to the amendment that established the Protocols, some patients were unable to obtain treatments they had chosen because their health care providers with conscience objections were free to decline to connect them to other health care professionals. For example, as the summary judgment opinion observed, one supporter of the bill described being turned away from a religious hospital while she was miscarrying, and the hospital's refusal to facilitate her care at another hospital that would have assisted with terminating the pregnancy. Supp.A10-11; *see NIFLA* Doc. 275-29 at 14-17 (committee testimony). Similarly, the record describes an incident a few years before section 6.1 was enacted, in which a neurologist refused to authorize general anesthesia for a patient's abortion because, he asserted, "there is no such thing as a medically necessary abortion." *NIFLA* Doc. 275-21.[7] These examples belie plaintiffs' argument that patients' health was not compromised before the Protocols. *See* AT Br. 27, 29.

Plaintiffs ignore this government interest entirely, *see* AT Br. 27-29, and argued in the district court that these incidents were irrelevant because they were not specific to crisis pregnancy centers, *NIFLA* Doc. 162 at 14-15. But cabining the government's interest in this way takes "too narrow a view of the State's interest."

---

[7] Although plaintiffs argued below that some of these incidents were hearsay, *see Schroeder* Doc. 236 at 8, courts can rely on legislative findings when applying intermediate scrutiny, *see City of Erie v. Pap's A.M.*, 529 U.S. 277, 298 (2000) (plurality opinion) (plaintiff's evidence objections did not provide sufficient reason to disregard city council's judgment about existing problems); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986) (to support government interest, city could rely on evidence that is "reasonably believed to be relevant to the problem that the city addresses").

*Heffron*, 452 U.S. at 652; *accord Ward*, 491 U.S. at 801 (when applying intermediate scrutiny, a law's "effectiveness must be judged by considering all the varied groups" to whom the law would apply); *Siders v. City of Brandon*, 123 F.4th 293, 305-08 & n.10 (5th Cir. 2024) (when applying intermediate scrutiny, the court must evaluate the government's interest in the law as a whole, not just as applied to specific plaintiff). Moreover, plaintiffs sought to invalid the Referral Protocol on its face, *see NIFLA* Doc. 283 at 20, making its other applications relevant, *cf. Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 802-03 (1984) (plaintiffs' argument that government's interest was not served by applying law to them was "basically a challenge to the ordinance *as applied* to their activities") (emphasis added).

In any event, the State also has an important interest in ensuring that patients at crisis pregnancy centers are able to access care, notwithstanding the conscience beliefs of their provider. The Referral Protocol furthers that interest because these patients often are hindered from getting information about abortion providers. Plaintiffs pay search engines like Google to ensure that their websites are the top results for internet searches for terms like "abortion," "clinic," "pregnancy," and "help." Tr. at 127-28, 166. This erects barriers for their patients who want abortion care, many of whom have less access to information because they are minors, homeless, illiterate, abused, or have limited financial means. *See* Tr. at 158, 191, 266-68, 395-96; *NIFLA* Doc. 275-36 at 7. Hindering patients' access to abortion is particularly problematic, given the time-sensitive nature of that procedure. *See* Tr.

at 623.  And in some instances, a patient needs to find a provider who will perform an abortion to preserve her life, health, or fertility.  *See* Tr. at 624-25, 642.  The fact that some of plaintiffs' own patients could obtain abortions despite these barriers, *see* AT Br. 27, 29, does not eliminate the State's substantial interest, *see TikTok*, 604 U.S. at 75 (legislature need not wait until harm occurs to act to protect citizens).

The Referral Protocol is also narrowly tailored to achieve these government interests.  Most prominently, health care providers are only required to provide the requested referral or information about alternate providers *if* the patient asks for a specific treatment that the provider declines to offer because of a conscience objection.  745 ILCS 70/6.1(2), (3).  In this way, the statute goes no further than necessary because it is limited to situations when the patient expressly wants that information.  *Cf. United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) (requiring cable operators to block channels "upon request" from household would be narrowly tailored); *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1232 (4th Cir. 1989) (disclosure was narrowly tailored because it was targeted at "group which would most desire the information"); *see also Grayned v. City of Rockford*, 408 U.S. 104, 119 (1972) ("individualized" requirement was narrowly tailored); *MacDonald v. City of Chi.*, 243 F.3d 1021, 1034 (7th Cir. 2001) (similar).

The Referral Protocol is narrowly tailored for the additional reason that it mirrors the information and referrals given by providers without conscience objections.  Guidelines for medical professionals instruct providers to refer patients for procedures that they "decline[ ] to offer," or at least to offer "impartial guidance"

— like a list of alternate providers — so the patient can access the treatment sought. *See NIFLA* Doc. 275-17 at 7; *accord* Tr. at 620-21, 672. Plaintiffs complain that because no law expressly codifies these guidelines, health care professionals are not "requir[ed]" to make referrals, and so the Referral Protocol is "wildly underinclusive." AT Br. 28. But these guidelines evince the standard of care for medical professionals, which is determined by what a reasonable medical professional would do in the same circumstances. *Sekerez v. Rush Univ. Med. Ctr.*, 2011 IL App (1st) 090889, ¶ 58. Medical professionals without conscience objections who fall short of this standard — who do not act as a reasonable medical professional would — can then be liable for malpractice. *See id*. And regardless, there is no evidence that patients of non-objecting providers lack access to their requested treatments. Amending the Conscience Act thus "aim[ed] to fill gaps" left by the prior law. *See Nicodemus*, 137 F.4th at 669; *see also Burson*, 504 U.S. at 207 ("We do not, however, agree that the failure to regulate all speech renders the statute fatally underinclusive. . . . States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist.").

Finally, plaintiffs contend that the Referral Protocol is not narrowly tailored because the State instead could have engaged in a public information campaign to "inform women about licensed abortion providers." AT Br. 29; *accord* AT Br. 28. But as the summary judgment opinion observed, this would require the State to conduct a public information campaign about "every procedure for which a physician

46

may have a conscience objection," not just about abortion. *See* Supp.A25, Supp.A29. And the awareness campaign contemplated in *Becerra* was minimally burdensome because California could conduct a single uniform awareness campaign about abortion services that were available statewide. 585 U.S. at 763, 775. In contrast, because the Referral Protocol is meant to connect patients to alternate providers, here the State would have to present multiple campaigns tailored to different localities. This alternative would be far more burdensome and would not achieve the State's interests. *Cf. Ward*, 491 U.S. at 800 (law is narrowly tailored as long as "the means chosen are not *substantially* broader than necessary to achieve the government's interest (emphasis added)).

## 2. The Discussion Protocol passes intermediate scrutiny.

The Discussion Protocol, for its part, furthers the important government interest of ensuring that patients have information about treatment options and the risks and benefits of those options. This was also a problem in the years before the amendment's passage. For example, sponsors of the bill had learned that pregnant women being treated at religious hospitals lacked information about their options when they were having miscarriages or pregnancy complications. *NIFLA* Doc. 275-24 at 3; *see* House Proceedings at 57, 83. Likewise, legislators were concerned that patients were being denied information about a number of treatments, including blood transfusions, Senate Proceedings at 202, HIV treatment, *id.*, and end-of-life care, House Proceedings at 76. Testimony reflected that this was a recurring

problem, as the chair of the Illinois section of the American College of Obstetricians and Gynecologists told the legislative committee. *See NIFLA* Doc. 275-29 at 17-18.

The district court asserted that, in its view, the Discussion Protocol would not have remedied these problems because (1) section 6.1 does not require conscience objectors to "personally perform" abortions and (2) conscience-based objectors were already required, under the pre-amended Conscience Act, to "facilitat[e] emergency treatment." RSA6; *see* 745 ILCS 70/6 (2016). But the State did not need to take the drastic step of requiring conscience objectors to "personally perform" abortions to remedy the problem before it. *See* RSA6. Further, the record shows that patients lacked information needed to make informed medical decisions even outside emergency situations — which Illinois courts have interpreted narrowly, *Morr-Fitz, Inc. v. Quinn*, 2012 IL App (4th) 110398, ¶ 76 (emergency medical care consists of situations with a "need for immediate action"). *See NIFLA* Doc. 275-24 at 3; *see also NIFLA* Doc. 275-29 at 15 (patient's testimony that religious hospital would only provide care if she was "already infected or hemorrhaging," but not to prevent those conditions). The State has an important interest in ensuring that all patients — not just those experiencing acute emergencies — have access to relevant information and care. Indeed, facilitating such access would likely stop emergencies from arising in the first place.

In any event, the State also has an important interest in ensuring that plaintiffs' patients, specifically, have timely access to information relevant to their treatment options. Plaintiffs claim to counsel patients about all their options. *E.g.,*

Tr. at 121, 273, 324, 369-70. But they do not discuss any benefits of abortion, *e.g.*, Tr. at 42, 122, 181-82, even though, as one plaintiff acknowledged, sometimes abortion can be not only beneficial, but medically necessary, Tr. at 329-30; *see also* Tr. at 623-25, 628, 642. Likewise, plaintiffs refuse to discuss any benefits of contraception, *see* Tr. at 247, even though plaintiffs' own expert acknowledged that contraception has some benefits, Tr. at 63-64; *see also* Tr. 631-32. And crucially, the refusal to counsel about these benefits is not based on plaintiffs' medical judgment, but rather on their religious beliefs. *See* Tr. at 205. Thus, plaintiffs' patients are deprived of a fulsome medical discussion, tailored to their own circumstances, because of the beliefs of their medical providers. *See generally* Tr. at 586-96 (medical counseling should be tailored to a patient's circumstances). The State has an important interest in rectifying this problem.

The Discussion Protocol is narrowly tailored because it requires a discussion "consistent with current standards of medical practice or care." 745 ILCS 70/6.1(1). The medical standard of care requires assessing the circumstances of each patient. Tr. at 50, 425-26, 514, 583; *see* Tr. at 599-600. Thus, for example, a patient who was "overjoyed about being pregnant" would not need to be counseled about abortion, but the standard of care would dictate more fulsome counseling about that option and its benefits for a patient with a "significant medical risk factor for pregnancy." Tr. at 600. Because the Discussion Protocol incorporates the otherwise applicable medical standard of care, it requires only a discussion of the risks, benefits, and options appropriate for each patient. Such "individualized" requirements are narrowly

49

tailored and do not burden more speech than necessary. *See Grayned*, 408 U.S. at 119; *MacDonald*, 243 F.3d at 1034.

The district court, for its part, construed this narrow tailoring as a bug rather than a feature, concluding that the Discussion Protocol was "fatally overbroad" because the standard of care is "essentially indefinable." RSA42. In other words, because the Discussion Protocol envisions an individualized discussion consistent with the standard of care, plaintiffs would have "little guidance" on when they need to discuss the option of abortion. RSA42. But medical professionals use their judgment — informed by years of training and expertise — on a daily basis to assess what information they must provide to their patients, and non-objecting providers may be liable in tort if they fail to do so. *See* Tr. at 50, 425-26; *NIFLA* Doc. 275-17 at 2 (physicians use "sound medical judgment on patients' behalf"); *Walski v. Tiesenga*, 72 Ill. 2d 249, 261 (1978) (Medicine is "a profession which involves the exercise of individual judgment within the framework of established procedures. Differences in opinion are consistent with the exercise of due care."); *Tobias v. Winkler*, 156 Ill. App. 3d 886, 895 (4th Dist. 1987) (doctor must "exercise discretion in prudently disclosing information in accordance with his patient's best interests"); *see also Xeniotis v. Cynthia Satko, D.D.S., M.S., P.C.*, 2014 IL App (1st) 131068, ¶ 51 (whether doctor conformed to professional standards must be proven by expert medical evidence). Indeed, plaintiffs already exercise this medical judgment — they urge patients to seek emergency care if they are experiencing bleeding, cramping, or pain. Tr. at 188, 227. Thus, the district court was wrong that assessing the standard

of care "after the fact" is suspect or problematic.  *See* RSA42; *Nicodemus*, 137 F.4th at 669 (rejecting argument that law was "not narrowly tailored because it does not specify the situations in which it may be invoked").  Indeed, whether a health care professional followed the standard of care in a given situation is always assessed after the fact in a malpractice suit or other case, *see Jones v. Chi. HMO Ltd. of Ill.*, 191 Ill. 2d 278, 295 (2000), but that does not make this assessment suspect or problematic.

For their part, plaintiffs argued in the district court that the Discussion Protocol is underinclusive because it does not apply to health care providers without conscience objections.  *E.g.*, *NIFLA* Doc. 271 at 14.  But again, the Discussion Protocol incorporates the medical standard of care to which non-objecting providers must already adhere.  And even if that were not so, as with the Referral Protocol, there is no evidence that non-objecting providers are failing to give this information — to the contrary, medical professional guidelines state that providers should "inform the patient about all relevant options for treatment, including options to which the physician morally objects."  *NIFLA* Doc. 275-17 at 7; *see id.* at 4 (patients have the right to "discuss the benefits" and "risks" of treatment "alternatives").

Equally importantly, the State already has a means to ensure that providers without conscience objections keep their patients fully informed about treatment options:  regulatory discipline and tort laws.  If a provider without a conscience objection does not adequately inform a patient about relevant treatment options, and that failure causes harm, the provider is subject to discipline or a malpractice suit. *See, e.g.*, 225 ILCS 60/22; *Crim*, 2016 IL App (4th) 150843, ¶ 48 (evidence could

support malpractice claim against doctor who failed to advise about treatment options). But before the 2016 amendment, a conscience objector would experience no consequences for the same failure, outside of the narrow emergency exception. *See* 745 ILCS 70/4. The State, therefore, reasonably amended the Conscience Act to close this gap — while preserving conscience objectors' right to refuse to participate in medical services and to have immunity for that choice.

Finally, the alternatives that plaintiffs posited in the district court — public information campaigns and relying on patients to search the internet to learn about treatment options, *NIFLA* Doc. 271 at 12-14, *Schroeder* Doc. 236 at 14 — would not achieve the State's interest, for similar reasons as the Referral Protocol. A public information campaign about every treatment to which someone might have a conscience objection is far more burdensome than the campaign envisioned in *Becerra*, which involved specific services. *See* 585 U.S. at 775. And advertising campaigns and internet searches (which may yield inaccurate information) are no substitute for a discussion with a medical professional, tailored to a patient's own circumstances. *See* Supp.A25, Supp.A29; *see also Ward*, 491 U.S. at 799 (regulation is narrowly tailored if government's interest would be served "less effectively" without it).

### D. The Protocols would also pass strict scrutiny.

Even if this court were to apply strict scrutiny, as plaintiffs urge, the Protocols would clear that hurdle because they are "the least restrictive means of achieving a compelling state interest." *See McCullen*, 573 U.S. at 478. The State's interest in

ensuring that patients have access to medical treatments is compelling. Indeed, in some instances, abortion may be needed to save a patient's life. *See* Tr. at 329-30, 623-25, 641-42. And, as explained, plaintiffs' proffered alternatives would not accomplish this goal. *Supra* pp. 46-47, 52. Accordingly, the Protocols are constitutional even if strict scrutiny applies.

## III. Neither the Referral Protocol nor the Discussion Protocol violates the Free Exercise Clause.

The district court correctly held that the Referral Protocol does not violate the Free Exercise Clause. And although it did not reach that claim as to the Discussion Protocol, that provision likewise does not burden plaintiffs' free exercise of religion.

Under the Free Exercise Clause, "a neutral law of general applicability is constitutional if it is supported by a rational basis." *Ill. Bible Colleges Assoc. v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017) (citing *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990)); *accord Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021). Laws are neutral if they "do not target religion or religious institutions." *Ill. Bible Colleges Ass'n*, 870 F.3d at 639; *accord Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993) (law is not neutral if its object "is to infringe upon or restrict practices because of their religious motivation").[8] And a law "lacks general

---

[8] A law can be non-neutral on its face or it can "subtl[y] depart[ ] from neutrality." *Lukumi*, 508 U.S. at 534. This court has sometimes described the examination of such subtle departures as a separate step in the free exercise inquiry. *See Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 745 (7th Cir. 2015) (citing *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006)); *cf. Vision Church*, 468 F.3d at 996 (law that "unduly burdens" religion may not be neutral even if appears neutral on its face).

applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. Both Protocols satisfy these "interrelated" requirements. *See Lukumi*, 508 U.S. at 531.

### A. The Referral Protocol does not violate the Free Exercise Clause.

The district court correctly held that the Referral Protocol is neutral and generally applicable. As both the summary judgment order and the trial order explained, the Referral Protocol must be considered in the context of the Conscience Act as a whole. RSA51-54; Supp.A35. The Conscience Act, as the summary judgment order explained, provides an accommodation to religious health care providers — it excuses them from liability for a conscience-based refusal, even if the refusal ultimately harms a patient. Supp.A35. In other words, where providers without conscience objections would be liable for violating neutral and generally applicable laws about medical practice — general licensing rules and malpractice torts — religious providers are shielded from liability. *See* RSA53. Granting this accommodation to religious health care providers does not exhibit "hostility," *see Lukumi*, 508 U.S. at 534, "intoleran[ce]," *see Fulton*, 593 U.S. at 533, or "animus" toward religion, *see Ill. Bible Colleges Ass'n*, 870 F.3d at 639. *See also Locke v. Davey*, 540 U.S. 712, 724 (2004) (scholarship program did not exhibit religious animus when program went "a long way toward including religion in its benefits").

To be sure, the Referral Protocol adds a new condition on this accommodation. But as two district judges explained, religious accommodations can be narrowed.

RSA52-54; Supp.A35. To hold otherwise "would mean that the religious exemptions are a one-way ratchet: once extended, they could never be narrowed or abolished." RSA52 (quoting Supp.A35). This would have the perverse effect of "discourag[ing] the creation of new accommodations, lest governments fear that they will be powerless to update them in the face of new challenges." Supp.A35; *see Spivack v. City of Phila.*, 109 F.4th 158, 168 (3d Cir. 2024) (governments need not "preserve in amber any religious exemption . . . for fear of triggering strict scrutiny"); *We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 149-50 (2d Cir. 2023) (rejecting argument that "repealing any existing religious exemption is hostile to religion per se"); *see also Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th Cir. 2014) (Gorsuch, J.) (in RLUIPA claim, "the granting of a religious accommodation to some in the past doesn't bind the government to provide that accommodation to all in the future"); *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 632-33 (7th Cir. 2007) (law that repealed protections of Illinois Religious Freedom Restoration Act for certain cemeteries was neutral because secular cemeteries did not have the "extraordinary" protections of IRFRA in the first place).

Plaintiffs cite no authority suggesting that religious accommodations must be a "one-way ratchet" to avoid running afoul of the Free Exercise Clause. *See* RSA52; AT Br. 29-32. Indeed, they fail to address this analysis at all, despite its adoption by two district court judges. *See* AT Br. 29-32. Instead, plaintiffs echo their contention that providers without conscience objections are not required to refer, transfer, or inform patients about alternate providers, and therefore, they assert, the Referral

55

Protocol is not generally applicable.  *See* AT Br. 31 (contending that the standard of care does not encompass referrals).  As explained, *supra* pp. 45-46, that is incorrect. Providers without conscience objections can be liable under tort law or regulatory discipline if they fall short of the standard of care.  *Supra* p. 46.  As the district court noted, the standard of care may encompass referring patients and providing information about alternate providers.  RSA53.  The record amply supports that finding.  *See NIFLA* Doc. 275-17 at 7; Tr. at 620-21, 672; *see also Sekerez*, 2011 IL App (1st) 090889, ¶ 58 (standard of care is assessed by what reasonable provider would do in similar circumstances).  Thus, the legislature was faced with a problem that was unique to conscience objectors:  their patients were not getting needed medical care.  *Supra* p. 46.  This means that non-objecting providers are not "comparable" to conscience objectors.  *See Tandon v. Newsom*, 593 U.S. 61, 62 (2021) ("whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue").

Finally, plaintiffs have not identified any evidence suggesting the Referral Protocol was motivated by "religious animus."  *See Ill. Bible Colleges Ass'n*, 870 F.3d at 639; *see also Lukumi*, 508 U.S. at 534 (legislature's "improper attempt to target" religion could demonstrate non-neutrality).  Rather, as explained, the legislature was motivated to ensure that all patients receive access to the full panoply of treatment options.  The Protocol is therefore neutral and generally applicable.

Plaintiffs do not dispute that the Referral Protocol satisfies rational-basis review. *See generally* AT Br. And it readily does so for the same reasons that it satisfies intermediate scrutiny. *Supra* pp. 42-47; *see also Ill. Bible Colleges Ass'n*, 870 F.3d at 639 (law satisfies rational-basis review if it is "rationally related to a valid government purpose").

## B. The Discussion Protocol does not violate the Free Exercise Clause.

The Discussion Protocol is a neutral law of general applicability for the same reasons. Though the Protocol modifies the Conscience Act, the State is permitted to temper religious accommodations. *See* Supp.A35. There is no evidence that the State did so out of hostility toward religion. On the contrary, conscience-based objectors still receive the benefits of an immunity shield that is not available to other providers.

The Discussion Protocol also does not "prohibit[ ] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *See Fulton*, 593 U.S. at 534. First, as explained, the Protocol puts conscience objectors on the same level as providers without conscience objections. It merely requires a discussion "consistent with current standards of medical practice or care," 745 ILCS 70/6.1(1), thus incorporating the same standard of care requirements that apply to non-objecting providers (subject to the risk of disciplinary action or tort liability). Second, and regardless, there is no evidence that patients of non-objecting providers lacked complete information about treatment options, *supra*

pp. 51-52, meaning that there would be no constitutional infirmity with requiring conscience-based objectors to provide that information, *see supra* p. 56.

In the district court, plaintiffs argued that even if the Discussion Protocol was neutral and generally applicable, it still warranted strict scrutiny because plaintiffs brought a "hybrid rights" claim, combining free exercise and free speech challenges. *NIFLA* Doc. 283 at 14-15.[9] The district court correctly recognized that this "hybrid rights" theory "rests on a teetering foundation." RSA55-56; *see Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 244 (3d Cir. 2008) (collecting cases casting doubt on this theory). The court need not explore this theory here because plaintiffs' free speech claim lacks merit. *Supra* § II; *see Ill. Bible Colleges Ass'n*, 870 F.3d at 641 ("A plaintiff does not allege a hybrid rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right." (cleaned up)).

Thus, the Discussion Protocol need only be rationally related to a legitimate government purpose to satisfy the Free Exercise Clause. *See Ill. Bible Colleges Ass'n*, 870 F.3d at 639. It easily does so, for the same reasons it satisfies intermediate scrutiny.

---

[9]  Plaintiffs made the same argument with respect to the Referral Protocol, *NIFLA* Doc. 283 at 14-15, but the district court rejected this argument, RSA55-56, which plaintiffs do not challenge on appeal, *see* AT Br., and they therefore forfeit that argument, *see Hackett v. City of S. Bend*, 956 F.3d 504, 510 (7th Cir. 2020).

**IV.   Even accepting the district court's analysis, the court erred in declaring the Discussion Protocol unconstitutional in all applications.**

Finally, even if the court agrees with the district court that the Discussion Protocol violates the First Amendment (or if it agrees with plaintiffs about the Referral Protocol), it should remand this action with instructions for the district court to enter an injunction limited to plaintiffs.  The district court's judgment — enjoining the Secretary from enforcing the Discussion Protocol against anyone — is not supported by the evidence and is far broader than needed to give plaintiffs complete relief.  And it could deprive patients of accurate information about any number of treatment options — information they may not even realize they lack — based solely on their providers' conscience objections.

In the First Amendment context, there are two types of facial challenges.  *See United States v. Stevens*, 559 U.S. 460, 472-73 (2010).  In "a typical facial attack," a plaintiff must show that "no set of circumstances exists under which [the statute] would be valid."  *Id.* at 472 (cleaned up).  In the "second type of facial challenge," a law can be "invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Id.* at 473 (cleaned up).  An overbreadth challenge can succeed "only if the law's unconstitutional applications substantially outweigh its constitutional ones."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024).  In other words, the court must examine "the full range of activities the laws cover," *id.*, and "weigh the unconstitutional [applications] as against the constitutional ones," *id.* at 726.  An as-applied

constitutional challenge, in contrast, alleges that the law is unconstitutional as applied to the plaintiff's own situation. *See id.* at 724.

This distinction matters for the relief that the district court can enter. An injunction that "reach[es] beyond the particular circumstances of the[ ] plaintiff[ ]" must "satisfy [the] standards for a facial challenge." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010); *accord Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012). If a plaintiff has not satisfied one of the standards for a facial challenge, then enjoining a statute in all applications is not appropriate. *See Doe No. 1*, 561 U.S. at 200-01. And, "a court should adjudicate the merits of an as-applied challenge before reaching a facial challenge to the same statute," *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 683 (7th Cir. 1998), given that "relief should be no greater than necessary to protect the rights of the prevailing litigants," *Rokita*, 54 F.4th at 519 (enjoining statute on its face was "needlessly broad" relief); *see also Moody*, 603 U.S. at 744 ("Even in the First Amendment context, facial challenges are disfavored"); *Miller v. Downey*, 915 F.3d 460, 463 (7th Cir. 2019) (federal courts "should strive to decide constitutional cases narrowly and refrain from answering questions broader than necessary to resolve the case or controversy before them").

Here, the substance of the district court's analysis of the Discussion Protocol was the model of an as-applied challenge. Its conclusion that the Protocol did not regulate professional conduct centered on its fears that plaintiffs would have to discuss abortion with a patient who was "thrilled" to be pregnant. *See* RSA40. Its

determination that the Protocol was content-based rested on its view that the Protocol "governs a health care provider's discussion on pregnancy and abortion." RSA17. And its heightened scrutiny analysis focused on the impact of the Protocol on plaintiffs, RSA41-42, ignoring that the law applies to other types of health care providers even though those applications motivated the legislature, *see* RSA6. And the court analyzed the Protocol in this way notwithstanding that it applies to all conscience-based objections, including those that have nothing to do with abortion, like *in vitro* fertilization and end-of-life care. *See* 745 ILCS 70/6.1.

This singular focus on the Discussion Protocol's application to plaintiffs means that, at most, the district court should have enjoined the Discussion Protocol only as applied to plaintiffs. *See Taxpayers for Vincent*, 466 U.S. at 802-03 (plaintiffs' argument that applying ordinance to them did not further state interests "is basically a challenge to the ordinance as applied to their activities"). The most that plaintiffs proved was that the Protocol is unconstitutional as applied to them, not as applied to other types of conscience objectors. And although *Schroeder* plaintiffs asserted that the Discussion Protocol was "overbroad," they merely argued that the law compelled *Schroeder* plaintiffs *themselves* to speak more than necessary. *Schroeder* Doc. 236 at 8-9; *see* Supp.A33. They did not examine the full scope of the Protocol's applications to determine whether its "unconstitutional applications substantially outweigh its constitutional ones." *See Moody*, 603 U.S. at 724.

Moreover, if this court agrees with the district court's analysis, an injunction as applied to plaintiffs would be sufficient to give them complete relief. *See*

*Commodity Trend Serv.*, 149 F.3d at 683 ("a court should adjudicate the merits of an as-applied challenge before reaching a facial challenge to the same statute"); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 853 (2025) ("Extending the injunction to cover all other similarly situated individuals would not render [plaintiff's] relief any more complete.").  This court should therefore "remand[ ] with instructions to tailor the relief to the violation."  *See Rokita*, 54 F.4th at 519.

# CONCLUSION

For these reasons, Defendant-Appellee/Cross-Appellant requests that this court affirm the district court's judgment denying plaintiffs' requested relief regarding the Referral Protocol, 745 ILCS 70/6.1(3). Defendant-Appellee/Cross-Appellant also requests that this court reverse the district court's judgment granting relief regarding the Discussion Protocol, 745 ILCS 70/6.1(1), or alternatively, remand for entry of an injunction that is limited to plaintiffs.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3000

Attorneys for Defendant-
Appellee/Cross-Appellant

/s/ Leigh J. Jahnig
**LEIGH J. JAHNIG**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 793-1473 (office)
(773) 590-7877 (cell)
Leigh.Jahnig@ilag.gov

October 27, 2025

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 365, in 12-point Century Schoolbook BT font, and complies with Federal Rule of Appellate Procedure 28.1(a)(2)(B) and Circuit Rule 28.1 in that the brief contains 15,873 words.

/s/ Leigh J. Jahnig
LEIGH J. JAHNIG
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 793-1473 (office)
(773) 590-7877 (cell)
Leigh.Jahnig@ilag.gov

**TABLE OF CONTENTS TO SUPPLEMENTAL APPENDIX**

Memorandum Opinion and Order (*NIFLA* Doc. 176 and *Schroeder* Doc. 154)
Entered September 3, 2020…………………………………………………Supp.A1-41

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, d/b/a NIFLA; TRI-COUNTY CRISIS PREGNANCY CENTER, d/b/a INFORMED CHOICES; THE LIFE CENTER, INC., d/b/a TLC PREGNANCY SERVICES; and MOSAIC PREGNANCY & HEALTH CENTERS, Plaintiffs, v. BRYAN A. SCHNEIDER, in his official capacity as Secretary of the Illinois Department of Financial & Professional Regulation, Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 3:16 C 50310  Judge Rebecca R. Pallmeyer |
| DOCTOR RONALD L. SCHROEDER, 1st WAY PREGNANCY SUPPORT SERVICES, and PREGNANCY AID SOUTH SUBURBS, Plaintiffs, v. BRYAN A. SCHNEIDER, Secretary of Illinois Department of Financial and Professional Regulation, Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | No. 17 C 4663  Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

In August 2016, then-Governor Rauner signed into law an amendment to the Illinois Healthcare Right of Conscience Act. The amendment, adopted after negotiations with religious groups, directs that healthcare providers provide patients with information about how medical treatments the patients seek might conflict with the medical providers' religious beliefs. In two lawsuits, Plaintiffs, pro-life crisis pregnancy centers and doctors, challenge the amendment as a violation of their First Amendment rights. Plaintiffs contend that the amended Act compels them to speak an objectionable message and burdens the free exercise of their religion. In July 2017, then-Judge Kapala entered a preliminary injunction enjoining Defendant Secretary of the Illinois Department of Financial and Professional Regulation from enforcing the amended law. Plaintiffs

**Supp.A1**

now seek permanent injunctive relief and have moved for summary judgment declaring that the law infringes their First Amendment free speech and free exercise rights. (*See Nat'l Inst. of Family & Life Advocates, et al., v. Schneider*, No. 16 C 50310 (hereinafter "*NIFLA*") [90]; *Schroeder, et al., v. Schneider*, No. 17 C 04663 (hereinafter "*Schroeder*") [67].) The court concludes, however, that genuine disputes of material facts remain and denies the motions from both sets of Plaintiffs.

## BACKGROUND

### I.    Crisis Pregnancy Centers

The *NIFLA* Plaintiffs are three pro-life Illinois nonprofit organizations—Tri-County Crisis Pregnancy Center (d/b/a "Informed Choices"), The Life Center, Inc. (d/b/a "TLC Pregnancy Services"), and Mosaic Pregnancy & Health Centers—and the National Institute of Family and Life Advocates, a faith-based nonprofit incorporated in Virginia with members comprising pro-life healthcare facilities across the nation. (*NIFLA* Pls.' Statement of Material Facts [92] (hereinafter "NPSF") ¶¶ 14–19.) The *Schroeder* Plaintiffs include two pro-life Illinois nonprofits—1st Way Pregnancy Support Services and Pregnancy Aid South Suburbs ("PASS")—and Dr. Ronald Schroeder, who serves as the medical director of Options Now, another pro-life healthcare organization. (*Schroeder* Pls.' Resp. to Def.'s Statement of Facts ("DSF") [144] ¶¶ 13–14.) A goal of the Plaintiff healthcare facilities or crisis pregnancy centers ("CPCs") is to dissuade pregnant women from having abortions. (*NIFLA* Pls.' Resp. to DSF [165] ¶ 14; *Schroeder* Pls.' Resp. to DSF [144] ¶ 17.) Defendant is Deborah Hagan,[1] the Secretary of the Illinois Department of Financial and Professional Regulation ("IDFPR"), the state department responsible for, among other duties, prescribing rules and regulations for professionals, including health care professionals. The IDFPR has the authority to discipline medical professionals, including imposing fines and revoking licenses. (*NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 4.)

---

[1]      Both sets of Plaintiffs' complaints originally named former Secretary Bryan A. Schneider as a defendant in his official capacity. Secretary Hagan has been substituted as defendant for these cases. FED. R. CIV. P. 25(d).

Secretary Hagan, sued here in her official capacity, is charged with enforcing the law challenged in Plaintiffs' suits.  (Def.'s Resp. to *Schroeder* Pls.' Statement of Facts [122] ¶ 1.)

The Plaintiff CPCs all offer a similar set of services to further their pro-life message.[2]  They all provide pregnancy tests and ultrasounds.  (*NIFLA* Pls.' Resp. to DSF [165] ¶¶ 15–16; *Schroeder* Pls.' Resp. to DSF [144] ¶¶ 15–16.)  Plaintiff Dr. Schroeder testified that viewing an ultrasound that shows movement or a heartbeat might change a woman's mind about having an abortion.  (Dr. Schroeder Dep., Ex. 12 to DSF, at 154:10–24; *see also* Dr. Anthony Caruso Dep., Ex. 32 to DSF, at 74:17–20 ("The hope is that seeing the baby will help her make a decision to keep the baby.").)  Indeed, there is evidence in the record that CPCs' motivations influence the timing for administration of these tests: while Plaintiff Mosaic will not schedule an ultrasound appointment for a "non-abortion-minded" patient until six to eight weeks after her last menstrual period ("LMP"), Mosaic will conduct an ultrasound—as well as a counseling session—as soon as possible for  an "abortion-minded" patient.  (Ex. 21 to DSF at NIFLA00045.)  Likewise, 1st Way will offer an "abortion-minded" patient an ultrasound if she is six to twenty-four weeks since LMP, but will not provide such a test for a patient who is "non-abortion-minded" after fifteen weeks of pregnancy unless she has some other symptoms.  (Appointment for Pregnancy Test Policy, Ex. 23 to DSF.)  Plaintiff TLC Pregnancy Services takes steps to determine whether the ultrasound has had TLC's desired effect, tracking whether a woman's plans change after seeing a sonogram.  (Vivian Maly Dep., Ex. 15 to DSF, at 110:6–12; *see also* Options Now Ultrasound Form, Ex. 30 to DSF (asking sonographers to determine "the patient's abortion vulnerability after the Sonogram").)

The CPCs do also discuss abortion with pregnant women or provide them with materials aimed at discouraging use of the procedure.   (*NIFLA* Pls.' Resp. to DSF [165] ¶ 19; *Schroeder*

---

[2]     The Plaintiff CPCs offer a number of other services that are not at issue in the cases before this court.  For example, they may provide information about and referrals for adoption; items for babies like diapers, parental and finance classes; and other services for expecting and new parents.  (*See* NPSF ¶ 29; Schroeder Compl. [1] ¶¶ 21, 32–33.)

**Supp.A3**

Pls.' Resp. to DSF [144] ¶ 19 ("Plaintiffs provide general information about abortion with the aim of assisting the client/patient to make a decision that would preserve the life of the unborn child.").) CPCs provide women with information about the risks of abortion; they do not review any benefits abortion might offer—either in a patient's particular circumstances or in general. (*NIFLA* Pls.' Resp. to DSF [165] ¶¶ 20–21; *Schroeder* Pls.' Resp. to DSF [144] ¶¶ 20–21.) Risks that CPCs discuss with patients include not only medical risks like excessive bleeding, perforation of the uterus, or not being able to bear children again;[3] CPCs may also tell pregnant women "about the spiritual aspect . . . and the ramifications for future relationships and how they view themselves as a person." (Susan Wilson Dep., Ex. 17 to DSF, at 64:18–65: 1.) As the director of Plaintiff 1st Way tells patients, abortion is "more than just a choice on their part" because it can "affect[ ] you completely physically of course and mentally and spiritually." (Judy Cocks Dep., Ex. 18 to DSF, at 56:5–18.)

The CPCs' communications concerning abortion occur at various stages in the provision of services. Options Now talks to patients about abortion during intake. (Dr. Schroeder Dep., Ex. 12 to DSF, at 82:2–12.) 1st Way provides counseling to women interested in terminating their pregnancy after providing them with other services; as they tell their volunteers, because "we have given her a free service, so we can respectfully and firmly request some of her time to speak with her on this important issue." (Basic Counseling & Dealing with Abortion-Minded Women, Ex. 44 to DSF.) Other CPCs will provide patients with DVDs (*see* Informed Choices DVD Selection/Release Form, Ex. 45 to DSF), and printed handout materials (*see* PASS Abortion Raises Breast Cancer Risk handout, Ex. 54 to DSF) at various times.

---

[3]     The magnitude of such risks appears to be at least contested within the medical community. *Amici curiae* American College of Obstetricians and Gynecologists, et al., describe abortion as far safer than carrying a pregnancy to term. (Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 9.)

4

The CPCs do not provide obstetrical or gynecological care. If a patient is in need of care from an Ob/Gyn physician, the CPCs refer the patient to see her own doctor, whether or not the CPC staff is aware of who that doctor is or what treatments the doctor provides. (*NIFLA* Pls.' Resp. to DSF [165] ¶ 18; *Schroeder* Pls.' Resp. to DSF [144] ¶ 18.) For example, Informed Choices instructs its sonographers, should they discover an ectopic pregnancy, to direct the patient to go to the emergency room or contact her obstetrician. (Ex. 20 to DSF at NIFLA00020.) The CPCs also maintain lists of physicians to whom they will refer patients who do not already have a relationship with an Ob/Gyn. (*NIFLA* Pls.' Resp. to DSF [165] ¶ 26; *see, e.g.,* Dr. Schroeder Dep., Ex. 12 to DSF, at 134:1–136:24; PASS Primary Care Clinics Form, Ex. 72 to DSF; 1st Way Referrals/Resource Manual, Ex. 61 to DSF.)

As the CPCs advise their patients, the CPCs do not perform abortions. (*NIFLA* Pls.' Resp. to DSF [165] ¶ 28; *Schroeder* Pls.' Resp. to DSF [144] ¶ 28.) The CPCs do not necessarily also make clear their pro-life position, however, nor do they always disclose that one of their goals is to dissuade women from having abortions. For instance, TLC Pregnancy Services, according to its executive director, does not disclose its pro-life policy on its website, verbally, or in advertisements. (Vivian Maly Dep., Ex. 15 to DSF, at 75:1–23.) And although they do not perform abortions, the CPCs do offer other services to women interested in abortions. For example, Options Now's "talking points" for telephone calls instruct that staff tell callers that while Options Now does not perform or refer for abortions, Options Now will provide, free of charge, services that "typically cost between $180 and $200 at other clinics in our area." (Telephone Talking Points, Ex. 34 to DSF, at 3.) Options Now's talking points also direct that staff tell "abortion-minded" women[4] that Options Now will provide free STD tests because "[i]t's also important to make sure you don't have an STD before having an invasive procedure like abortion." (*Id.* at 5.)

---

[4] Options Now also provides the "abortion-minded" telephone talking points to rape victims "concerned about a possible pregnancy and [ ] hastily looking for abortion services or inquiring about [emergency contraception]." (Rape Talking Points/Procedure, Ex. 34 to DSF, at ONHOF20.)

Supp.A5

Finally, as they do with respect to abortion, the CPCs provide information and materials about the risks of using contraception (*see* Ex. 57 to DSF), but they do not discuss the benefits of contraception or sterilization and will not refer or transfer a patient to a provider who will provide contraception or perform a sterilization procedure. (NPSF ¶ 34; *Schroeder* Compl. [1] ¶¶ 24, 37.) Similar to their views concerning abortion, Plaintiffs believe there are no benefits to contraception or sterilization and that providing or facilitating the provision of contraception or sterilization would violate their religious beliefs. (NPSF ¶ 34; *Schroeder* Compl. [1] ¶ 1.)

In this litigation, Plaintiffs allege that the CPCs' ability to promote their religiously-motivated pro-life messaging through services like those discussed above are threatened by changes to the Illinois Healthcare Right of Conscience Act adopted in 2016. (*See* NPSF ¶¶ 65–66; *Schroeder* Compl. [1] ¶ 2.) The law will compel them, Plaintiffs assert, to discuss the benefits of treatments they deem objectionable: abortion, contraception, or sterilization. Likewise, under the law, Plaintiffs must facilitate those treatments by providing patients with lists of doctors who provide those services or by transferring or referring patients to them. Both requirements violate Plaintiffs' First Amendment Speech and Free Exercise rights, they claim.

## II.    The HCRCA

The Illinois Healthcare Right of Conscience Act ("HCRCA" or "the Act"), originally enacted in 1977, grants immunity from civil liability and other protections to healthcare providers who have religiously-motivated objections to providing certain forms of treatment. *See* 745 ILCS 70/1, *et seq.*; *id.* § 2 ("It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care whether acting individually, corporately, or in association with other persons . . . ."). Specifically, the pre-2017 HCRCA includes several protections for medical providers who have "conscience objections" to certain treatments. "Conscience" is defined as "a sincerely held set of moral convictions arising from belief in and relation to God, or which, though not so derived, arises from a place in the life

6

of its possessor parallel to that filled by God among adherents to religious faiths." *Id.* § 3(e). The Act provides:

> No physician or health care personnel shall be civilly or criminally liable to any person, estate, public or private entity or public official by reason of his or her refusal to perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care service which is contrary to the conscience of such physician or health care personnel.

*Id.* § 4. A similar provision affords immunity for the owners and operators of healthcare facilities with conscience objections. *Id.* § 9. Moreover, the HCRCA prohibits several forms of discrimination against persons and organizations who have conscience objections to treatments. *Id.* § 5 (prohibiting discrimination in "licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or any other privileges"), § 7 (prohibiting any employer or "medical training institution" from discriminating against applicants with conscience objections in hiring or admissions decisions), § 8 (prohibiting denial of "aid, assistance or benefits" due to conscience objection), § 10 (discrimination against healthcare facilities with conscience objections), § 11 (denial of aid or benefits to facilities with conscience objections).

Even before the amendments challenged in this suit, however, the HCRCA's protection of medical providers who have conscience objections to certain procedures was not total. Physicians with conscience objections were not freed from any obligation to provide emergency medical services. *Id.* § 6. Importantly, the HCRCA also did not "relieve a physician from any duty, which may exist under any laws concerning current standards, of normal medical practices and procedures, to inform his or her patient of the patient's condition, prognosis and risks." *Id.*

Defendant argues that the pre-2017 HCRCA's broad immunity created obstacles for some patients seeking care. (*See* Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 5.)[5] The record includes a few recent instances of what Defendant describes as "conscience-based objectors

---

[5] Defendant submitted the same response to the summary judgment motions for both set of Plaintiffs. The document number used refers to the *NIFLA* docket.

**Supp.A7**

failing to obtain informed consent from patients."[6]  (*Id.*)  First, the record includes documents concerning an April 2014 incident in which a neurologist reportedly refused to authorize general anesthesia for a patient seeking an abortion.  (*See* Def.'s Statement of Facts [142] (hereinafter "DSF") ¶ 5.)[7]  In a letter to the patient's Ob/Gyn, the doctor wrote that the patient could suffer "major complications," and he therefore did not authorize "general anesthesia for this patient, especially in regards to an *elective and unnecessary* procedure."  (Ex. 7 to DSF (emphasis added).)  In a letter to the patient herself, however, the neurologist said that while her potential "abortion is thought to be medically necessary," "[t]here is no such thing as a medically necessary abortion."  (Ex. 4 to DSF.)  He told the patient that he has "dealt with many women who were told to have an abortion because either the baby wouldn't live or they would have lasting health problems if they delivered the baby.  In all cases the mom and the baby were fine without any problems whatsoever."  (*Id.*)  The neurologist also warned the patient that "[t]he decision to have an abortion is one that will cause more health problems for you than going through delivery" and that abortion is "[t]he highest risk factor for developing breast cancer in a woman."[8]  (*Id.*)  He also

---

[6]     Both sets of Plaintiffs object to the relevance or materiality of this evidence, but the court considers it because Defendant cites it as evidence of the asserted need for the HCRCA amendments.  The *Schroeder* Plaintiffs also raise hearsay objections to this evidence, but these materials (further discussed below) may be admissible under a hearsay exception, such as Fed. R. Evid. 803(4), or may have a nonhearsay purpose—for example, to illustrate the concerns that motivated passage of the HCRCA amendments,  *see Whitford v. Gill*, 218 F. Supp. 3d 837, 894 n.224 (W.D. Wis. 2016) (noting that legislative history was admissible for a nonhearsay purpose because it "provides useful background information on [the law's] path to enactment and on the types of concerns voiced by the legislators"), *vacated on other grounds and remanded*, 138 S. Ct. 1916, 201 L. Ed. 2d 313 (2018).

[7]     Defendant submitted the same Local Rule 56.1 Statement of Additional Facts in both cases.  The document number used refers to the *NIFLA* docket.

[8]     The assertion that abortion is the highest risk factor for developing breast cancer appears to be unsupported.  *Amici curiae* American College of Obstetricians and Gynecologists, et al., write that "no link exists between" breast cancer and abortion.  (Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 9 (citing Melbye Mads, et al., *Induced Abortion and the Risk of Breast Cancer*, 336 New Eng. J. of Med. 81 (1997)).)  An amicus brief filed in support of Plaintiffs' motion for preliminary injunction acknowledges that fewer than half of all studies on the topic have

attached to the email a "model of a baby the same size of the baby that is within you" and concluded by telling her that he "will be praying for [her] to make the right decision." (*Id.*)

Second, in October 2014, the IDFPR received a complaint about CPCs. (*See* DSF ¶ 7.) The complaint alleged that such centers were "claiming to offer information on abortion services but are actually Pro-life (anti-choice) activists in disguise. They are employing bait and switch tactics to falsely lure people in for services they do not offer." (Ex. 8 to DSF at IDFPR001888.) Furthermore, "[t]hey are offering pregnancy tests without a [Clinical Laboratory Improvement Amendments] license and offering Ultrasounds without a physician's orders." (*Id.*) The complaint also included documents suggesting that pro-life organizations had purchased ads on Google to try to direct those searching about abortion to pro-life websites.[9] (*Id.* at IDFPR001892–1900.) It appears, however, that the complainant stopped pursuing that complaint; the IDFPR closed the matter in December 2015. (*Id.* at IDFPR001940.)

Third, the IDFPR received a complaint in March 2015 that accused a licensed clinical professional counselor of refusing to help the complainant come to terms with his sexual orientation because of the counselor's personal beliefs that homosexuality is contrary to the Bible. (Ex. 9 to DSF.) The counselor also refused to help the patient find a therapist who would be willing to help. (*Id.*) The complainant was treated by this counselor for about nine years and felt that the counselor was trying to "brain wash [him] to not be gay." (Ex. 6 to DSF at IDFPR001976.)

---

found any statistically significant association between the two. (Br. of *Amici Curiae* Am. Assoc. of Prolife Obstetricians & Gynecologists, Am. Coll. of Pediatricians, Christian Med. & Dental Assocs., & Heartbeat Int'l, in Supp. of *NIFLA* Pls.' Mot. for Prelim. Inj. [56] at 13 (noting that there have been seventy studies on whether there is an association between abortion and breast cancer, of which fifty-seven found a positive association but in only thirty-four of those were the associations statistically significant).)

[9] This may not be an isolated issue. *Amici curiae* American ollege of Obstetricians and Gynecologists, et al., explain that CPCs have "for years . . . purchased advertisements from search engines like Google that appear when a user searches for a term like abortion clinic." (Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 8.) It appears that Google has taken some measures to counteract the misleading nature of some ads. (*Id.* (noting that Google updated its advertising policy to add a "provides abortions" or "does not provide abortions" label).)

9

The complainant reported to IDFPR that he suffered two mental breakdowns during the time he was treated by this counselor. (DSF ¶ 11.) Defendant uses this case as an example of how medical professionals with conscience-based objections failed to provide their patients with information about other providers who may offer appropriate or desired treatment. (Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 20.) The case also shows, Defendant asserts, that the improper handling of conscience objections occurred not only in the reproductive health context, undermining Plaintiffs' assertion that the amended HCRCA targeted anti-abortion providers. (*Id.* at 26 n.7.)

Fourth, Defendant asserts that the HCRCA amendments were introduced because Catholic hospitals had been turning away pregnant women while they were having miscarriages. (DSF ¶ 12.) One supporter of the bill testified at a state House of Representatives committee hearing about her experience:

> Weeks into my pregnancy doctors told us that the baby suffered a number of severe anomalies. At 20 weeks as we were coping with that news and trying to understand how our lives would change, my water broke. The doctors told us that the baby was not going to live. We were heartbroken, but our nightmare was just beginning.
>
> When we learned that my water had broken, the doctors told me that waiting to miscarry could lead to hemorrhage and infection. I knew that these complications could threaten not only my future fertility, but also my life. . . .
>
> . . .
>
> The doctors responsible for my care couldn't help me end the pregnancy and avoid these risks to my health. The reason for this is that the hospital operated under religious restrictions imposed by the Catholic Church. They could not provide me the care I needed to keep from getting sick. I could only get help if I was already infected or hemorrhaging.
>
> . . . We attempted to go to a secular hospital a few hours away for help in terminating the pregnancy, but we could not get the procedure covered by our insurance at the hospital, and we could not afford to pay for the services out of pocket.
>
> We understand that the barrier to our insurance covering the procedure resulted from the religious hospital's failure to provide adequate records showing that the procedure was medically necessary. Had the religious hospital made my health information available, our insurance would have provided coverage.

**Supp.A10**

(Ex. 13 to Def.'s Resp. to *NIFLA* Pls.' Statement of Facts [144-13] at 13–15.)  This witness further described how she returned to that hospital several times as a result of her bleeding but was repeatedly denied the care she sought.  (*Id.* at 15–16.)

The Illinois General Assembly made several changes to the HCRCA, effective on January 1, 2017, to narrow the scope of immunity for conscience-based objectors.  Where the law previously recognized that "[i]t is the public policy of the State of Illinois to respect and protect the right of conscience of all persons," the amendments added that "[i]t is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care."  745 ILCS 70/2.  The provision requiring doctors with conscience objections to "inform his or her patient of the patient's condition, prognosis and risks" now says that such a physician must "inform his or her patient of the patient's condition, prognosis*, legal treatment options,* and risks *and benefits of treatment options.*"  *Id.* § 6 (emphasis added).  The amendments also added the following provision:

§ 6.1. Access to care and information protocols. All health care facilities shall adopt written access to care and information protocols that are designed to ensure that conscience-based objections do not cause impairment of patients' health and that explain how conscience-based objections will be addressed in a timely manner to facilitate patient health care services. The protections of Sections 4, 5, 7, 8, 9, 10, and 11 of this Act [which provide protections from liability and against discrimination for providers with conscience objections] only apply if conscience-based refusals occur in accordance with these protocols. These protocols must, at a minimum, address the following:

(1) The health care facility, physician, or health care personnel shall inform a patient of the patient's condition, prognosis, legal treatment options, and risks and benefits of the treatment options in a timely manner, consistent with current standards of medical practice or care.

(2) When a health care facility, physician, or health care personnel is unable to permit, perform, or participate in a health care service that is a diagnostic or treatment option requested by a patient because the health care service is contrary to the conscience of the health care facility, physician, or health care personnel, then the patient shall either be provided the requested health care service by others in the facility or be notified that the health care will not be provided and be referred, transferred, or given information in accordance with paragraph (3).

(3) If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall: (i) refer the patient

to, or (ii) transfer the patient to, or (iii) provide in writing information to the patient about other health care providers who they reasonably believe may offer the health care service the health care facility, physician, or health personnel refuses to permit, perform, or participate in because of a conscience-based objection.

(4) If requested by the patient or the legal representative of the patient, the health care facility, physician, or health care personnel shall provide copies of medical records to the patient or to another health care professional or health care facility designated by the patient in accordance with Illinois law, without undue delay.

*Id.* § 6.1.  In essence, § 6.1 requires all health care facilities to adopt written policies and procedures to ensure that a patient requesting or in need of a particular legal treatment can receive it, despite any conscience objections that a particular medical professional at the facility or the facility itself might have.  Facilities or medical professionals who do not comply with these requirements cannot enjoy the immunity from civil and criminal liability or protection from certain forms of discrimination provided elsewhere in the HCRCA.  *See id.* §§ 4–5, 7–11.

Plaintiffs assert that the communications mandated by these provisions require them to discuss benefits of treatments to which they have conscience objections—specifically, abortion, contraception, and sterilization.  This mandate, Plaintiffs assert, violates their First Amendment free speech and free exercise rights.  (*See NIFLA* Compl. [1] ¶ 89; *Schroeder* Compl. [1] ¶ 1.)  So too, Plaintiffs insist, does the requirement that they refer a patient to, transfer a patient to, or provide written information to a patient about providers who may offer such treatment options.  (*See NIFLA* Compl. [1] ¶ 105; *Schroeder* Compl. [1] ¶ 1.)

## III.    Procedural History

The *NIFLA* Plaintiffs, asserting a number of state-law and federal statutory and constitutional claims, initiated this suit in September 2016, seeking to enjoin the HCRCA's amendments before they took effect.  (*See NIFLA* Compl. [1].)  In July 2017, Judge Kapala dismissed the state-law claims and some of the federal claims but granted a statewide preliminary injunction against the law's enforcement, reasoning that the law was a content- and viewpoint-

based speech regulation and that the law would be unlikely to survive strict scrutiny.[10]  (*NIFLA* July 19, 2017 Order [65] at 6–8.)  The *Schroeder* Plaintiffs brought their suit in March 2017.  (*See Schroeder* Compl. [1].)  Judge Kapala likewise dismissed certain claims but denied without prejudice the *Schroeder* Plaintiffs' request for a preliminary injunction in light of the injunction the court had already granted for the *NIFLA* Plaintiffs.  (*Schroeder* Oct. 27, 2017 Order [58].)

In December 2017, both cases were stayed pending a decision by the Supreme Court in *National Institute of Life Advocates v. Becerra*, which the Court decided in June 2018.  138 S. Ct. 2361 (2018).  Plaintiffs in both cases then moved for summary judgment in January 2019.  (*See NIFLA* Pls.' Mot. for Summ. J. [90]; *Schroeder* Pls.' Mot. for Partial Summ. J. [67].)  Both cases were reassigned to this court in May 2019 after Judge Kapala took inactive senior status.  (*See* Am. Gen. Order 19-007 [117].)[11]  Because it will become important to the analysis below, the court also notes that Defendant requested expert discovery in this case as necessary for Defendant's own summary judgment motion (*see* Defs.' Mot. to Align Summ. J. Br. Schedule & Set Remaining Disc. Schedule [123] at 5–7), but the court denied the request pending review of Plaintiffs' motions (June 4, 2019 Mot. Hr'g Tr. [131] at 14:13–17).[12]

## DISCUSSION

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party moving for summary judgment bears the burden of proving the absence of such a dispute.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets that burden, the nonmoving party

---

[10]  It was Judge Kapala's view that the law was unlikely to survive even intermediate scrutiny.  (*NIFLA* July 19, 2017 Order [65] at 9.)

[11]  The document number used refers to the *NIFLA* docket.

[12]  The document number used refers to the *NIFLA* docket.

then bears the burden of demonstrating that there is a genuine dispute of material fact, "such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012). The burden on the nonmovant "is not onerous," *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999), and the court "construe[s] all facts and reasonable inferences in favor of the nonmoving party." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). To defeat the motion, however, the nonmoving party must be able to point to more than the "mere existence of a scintilla of evidence in support of" her position. *Liu*, 191 F.3d at 796. As discussed below, the court concludes that there are genuine disputes of material fact concerning Plaintiffs' Free Speech and Free Exercise claims and therefore denies their summary judgment motions.

## I.     Free Speech Claims

### A.     Regulation of Content or Conduct

As noted, this case was stayed for several months pending the Supreme Court's resolution of a claim of compelled speech in a similar context: *National Institute of Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"). That case concerned a challenge to a California law that required clinics like CPCs to disseminate particular government-written notices. First, the law required certain licensed clinics providing pregnancy-related services[13] to post the following notice at their facility, distribute it to all patients, or provide it to them at check-in: "California has public programs that provide immediate free or low-cost access to comprehensive family planning services (including all FDA-approved methods of contraception), prenatal care, and abortion for eligible women. To determine whether you qualify, contact the county social services office at [insert the telephone number]." *Id.* at 2369 (quoting Cal. Health & Safety Code Ann. § 123472(a)(1)). The law required that this notice be printed in English and in any other language identified by the state (up to 13 languages in some places). *Id.* Second, California required

---

[13]     *See NIFLA*, 138 S. Ct. at 2368–69 (detailing which clinics were subject to or exempt from the first notice requirement).

Supp.A14

certain unlicensed clinics providing pregnancy-related services[14] to post conspicuously onsite and provide, with all advertising materials, a notice stating, "This facility is not licensed as a medical facility by the State of California and has no licensed medical provider who provides or directly supervises the provision of services." *Id.* at 2670 (quoting Cal. Health & Safety Code Ann. § 123472(b)(1)). That notice, too, had to be in English and in other languages identified by the state, and the law further specified the size for the onsite posting and the font size to be used in advertisements. *Id.*

The Supreme Court held that both requirements violated the plaintiff CPCs' First Amendment rights. Starting with the licensed-facility notice requirement, the Court characterized it as a "content-based regulation of speech." *Id.* at 2371. "By compelling individuals to speak a particular message," Justice Thomas wrote for the Court, "such notices 'alte[r] the content of [their] speech.'" *Id.* (alteration in original) (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). Content-based regulations are subject to strict scrutiny and are therefore presumptively unconstitutional. *See id.*; *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226–27 (2015). The Ninth Circuit, however, had upheld the licensed-facility notice requirement because it regulated only "professional speech," *NIFLA*, 138 S. Ct. at 2371, a category that several circuit courts had recognized as being excluded from strict scrutiny analysis, *see, e.g., Pickup v. Brown*, 740 F.3d 1208, 1227–29 (9th Cir. 2014); *Moore-King v. Cty. of Chesterfield*, 708 F.3d 560, 568–70 (4th Cir. 2013). The Supreme Court rejected the "professional speech" rationale; "[s]peech is not unprotected merely because it is uttered by 'professionals.'" *NIFLA*, 138 S. Ct. at 2371–72.

Still, the Court did recognize two circumstances in which professional speech is afforded less protection. "First, our precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Id.* at 2372 (citing, e.g., *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*,

---

[14] *See NIFLA*, 138 S. Ct. at 2369–70 (detailing which clinics were subject to or exempt from the second notice requirement).

471 U.S. 626, 651 (1985)). This exception did not apply to the licensed-facility notice requirement, the Supreme Court observed, because the mandated disclosures were "not limited to 'purely factual and uncontroversial information about the terms under which . . . services will be available.'" *Id.* (quoting *Zauderer*, 471 U.S. at 651). As the Court reasoned, "[t]he notice in no way relates to the services that licensed clinics provide. Instead, it requires these clinics to disclose information about *state*-sponsored services—including abortion, anything but an 'uncontroversial' topic." *Id.*

The second circumstance in which laws regulating professional speech are afforded more deferential review involve "regulations of professional conduct that incidentally burden speech." *Id.* at 2373. As an example, the Court pointed to its rejection of a First Amendment challenge to a law requiring physicians to obtain informed consent before performing abortions in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992). The law under review in *Casey*, which required doctors to inform patients about state-printed materials, to discuss the unborn child's gestational age, and to advise patients on the risks of both abortion and childbirth, was, "for constitutional purposes, no different from a requirement that a doctor give certain specific information about any medical procedure." *Id.* According to the *NIFLA* Court, "[t]he [*Casey*] joint opinion explained that the law regulated speech only 'as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State.'" *NIFLA*, 138 S. Ct. at 2373 (quoting *Casey*, 505 U.S. at 884). Unlike the law in *Casey*, the licensed-facility notice requirement under review in *NIFLA* was not an informed-consent law or a regulation of professional conduct that only incidentally burdened speech. *Id.* As Justice Thomas explained:

> The notice does not facilitate informed consent to a medical procedure. In fact, it is not tied to a procedure at all. It applies to all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered, or performed. If a covered facility does provide medical procedures, the notice provides no information about the risks or benefits of those procedures. Tellingly, many facilities that provide the exact same services as covered facilities . . . are not required to provide the licensed notice. The licensed notice regulates speech as speech.

*Id.* at 2373–74.

Neither circumstance in which professional speech regulations are afforded more deferential review applied to the notice requirement under consideration in *NIFLA*. The Court therefore subjected it to strict scrutiny and concluded that the law was "not sufficiently drawn to achieve" California's one identified interest—"providing low-income women with information about state sponsored services." *Id.* at 2375. In particular, the law was underinclusive because it exempted numerous clinics that serve low-income women and provide a similar set of services as CPCs. *See id.* at 2375–76. And the Court also noted that the state had other means of promoting its interest, such as a public awareness campaign, without burdening speech. *Id.* at 2376.

As for the requirement that the law imposed on unlicensed clinics, the Supreme Court did not determine whether the *Zauderer* standard applied, but noted that the requirement would not satisfy that standard: "Even under *Zauderer*, a disclosure requirement cannot be 'unjustified or unduly burdensome.'" *Id.* at 2377 (quoting *Zauderer*, 471 U.S. at 651). California had not demonstrated that the requirement for unlicensed clinics was justified because it had offered no more than a "purely hypothetical" justification for the law. *Id.* And the requirement was also unduly burdensome: it required covered facilities to post a particular notice verbatim, was directed to "a curiously narrow subset of speakers," applied to all advertising materials, and had to be in as many as thirteen different languages. *Id.* at 2377–78.

In the case before this court, both Plaintiffs and Defendant point to *NIFLA* as supporting their view of the constitutionality of the amended HCRCA. Plaintiffs argue that like the regulations in *NIFLA*, the Illinois law constitutes a content-based regulation because it compels them to speak a particular message, thus altering the content of their speech. *Id.* at 2371. Defendant, on the other hand, contends that the law is merely a regulation of professional conduct, akin to the

informed consent rules upheld in *Casey*.[15]  Plaintiffs challenge two specific requirements of the law: (1) discussing the benefits of abortion, and, if requested, (2) referring a patient to, transferring a patient to, or providing a patient information about providers of abortion.[16]  *See* 745 ILCS 70/6–6.1.  The court will discuss each requirement in turn.

### 1.    Benefits-Discussion Requirement

Starting with the requirement to discuss the benefits of abortion, the court agrees with Defendant that as in *Casey*, this is a regulation of professional conduct that only incidentally burdens speech.  The Pennsylvania law in *Casey* provided:

---

[15]    Notably, neither side in this case analyzes whether *Zauderer* might apply to any aspect of the amended HCRCA.  *Zauderer* has generally been applied only to commercial speech.  *See, e.g., Amarei v. City of Chi.*, No. 13 C 2805, 2015 WL 725940, at *2–3 (N.D. Ill. Nov. 17, 2015) (discussing *Zauderer*).  The Seventh Circuit has said that considerations for determining whether speech is commercial include whether: "(1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has economic motivation for the speech." *United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009); *see also Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014) (noting that these three factors are "just a general framework").  It is not clear whether *NIFLA* suggests that *Zauderer* applies beyond commercial speech, nor is it clear that CPCs are engaged in commercial speech.  The Fourth Circuit previously suggested that the answer to that second question may be yes.  *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283–88 (4th Cir. 2013) (holding that a district court erred in denying the City's request for discovery on whether an ordinance requiring CPCs to make certain disclosures regulated commercial speech).  Of course, the Court may have foreclosed this avenue in noting that California's licensed-facility notice requirement failed *Zauderer* because it required the disclosure of "information about state-sponsored services—including abortion, anything but an 'uncontroversial' topic." *NIFLA*, 138 S. Ct. at 2372.  *But see CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) ("We do not read the Court as saying broadly that any purely factual statement that can be tied in some way to a controversial issue is, for that reason alone, controversial.  The dispute in *NIFLA* was whether the state could require a clinic whose primary purpose was to oppose abortion to provide information about 'state-sponsored services,' including abortion.  While factual, the compelled statement took sides in a heated political controversy, forcing the clinic to convey a message fundamentally at odds with its mission.  Under these circumstances, the compelled notice was deemed controversial within the meaning of *Zauderer* and *NIFLA*.").

[16]    The *NIFLA* Plaintiffs' brief takes issue with speech regarding abortion (*see NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 5), while the *Schroeder* Plaintiffs' brief challenges the compulsion to speak about contraception and sterilization as well (*see Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2]).  At least at this stage, however, the First Amendment analysis does not differ depending on whether abortion-related speech or sterilization- and contraception-related speech is at issue.  Hence, where the court refers only to abortion, its analysis applies with equal weight to the other two procedures.

> Except in a medical emergency, the statute requires that at least 24 hours before performing an abortion a physician inform the woman of the nature of the procedure, the health risks of the abortion and of childbirth, and the "probable gestational age of the unborn child." The physician or a qualified nonphysician must inform the woman of the availability of printed materials published by the State describing the fetus and providing information about medical assistance for childbirth, information about child support from the father, and a list of agencies which provide adoption and other services as alternatives to abortion. An abortion may not be performed unless the woman certifies in writing that she has been informed of the availability of these printed materials and has been provided them if she chooses to view them.

*Casey*, 505 U.S. at 881. While acknowledging that "the physician's First Amendment rights not to speak are implicated," the joint opinion nonetheless determined that these requirements did not violate that Amendment because they regulated physicians' conduct, not their speech. *Id.* at 884. And as already noted, the Court in *NIFLA*, 138 S. Ct. at 2373, endorsed this conclusion because the Pennsylvania law facilitated informed consent. In contrast, the California law at issue in *NIFLA* required only certain licensed clinics to disseminate advertisements about services offered by the state to every patient (regardless of the patient's health conditions) and those advertisements provided no information about the risks and benefits of any procedure. *See id.* at 2373–74. As the Sixth Circuit has reasoned in a case challenging Kentucky's mandatory ultrasound law, *Casey* and *NIFLA* can be read together to say that an informed-consent statute will not be subject to heightened First Amendment scrutiny "so long as it meets these three requirements: (1) it must relate to a medical procedure; (2) it must be truthful and not misleading; and (3) it must be relevant to the patient's decision whether to undertake the procedure, which may include, in the abortion context, information relevant to the woman's health risks, as well as the impact on the unborn life." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 428–29 (6th Cir. 2019) (noting also that *NIFLA* and *Casey* "clarified that the First Amendment has a limited role to play in allowing doctors to avoid making truthful mandated disclosures related to informed consent").

The requirement that Plaintiffs discuss the benefits of abortion with pregnant patients meets that test. Information about the benefits of terminating a pregnancy clearly relate to a

medical procedure—abortion. Plaintiffs have made no argument that the benefits they must describe are false or misleading;[17] indeed, ensuring that both the risks and the benefits of the treatment are provided will minimize the danger of a woman making a decision on the basis of misleading information.[18] And the benefits of an abortion are, like the risks, obviously relevant to a woman's decision to undergo the treatment.

This benefits-discussion requirement is easily distinguishable from the mandated disclosures in *NIFLA*. Those disclosures provided no actual information about any medical procedures; the licensed-facility notice requirement merely advised women of the availability of certain state-subsidized services. Likewise, whereas the licensed-facility notice had to be provided to all patients, regardless of their medical conditions or the reasons they came to the clinic, *see NIFLA*, 138 S. Ct. at 2372, the court understands the amended HCRCA to require the CPCs to provide information concerning the benefits of abortion only to patients for whom there are such benefits, and to align the benefits discussed with the health and circumstances of each patient. The court does not now delineate the appropriate standard of care and, as discussed below, will permit expert discovery on the issue. The court does conclude at this stage that— unlike the law in *NIFLA*, which did not apply to a large number of clinics offering similar pregnancy services— the benefits-discussion requirement merely imposes an obligation that the standard of care already requires of other medical professionals in other contexts.[19] (*See, e.g.,* AMA Code

---

[17]    "Based on their religious and ethical beliefs," neither set of Plaintiffs believes that abortion has any medical benefits. (*See NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 2–3; *Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2] at 2.) Plaintiffs have not, however, argued that the procedure lacks medical benefits from a scientific perspective; the court understands the amended HCRCA to require discussion only of these latter benefits.

[18]    *Amici* report that CPCs "invent or exaggerate health risks of abortion." (Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 9.)

[19]    The *NIFLA* Plaintiffs urge that no standard of care requires providers to discuss the benefits of all treatment options with their patients. (*See NIFLA* Pls.' Reply [163] at 5–6.) In support, they point to the fact that exemptions like the ones recognized in the HCRCA have been

of Medical Ethics Opinion 2.1.1, Ex. 1 to DSF (noting that a physician should discuss, among other things, "[t]he burdens, risks, and *expected benefits of all options*") (emphasis added).)

Both sets of Plaintiffs insist that this requirement is not tied to informed consent because CPCs do not actually perform abortions. (*See NIFLA* Pls.' Reply [163] at 4–5; *Schroeder* Pls.' Reply [145] at 5–6.) This argument is unconvincing in light of Supreme Court precedent. The informed consent law upheld in *Casey* went far beyond information tied to a procedure that the physician was actually performing; instead, the Pennsylvania law required physicians to discuss the risks of childbirth as well as the availability of information about medical assistance for childbirth, child support from the father, and adoption services. *Casey*, 505 U.S. at 881. If, as Plaintiffs insist, doctors can be required to obtain informed consent only for procedures they actually perform, how could abortion providers be compelled to speak about such topics as paternal child support and adoption services? *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 579 n.8 (5th Cir. 2012) ("Another perspective on this point is to note that under *Casey* and *Gonzales* [*v. Carhart*, 550 U.S. 124 (2007)]*,* what Appellees think is medically necessary does not cabin, under the state's legitimate power, the regulation of medicine, as *Casey* holds."). Mandating the provision of such additional information "is a reasonable measure to ensure an informed choice," *id.* at 883, just like the benefits-discussion requirement. Indeed, it is apparent that a patient would consider the alternatives of pregnancy and childbirth, on the one hand, and termination by way of abortion, on the other, together. Neither decision is likely made in isolation—that is, whether to carry a child to term depends not simply on weighing the costs and benefits of childbirth but considering them in comparison to the

---

in existence for decades and that certain regulations governing the profession postdate the Act. (*Id.*) But the issue is not what standard has been applied to those who have been shielded by the protections of the HCRCA; rather, because Defendant argues that the amendments to that Act were aimed at conforming the standard governing conscience objectors to that regulating everyone else, what matters is the standard of care that governs providers who do not have conscience objections. As further discussed below, the court concludes it cannot decide that issue without the benefit of expert discovery.

Supp.A21

costs and benefits of terminating the pregnancy. Underscoring this point is an analogy offered in the *Casey* joint opinion: "We would think it constitutional for the State to require that in order for there to be informed consent to a kidney transplant operation the recipient must be supplied with information about risks to the donor as well as risks to himself or herself." *Id.* at 882–83. In this analogy, a doctor can be required to inform a patient about a procedure she will not undergo and that the physician may not even be the one performing because the decision to receive a kidney transplant may be informed by "consequences that have no direct relation to her health." *Id.* at 882. Ultimately, the court reads *Casey* and *NIFLA* as permitting the state to require CPCs to obtain informed consent in the course of their practice of counseling women to proceed with pregnancy and carry the child to term.

There is disagreement among courts regarding the level of scrutiny to be applied to informed-consent laws, and *NIFLA* did not address whether rational basis or intermediate scrutiny was required.[20] Notably, *Casey* did not identify the appropriate level of scrutiny for the First Amendment challenge, and numerous courts of appeal have therefore upheld informed-consent laws without applying heightened scrutiny. *See EMW*, 920 F.3d at 424 ("[E]ven though an abortion-informed-consent law compels a doctor's disclosure of certain information, it should be upheld so long as the disclosure is truthful, non-misleading, and relevant to an abortion."); *Lakey*, 667 F.3d at 575 ("The [*Casey*] plurality response to the compelled speech claim is clearly not a strict scrutiny analysis. It inquires into neither compelling interests nor narrow tailoring. The three sentences with which the Court disposed of the First Amendment claims are, if anything, the antithesis of strict scrutiny."); *Planned Parenthood of Minn., N.D. & S.D. v. Rounds*, 530 F.3d 724, 734–35 (8th Cir. 2008) (en banc) (noting that the plaintiff could not succeed in its First Amendment claim "unless it can show that the [required] disclosure is either untruthful, misleading, or not relevant to the patient's decision to have an abortion"). *But see Stuart v. Camnitz*, 774 F.3d 238,

---

[20]     The Seventh Circuit does not appear to have addressed this issue either.

250–55 (4th Cir. 2014) (applying intermediate scrutiny). Incidental regulations of speech, however, are usually subject to intermediate scrutiny. *See, e.g., Tagami v. City of Chi.*, 875 F.3d 375, 378–79 (7th Cir. 2017) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)) (explaining that "incidental limitations on First Amendment freedoms" are reviewed under intermediate scrutiny).

The court need not decide which standard applies here because it would deny summary judgment on this issue even if the benefits-discussion requirement is subject to intermediate scrutiny. Intermediate scrutiny asks whether the regulation (1) "promotes a substantial government interest that would be achieved less effectively absent the regulation" and (2) "does not 'burden substantially more speech than is necessary to further' that interest." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 213–14 (1997) ("*Turner II*") (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994) ("*Turner I*")). Defendant contends that the benefits-discussion component of the amended HCRCA advances the state's interest in ensuring that patients have all relevant information needed to give informed consent. (*See* Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 18–19.) The law ensures that physicians who have conscience objections will provide information concerning the benefits of abortion to patients with high-risk pregnancies and to other women who might value that option. Both Plaintiffs insist that the state has no substantial interest in requiring the mandated disclosures because there is no evidence that CPCs' failure to inform women of the benefits of abortion has created any problems for the state. (*See NIFLA* Pls.' Reply [163] at 11–12; *Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2] at 10.) But "[t]here can be no doubt," the Supreme Court has said, that "the government 'has an interest in protecting the integrity and ethics of the medical profession.'" *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (quoting *Wash. v. Glucksberg*, 521 U.S. 702, 731 (1997)) (citing *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954) (noting that a state has "a legitimate concern for maintaining high standards of professional conduct")). The record supports an inference that CPCs use potentially deceptive tactics to lure women into their facilities by, for example, placing

Supp.A23

ads on Google for women searching for information about abortion (*see* Ex. 8 to DSF; Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 8), by not disclosing to potential patients that one of their goals is to discourage women from getting an abortion (*see, e.g.,* Vivian Maly Dep., Ex. 15 to DSF, at 75:1–23), and by using particular talking points and offering special services to "abortion-minded" women (*see, e.g.,* Options Now Telephone Talking Points, Ex. 34 to DSF; Mosaic Telephone Talking Points, Ex. 46 to DSF). There is also evidence that once in the door, pregnant women are given misleading information about abortion. (Br. of *Amici Curiae* Am. Coll. of Obstetricians & Gynecologists, Ill. Acad. of Family Physicians, *et al.*, in Opp'n to *NIFLA* Pls.' Mots. for Summ. J. [157] at 8–9 (noting that CPCs use misleading information, provide emotionally manipulative counseling, and exaggerate the medical risks of abortion).) At a minimum, the court is unwilling to conclude that Defendant has not met his burden of demonstrating that the law promotes a substantial interest until Defendant has been given an opportunity to complete the requested expert discovery. (*See NIFLA* June 4, 2019 Min. Order [130] (denying request for expert discovery); *Schroeder* June 4, 2019 Min. Order [108] (same).)

As for whether the benefits-discussion requirement burdens more speech than necessary, an important issue of fact remains. Defendant argues that the rule meets this standard because it mandates only that healthcare professionals having conscience objections provide the same information that others in their field without such objections must already provide under the standard of care. (*See* Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 22.) As already noted, there is some basis in the record for a finding that professional obligations do require physicians to discuss the benefits of all treatment options.[21] (*See, e.g.,* AMA Code of Medical Ethics Opinion

---

[21]     The *NIFLA* Plaintiffs point out that the Illinois State Medical Society has said that the "current common law requirement" is that "legal treatment options be mentioned to the patient, but health care professionals should not be required to recommend that patients undergo treatment to which they have a conscientious objection." (Ex. E to NPSF.) It is not clear, however,

2.1.1, Ex. 1 to DSF (noting that a physician should discuss, among other things, "[t]he burdens, risks, and *expected benefits of all options*") (emphasis added).) Defendant will need expert discovery for this issue, which is required in Illinois to establish professional standards of care.[22] *See Jones v. Chi. HMO Ltd.*, 191 Ill. 2d 278, 295–96, 730 N.E.2d 1119, 1130 (Ill. 2000). If Defendant's contention about the standard of care proves true, then Plaintiffs are incorrect in asserting that the amended HCRCA is underinclusive because it applies only to conscience objectors. (*See NIFLA* Pls.' Reply [163] at 12; *Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2] at 10.) That is, this requirement of discussing the benefits of all treatment options would apply to all providers of similar services, unlike the law in *NIFLA*. The *Schroeder* Plaintiffs also contend that the law is overinclusive because it requires conscience objectors to discuss the benefits of treatments that the CPCs' patients may not actually want. (*See Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2] at 12–13.) If the state's substantial interest is in ensuring that all patients be provided with all information necessary to give informed consent, then the requirement is likely not overinclusive. Finally, the court is not persuaded that a public awareness campaign could be a replacement for the benefits-discussion requirement. (*NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 10 (suggesting that a public awareness campaign is a less restrictive means for the State to present its message).) While the California law in *NIFLA* mandated that licensed clinics advertise government services, this aspect of the amended HCRCA applies to every procedure for which a physician may have a conscience objection and requires information that is patient-specific. The risks and benefits of an abortion will vary depending on individual medical and personal circumstances. A public awareness campaign covering such information would have little practical utility.

---

that discussing the benefits of a procedure is tantamount to recommending it. Regardless, this statement underscores that the applicable standard of care is a fact in dispute.

[22] The court previously declined Defendant's request to depose experts until after the court issued an order on Plaintiffs' summary judgment motions. (*See NIFLA* June 4, 2019 Min. Order [130]; *Schroeder* June 4, 2019 Min. Order [108].)

2.        Refer, Transfer, or Provide Information Requirement

The analysis is much the same with respect to the second challenged aspect of the amended HCRCA: that providers with conscience objections to a particular treatment, upon a patient's request, refer the patient to, transfer the patient to, or provide in writing information about other providers who they reasonably believe may offer that treatment.  745 ILCS 70/6.1(3).  This aspect of the HCRCA is not squarely an informed consent requirement like the one discussed above because it concerns more than the provision of information about a procedure.  *See Xeniotis v. Cynthia Satko, D.D.S, M.S., P.C.*, 2014 IL App (1st) 131068, ¶ 54, 14 N.E.3d 1207, 1213 (1st Dist. 2015) (discussing the elements of a malpractice action based on the doctrine of informed consent).  Section 6.1(3) of the amended HCRCA nonetheless bears striking similarities to the law at issue in *Casey*, 505 U.S. at 881, which, as noted above, compelled abortion providers to make available information about adoption agencies and other alternatives to abortion.  In fact, while the law in *Casey*, 505 U.S. at 882, required doctors to disclose to a patient information that the joint opinion noted "has no direct relation to her health," § 6.1(3) enables a patient to receive requested services or information about services that are directly tied to her health.  Furthermore, this requirement is unlike the licensed-facility notice requirement in *NIFLA*, 138 S. Ct. at 2369, which compelled certain clinics to advertise the availability of government services to *all* patients, whether appropriate for or desired by any of them.

This part of the amended HCRCA is a rule governing the conduct of those working in a regulated profession, akin to preexisting requirements like the obligation, imposed by the pre-2017 version of HRCA, that conscience objectors provide treatment in emergency situations.  *See* 745 ILCS 70/6.  The court acknowledges that "drawing the line between speech and conduct can be difficult," *NIFLA*, 138 S. Ct. at 2373, and that a doctor's refusal to provide information about abortion providers, as in this case, or to provide an ultrasound to a patient seeking an abortion, as in other cases, *e.g., EMW*,  902 F.3d at 424, may be expressive conduct.  But in such cases, "the physician's First Amendment rights not to speak are implicated, but only as part of the

**Supp.A26**

practice of medicine, subject to reasonable licensing and regulation by the State." *Casey*, 505 U.S. at 884 (citation omitted).

There are remaining issues of fact that prevent the court from determining whether the law satisfies intermediate scrutiny (assuming, without yet deciding, whether that standard applies). As previously noted, that standard calls for consideration of whether the law promotes a substantial government interest and does not burden substantially more speech than necessary. *Turner II*, 520 U.S. at 213–14. Defendant has identified one interest served by this provision: ensuring that patients have access to the safe and legal treatments that they have chosen to undergo. (*See* Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 18.) The Supreme Court has, in another context, "recognize[d] that the 'State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient.'" *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) (quoting *Roe v. Wade*, 410 U.S. 113, 150 (1973)). Ensuring that women who want abortions have easier and earlier access to providers furthers such an interest. In addition, as examples of the problem to be remedied, Defendant points to the neurologist who refused to clear his patient for an abortion and the counselor who rejected his patient's request to be referred to another provider who could help the patient cope with his sexual orientation. (Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 19.) The testimony provided by a supporter of the amendments about the difficulties she encountered at a Catholic hospital when she needed to terminate her pregnancy likewise provides support for Defendant's contention that the law is aimed at a real problem for patients in the state. (*See* Ex. 13 to Def.'s Resp. to *NIFLA* Pls.' Statement of Facts [144-13] at 13–16.). True, as Plaintiffs note, these are just a few examples (which have not been substantiated) and none relates exactly to CPCs or the services they provide. But § 6.1(3) would seem to mitigate the concerns, noted above, that CPCs use potentially misleading tactics to bring women into their facilities and then provide them with misleading information about abortion.

The court is also not convinced that § 6.1(3) burdens substantially more speech than necessary. First, there is some question about the extent to which this requirement actually burdens Plaintiffs. As discussed above, CPCs will refer patients to see their own Ob/Gyn or primary care provider without necessarily knowing who that doctor is or what treatments that doctor provides. And Dr. Schroeder testified that an abortion is necessary for a tubal pregnancy[23] and will make referrals for patients with such high-risk pregnancies without inquiring into whether the providers or hospitals perform abortions. (Dr. Schroeder Dep., Ex. 12 to DSF, at 87:6–10.) Likewise, Informed Choices, one of the *NIFLA* Plaintiffs, tells women with suspected tubal pregnancies to go to their Ob/Gyn or the Emergency Room and that terminating the pregnancy is typically necessary to protect their lives. (*See* Ectopic Precautions, Ex. 20 to DSF at NIFLA00026 ("An unborn baby cannot survive outside the womb, and cannot be put back inside it. To protect the woman's life, the baby, afterbirth, and perhaps the tube are taken out.").)

Second, as with the benefits-discussion requirement, the court cannot determine whether § 6.1(3) is underinclusive without expert discovery. In particular, if doctors who do not perform certain procedures for reasons other than conscience objections are, as Defendant asserts, already subject to a similar requirement to make referrals or provide information about providers to patients upon request, then this amendment to the HCRCA likely is not underinclusive. In any event, application of the law's mandate only to conscience objectors may be justified if conscience objectors are the only or the primary medical providers whose practices generate the concern addressed by that mandate. *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion) ("We do not, however, agree that the failure to regulate all speech renders the statute fatally underinclusive. . . . States adopt laws to address the problems that confront them. The First

---

[23]    The *Schroeder* Plaintiffs argued that Dr. Schroeder does not believe that removal of an ectopic pregnancy is an abortion. (*See Schroeder* Pls.' Resp. to DSF [144] ¶ 30.) In reality, although he initially denied that he would consider it an abortion, Dr. Schroeder subsequently acknowledged that removal of an ectopic pregnancy "would be an abortion because you're terminating pregnancy." (Dr. Schroeder Dep., Ex. 9 to *Schroeder* Pls.' Resp. to DSF [144], at 107:11–19.)

Amendment does not require States to regulate for problems that do not exist."). Defendant has not put forth sufficient evidence to support a conclusion on this issue.

Next, as with the benefits-discussion requirement, the court is not persuaded that a public awareness campaign could be an effective replacement for § 6.1(3). This aspect of the amended HCRCA applies only for patients who make a request. And a public campaign is unlikely to be able to provide the patient-specific or local information that providers would be better positioned to provide.

Finally, Plaintiffs insist that § 6.1(3) is not necessary in light of the availability of information over the Internet. (*Schroeder* Pls.' Mot. for Partial Summ. J. [67] at 9.) Again, the court is less certain, even if it were true that all pregnant women have ready and convenient access to the Internet. Like a public awareness campaign, it is far from clear that Internet searches can provide the particular information that a medical professional can. Nor is the Internet always a reliable source of accurate information. Indeed, the notion that the Internet can serve this purpose is arguably undermined by evidence indicating that some CPCs' ads appear in Google searches related to abortion. And for at least some CPCs, the overwhelming majority of their pregnant patients are considering abortion (*see* Sarah Vanderlip Dep., Ex. 19 to DSF, at 70:6–20), which may support an inference that women are visiting such facilities without necessarily being aware of the nature of the services they provide or their mission of discouraging abortions. That the CPCs' clientele consists of persons considering abortion also suggests that the information available over the Internet may not be detailed or comprehensive enough to advance the state's interest in ensuring that pregnant women have access to legal procedures.

### B.    Speaker or Viewpoint-Based Regulation

Plaintiffs also challenge the amended HCRCA as a regulation that targets particular speakers or viewpoints. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (citation omitted) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions

Supp.A29

distinguishing among different speakers, allowing speech by some but not others."). But any regulation of professional conduct that incidentally burdens speech will necessarily be speaker-based—and viewpoint-based, in many cases—because it affects only those operating within the regulated profession. It is indeed doubtful whether the court needs to consider this issue at all. *Casey* and subsequent cases like *EMW*, of course, upheld laws targeting the speech of only abortion providers. And no constitutional infirmity was found for such laws despite the fact that they compelled doctors who perform abortions to convey information that may conflict with their own ideology. *See Lakey*, 667 F.3d at 576 (quoting *Casey*, 505 U.S. at 871) (reasoning that laws requiring "truthful, nonmisleading, and relevant disclosures" "do not fall under the rubric of compelling 'ideological' speech that triggers First Amendment strict scrutiny" and that such disclosures "may entail not only the physical and psychological risks to the expectant mother facing this 'difficult moral decision,' but also the state's legitimate interests in 'protecting the potential life within her'"); *compare Rounds*, 530 F.3d at 735 (upholding a law requiring abortion providers to instruct women that "the abortion will terminate the life of a whole, separate, unique, living human being"), *with Roe v. Wade*, 410 U.S. 113, 160 (1973) (discussing "the wide divergence of thinking on this most sensitive and difficult question"). In fact, in comparison to these other laws, the amended HCRCA is on firm constitutional ground. The Sixth Circuit upheld an abortion-specific informed consent and mandatory ultrasound law that may have been designed to discourage abortion. *See EMW*, 920 F.3d at 446 (emphasis added) ("As a First Amendment matter, there is nothing suspect with a State's requiring a doctor, before performing an abortion, to make truthful, non-misleading factual disclosures, relevant to informed consent, even if those disclosures relate to unborn life and *have the effect of persuading the patient not to have an abortio*n."); *see also Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 988 (7th Cir. 2012) ("[T]he government need not be neutral between abortion providers and other medical providers . . . ."). The law at issue in this case instead requires only an even hand: Plaintiffs are required to discuss the benefits of abortion just as

**Supp.A30**

abortion providers are apparently required to discuss its risks. (AMA Code of Medical Ethics Opinion 2.1.1, Ex. 1 to DSF (a physician should discuss "[t]he burdens, risks, and expected benefits of all options").) *See NIFLA*, 138 S. Ct. at 2838 (Breyer, J., dissenting) (quoting *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016)) ("[T]he rule of law embodies evenhandedness, and 'what is sauce for the goose is normally sauce for the gander.'"); *cf. McCullen v. Coakley*, 573 U.S. 464, 497 (Scalia, J., concurring in judgment) (criticizing the majority for creating "an entirely separate, abridged edition of the First Amendment applicable to speech against abortion").

In addition, the amended HCRCA—broader than abortion-specific informed consent laws or mandatory ultrasound laws—is not aimed solely at professionals who perform certain operations or work in a particular field of medicine. *See McCullen*, 573 U.S. at 481 ("The broad reach of a statute can help confirm that it was not enacted to burden a narrower category of disfavored speech."). This distinguishes the law at issue here with that in *NIFLA*, where four justices in a concurrence wrote that it "appear[ed] that viewpoint discrimination is inherent in the design and structure" of the notice requirements because their underinclusiveness indicated that the statute targeted pro-life CPCs. *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring). True, the challenged law here applies only to conscience objectors, but any change to the HCRCA would affect only conscience objectors because the HCRCA grants protections only to conscience objectors. And the amendments were aimed at rectifying problems created by the breadth of immunity given to conscience objectors. *Cf. McCullen*, 573 U.S. at 481 (concluding that a law banning certain conduct in front of abortion clinics was content neutral because the state acted "in response to a problem that was, in its experience, limited to abortion clinics"); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) ("When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists."). Finally, without expert discovery on the standard of care, it is not yet clear that the amended HCRCA requires Plaintiffs to engage in any speech or conduct

**Supp.A31**

that other medical professionals without conscience objections are not also already obligated to engage in. Considering the statutory amendment in isolation of the state's other standards governing the medical profession would unreasonably promote form over substance.

* * *

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner I*, 512 U.S. at 641. The court is mindful that from Plaintiffs' perspective, the law compels speech on a message antithetical to their beliefs and thereby contradicts this Free Speech principle. But the court too recognizes that Plaintiffs' patients are no less deserving of this right to decide for themselves what ideas are worth considering and adhering to, and the state may be well within its powers to protect this principle in a context involving "matters of the highest privacy and the most personal nature." *Casey*, 505 U.S. at 915 (Stevens, J., concurring in part and dissenting part).

For the reasons discussed above, Plaintiffs' motions for summary judgment on their Free Speech claims are denied.

### C. Facial Challenge

As a final defense to Plaintiffs' Free Speech claim, Defendant asserts that Plaintiffs have waived any facial challenge to the amended HCRCA. (*See* Def.'s Resp. to Pls' Mots. for Summ. J. [145] at 26.) Typically when a law is subject to facial challenge, the court considers whether there are any circumstances in which the law is valid or if, instead, the law lacks any plainly legitimate sweep. *United States v. Stevens*, 559 U.S. 460, 472 (2010). "In the First Amendment context, however, this Court recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 473 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). An as-applied challenge, in contrast, asserts that "an act is unconstitutional as applied to a plaintiff's specific activities even

though it may be capable of valid application to others."  *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011).

Defendant is right that Plaintiffs' challenge to the HCRCA amendments appears more like an as-applied than a facial challenge.  The arguments presented in their summary judgment briefs concern the law's application to CPCs and their personnel; neither set of Plaintiffs has identified a non-CPC context in which the law's enforcement would be unconstitutional.  The *Schroeder* Plaintiffs do also contend that the law is overbroad, and overbreadth is a facial attack in the First Amendment context.  (*Schroeder* Pls.' Reply [145] at 14.)  But their overbreadth argument appears to be simply that the law is overbroad because it applies to them (*see id.*), whereas an overbreadth challenge ordinarily asserts that the law might chill the speech of third parties not before the court.  *See Schultz v. City of Cumberland*, 228 F.3d 831, 848 (7th Cir. 2000) ("To avoid chilling the speech of third parties who may be unwilling or unlikely to raise a challenge in their own stead, the overbreadth doctrine in certain circumstances permits litigants already before the court to challenge a regulation on its face and raise the rights of third parties whose protected expression is prohibited or substantially burdened by the regulation.").

That said, the line between a facial challenge and an as-applied challenge is not a bright one.  *See Citizens United*, 558 U.S. at 331 (noting that "the distinction between facial and as-applied challenges is not so well defined"); *United States v. Tollefson*, 367 F. Supp. 3d 865, 872 (E.D. Wis. 2019) ("Despite these varying standards, facial and as-applied challenges can overlap conceptually.").  What matters is not the label but the relief sought.  *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).  In this case, the *NIFLA* Plaintiffs have requested not only an injunction against enforcement of the HCRCA's amendments against Plaintiffs themselves, but also a declaratory judgment that the law is unconstitutional, relief that would reach beyond their particular circumstances.  (*NIFLA* Pls.' Compl. [1] at 31–32.)  And though the *Schroeder* Plaintiffs appear to seek relief specific only to them (*see Schroeder* Pls.' Compl. [1] at 24–25), portions of their complaint also relate to the amended HCRCA's application beyond themselves (*see, e.g.,*

33

**Supp.A33**

*id.* ¶¶ 57, 80–82).  The court therefore declines to hold that Plaintiffs' facial challenges are waived.  *Cf. Citizens United*, 558 U.S. at 330 (expressing skepticism whether, on appeal, "a party could somehow waive a facial challenge while preserving an as-applied challenge").

## II.   Free Exercise Claims

The court now turns to Plaintiffs' claim that the amended HCRCA violates the Free Exercise Clause of the First Amendment.[24]  "[T]he right of free exercise," the Supreme Court explained in *Employment Division v. Smith*, "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'"[25]  494 U.S. 872, 879 (1990) (quoting *United States v. Lee,* 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)).  Such a neutral law of general applicability survives constitutional challenge as long as it is supported by some rational basis.  *Ill. Bible Colls. Ass'n v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017).  But a law that is not neutral or generally applicable will be subject to strict scrutiny.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).  Defendant contends that the challenged law is neutral and generally applicable, while Plaintiffs insist it is neither.  But underlying that dispute is the parties' disagreement—which was present though less apparent in the Free Speech analysis—about what law is the proper subject of analysis.  For Plaintiffs, the HCRCA amendments are the beginning and end of the court's inquiry; that is, if the changes to the Act adopted in 2016 are neither neutral nor generally applicable, then the amendments themselves should be subject to strict scrutiny.  For Defendant, in contrast, what matters is not

---

[24]     The *NIFLA* Plaintiffs initially asserted claims under the Illinois Religious Freedom Restoration Act, 775 ILCS 35/1 *et seq.*, and the free exercise guarantee in Article I § 3 of the Illinois Constitution.  (*NIFLA* Pls.' Compl. [1] ¶¶ 146–71.)  Those claims were withdrawn.  (*See* July 19, 2017 Order [65] at 3.)

[25]     Earlier this year, the Supreme Court granted a petition for certiorari in which one of the questions presented is "[w]hether *Employment Division v. Smith* should be revisited."  *See* Petition for a Writ of Certiorari, *Fulton v. City of Philadelphia*, No. 19-123 (U.S. July 22, 2019), *cert. granted*, 140 S. Ct. 1104 (2020).

Supp.A34

the amended HCRCA in isolation but its place in the state's larger framework governing medical professionals.

Defendant has the better argument. The HCRCA is an accommodation to healthcare providers who have conscience objections; it excuses them from complying with certain regulations and standards that govern the rest of the field. *Smith* concluded that the Free Exercise Clause does not require exemptions from neutral and generally applicable laws. 494 U.S. at 878–79 ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."). The Court has also upheld the denial of requested exemptions from a law's applicability even where there are other religious exemptions to that law. *See Lee*, 455 U.S. at 259–61 (rejecting a Free Exercise challenge to the lack of a religious exemption from Social Security taxes for employers even though Congress granted such an exemption for the self-employed). Plaintiffs here are not entitled to any religious accommodation and have cited no cases suggesting otherwise. The greater includes the lesser: just as the state need not grant any exemption at all, so it can limit the extent of any accommodation it does offer. Indeed, considering the Act in isolation, as Plaintiffs insist the court should, would mean that religious exemptions are a one-way ratchet: once extended, they could never be narrowed or abolished without violating the Free Exercise Clause because religious accommodations are, by their very nature, neither neutral nor generally applicable. *Cf. Employment Div. v. Smith*, 494 U.S. at 890 ("Values that are protected against government interference through enshrinement in the Bill of Rights are not thereby banished from the political process."). This could discourage the creation of new accommodations, lest governments fear that they will be powerless to update them in the face of new challenges.

The question then is (i) whether the regulatory framework from which the HCRCA exempts conscience objectors is a neutral and generally applicable law and, if so, (ii) whether the Act's amendments go no further than requiring conformity to that neutral and generally applicable law. There is no suggestion that the state's rules governing the medical profession, such as the

Medical Practice Act, 225 ILCS 60/1 *et seq.*, or the common-law standard of care, is anything other than a neutral and generally applicable law.  Nor is there any indication that the amended HCRCA mandates conscience objectors to engage in conduct more burdensome than that expected of medical professionals without such religiously motivated objections.  For example, there is some evidence that the standard of care requires doctors to discuss the benefits of all treatment options (*see* AMA Code of Medical Ethics Opinion 2.1.1, Ex. 1 to DSF), and that conscience objectors who decline to make referrals nevertheless "offer impartial guidance to patients about how to inform themselves regarding access to desired services"[26] (AMA Code of Medical Ethics Opinion 1.1.7, Ex. 2 to DSF).  And § 6.1's policy concerning the adoption of written access to care and information protocols applies to all health care facilities.  745 ILCS 70/6.1. These issues are not free from dispute, however, and as with respect to Plaintiffs' Free Speech challenges, the court concludes that expert discovery about the standard of care is necessary before the court can resolve this question.

Next, Plaintiffs correctly argue that satisfaction of the *Smith* test is not sufficient for determining whether a law is constitutional.  "Facial neutrality is not determinative. . . . Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.  The Free Exercise Clause protects against governmental hostility which is masked, as well as overt."  *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 534; *see also Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006) (emphasis added) (quoting *Jimmy Swaggart Ministries v. Bd. of Equal of Cal.,* 493 U.S. 378, 384– 85 (1990)) ("'[A] regulation neutral on its face may, *in its application*, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of

---

[26]     In fact, as *amici curiae* Physicians for Reproductive Health note, the requirement in § 6.1(3) of the amended HCRCA, which requires only that a conscience objector provide information about healthcare providers "who they may reasonably believe may offer" the objectionable service, may be even more permissive than the AMA standard.  (Br. of *Amici Curiae* Physicians for Reproductive Health in Opp'n to *NIFLA* Pls.' Mot. for Summ. J. [159] at 9.)

religion,' in which case there must be 'a compelling governmental interest justif[ying] the burden.'").[27] That is, the court must consider whether the HCRCA's amendments have some discriminatory purpose or regulate Plaintiffs' conduct because that conduct is religiously motivated. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017); *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 543 ("The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause."). Once again, the court recognizes that the amended Act applies only to those with religiously-motivated objections to certain treatments, but that would be true of any change ever made to a religious accommodation. If the law does no more than bring the regulations of conscience objectors into conformity with that of other medical professionals (again, still a disputed issue), then the amended HCRCA may not be characterized as discriminating against

---

[27]     As Plaintiffs and Defendant mention in their briefs, the *Vision Church* opinion stated that "the Free Exercise Clause and [Religious Land Use and Institutionalized Persons Act] provide that, if a facially-neutral law or land use regulation imposes a substantial burden on religion, it is subject to strict scrutiny." 468 F.3d at 996. This was cited in one subsequent Seventh Circuit opinion for the proposition that "our circuit precedent includes a subsequent step after the *Smith* test, namely to consider whether a law 'unduly burdens' the religious practice." *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 745 (7th Cir. 2015). That is, *Listecki* suggested that any law causing a substantial burden is subject to strict scrutiny even if it satisfies *Smith. See id.* at 745–50 (determining that the portion of the bankruptcy code at issue satisfied strict scrutiny). The Court of Appeals' more recent Free Exercise Clause cases have not included this second step after the *Smith* analysis. *See St. Augustine Sch. v. Evers*, 906 F.3d 591, 596 (7th Cir. 2018); *Ill. Bible Colls. Ass'n*, 870 F.3d at 639–41. Indeed, recent decisions from the Supreme Court make no reference to any such second step. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) (suggesting that laws imposing substantial burdens are constitutional if neutral and generally applicable by noting that "while those religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law"); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017) (observing that a "valid and neutral law of general applicability" is constitutional where it regulates "physical acts" and does not interfere with the "faith and mission of the church itself"). Recent opinions from courts in this district have likewise not applied this subsequent step after the *Smith* test. *See, e.g., Elim Romanian Pentecostal Church v. Pritzker*, No. 20 C 2782, 2020 WL 2468194, at *3–4 (N.D. Ill. May 13, 2020); *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374, at *7–8 (N.D. Ill. May 3, 2020).

**Supp.A37**

religious medical professionals. The law's text and history, discussed *supra* Part II, suggest instead that the legislature adopted the changes due to legitimate concerns about patient access to healthcare and not out of a desire to stifle religiously-motivated conduct. *See, e.g.,* 745 ILSC 70/3 ("It is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care."). Plaintiffs have identified nothing in the legislative record intimating that the legislature had illicit motives when it enacted the law. If anything, legislative history shows that the Act's amendments were written to minimize interference with religious teachings. (*See, e.g., Human Servs. Comm. Hearing* (statement of Lorie Chaiten), Ex. 13 to Def.'s Resp. to *NIFLA* Pls.' Statement of Facts [144-13] at 8:11–19 (noting that the bill was drafted through negotiations with Catholic organizations and such groups did not oppose the bill).)

Finally, "[n]eutral and generally applicable laws are still subject to strict scrutiny if (1) the government is allowed to make individualized exemptions from a general requirement, or (2) the claim is a hybrid-rights claim because it triggers additional constitutional rights." *Ill. Bible Colls. Ass'n*, 870 F.3d at 640. Plaintiffs here have not claimed that either exception applies, and the court agrees that neither appears applicable here. The first of these exceptions concerns a situation in which a neutral law of general application provides exemptions for nonreligious reasons but not for religious hardship. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 537–38. The parties here have identified no exemption from the regulatory framework governing medical professionals other than what is available to conscience objectors in the HCRCA. Plaintiffs also do not have a hybrid-rights claim, which originates in *dictum* in Justice Scalia's opinion in *Smith.* 494 U.S. at 881–82 ("The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections . . . ."). Plaintiffs assert that the amended HCRCA violates the Free Speech Clause, but they have not demonstrated any such violation or even shown that the law warrants anything more than rational basis review in that context as well. "[A] plaintiff

does not allege a hybrid rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right." *Ill. Bible Colls. Ass'n*, 870 F.3d at 641 (alteration in original) (quoting *Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 765 (7th Cir. 2003)).

The cases that Plaintiffs rely on in support of their Free Exercise claim are distinguishable. The *NIFLA* Plaintiffs cite *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012), for the proposition that some long-established historical religious practices may not be burdened even by a neutral and generally applicable law. (*NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 14.) But that case "concern[ed] government interference with an internal church decision that affects the faith and mission of the church itself," 564 U.S. at 190, whereas this one concerns the regulation of healthcare professionals in their medical practices. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017) (explaining that while *Hosanna-Tabor* dealt with regulation of internal church operations, *Smith* "concerned government regulation of physical acts"). The *NIFLA* Plaintiffs also point to language from *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018), where the Supreme Court said that "it can be assumed that a member of the clergy who objects to gay marriage on moral and religious grounds could not be compelled to perform the ceremony without denial of his or her right to the free exercise of religion." But this provides no support for Plaintiffs' claim. In that same paragraph, the Court also explained that "if that exception were not confined, then a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations." *Id.* There is no equivalence between compelling a member of the clergy to perform a same-sex marriage ceremony and requiring that medical professionals abide by the regulations and standards governing their chosen field. As the *Masterpiece Cakeshop* Court put it, "while [ ] religious and philosophical objections are protected, it is a general rule that such

objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Id.* The *NIFLA* Plaintiffs also cite *Sherbert v. Verner*, 374 U.S. 398, 404 (1963), where the Court said that it is unconstitutional for the government to force one "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." But, of course, the Court repudiated *Sherbert* in *Smith*. *See Holt v. Hobbs*, 574 U.S. 352, 357 (2015).

* * *

Based on the record before the court, Plaintiffs have not shown that the amended HCRCA should be subject to strict scrutiny for burdening their free exercise rights. Because Plaintiffs have identified no reason that the law lacks a rational basis, the court denies their motions for summary judgment on their Free Exercise claim.

### III. Unconstitutional Conditions

Finally, both sets of Plaintiffs have argued at times that the HCRCA amendments impose an unconstitutional condition on them because, in their view, they can receive the Act's protections only on the condition that they engage in conduct contrary to their Free Speech and Free Exercise rights. (*NIFLA* Pls.' Mem. in Supp. of Summ. J. [91] at 13; *Schroeder* Pls.' Mem. in Supp. of Partial Summ. J. [67-2] at 15.) "The 'unconstitutional conditions' doctrine is premised on the notion that what a government cannot compel, it should not be able to coerce." *Planned Parenthood of Ind.*, 699 F.3d at 986 (quoting *Libertarian Party of Ind. v. Packard,* 741 F.2d 981, 988 (7th Cir.1984)). The parties' filings largely failed to distinguish Plaintiffs' claims that the amended HCRCA directly compels them to violate their First Amendment rights from Plaintiffs' claims that the amendments coerce them to give up their constitutional rights by leveraging the Act's protections for conscience objectors. The court has denied summary judgment on Plaintiffs' direct Free Speech and Free Exercise claims, finding that at the very least, there are remaining

**Supp.A40**

disputes of material fact that prevent the court from holding that Plaintiffs' First Amendment rights have been infringed. Denial of summary judgment is appropriate for any unconstitutional conditions claim they assert as well. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59–60 (2006) ("It is clear that a funding condition cannot be unconstitutional if it could be constitutionally imposed directly."). Because Plaintiffs have not succeeded in demonstrating that the challenged sections of the HCRCA are unconstitutional as applied directly to them, they have necessarily also failed to show that the law's conditional protections are an unconstitutional condition. *Planned Parenthood of Ind.*, 699 F.3d at 986 ("Understood at its most basic level, the doctrine aims to prevent the government from achieving indirectly what the Constitution prevents it from achieving directly.").

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motions for summary judgment (*NIFLA* Mot. for Summ. J. [90]; *Schroeder* Mot. for Partial Summ. J. [67]) are denied.

ENTER:

Dated: September 3, 2020

_____
REBECCA R. PALLMEYER
United States District Judge

41

**Supp.A41**

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on October 27, 2025, I electronically filed the foregoing Combined Principal and Response Brief and Supplemental Appendix of Defendant-Appellee/Cross-Appellant with the Clerk of United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

I further certify that the other participants in this appeal, named below, are CM/ECF users, and thus will be served via the CM/ECF system.

Erik Baptist
ebaptist@adflegal.org

James A. Campbell
jcampbell@adflegal.org

Erin Morrow Hawley
ehawley@adflegal.org

Thomas Gerald Olp
tolp@thomasmoresociety.org

Kevin Theriot
ktheriot@adflegal.org

Julia Catherine Koon
jkoon@adflegal.org

/s/ Leigh J. Jahnig
LEIGH J. JAHNIG
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 793-1473 (office)
(773) 590-7877 (cell)
Leigh.Jahnig@ilag.gov